Exhibit A

SUM-100

# SUMMONS
## *(CITACION JUDICIAL)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
CONDÉ NAST DIGITAL,

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
AARON DEIVAPRAKASH, individually and on behalf of all other persons similarly situated

| *FOR COURT USE ONLY*<br>*(SOLO PARA USO DE LA CORTE)* |
|---|
| **ELECTRONICALLY FILED**<br>Superior Court of California<br>County of Alameda<br>03/07/2025<br>Chad Finke, Executive Officer / Clerk of the Court<br>By: _____ Chan Huang _____ Deputy |

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | CASE NUMBER:<br>*(Número del Caso:)* |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* Superior Court of California,<br><br>County of Alameda, 1225 Fallon Street, Oakland, CA 94612 | 25CV115106 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Emily A. Horne, Bursor & Fisher, P.A., 1990 N. California Blvd., 9th Floor, Walnut Creek, CA, Tel. (925) 300-4455

| DATE: 03/07/2025<br>*(Fecha)* | Clerk, by Chad Finke, Executive Officer / Clerk of the Court<br>*(Secretario)* Chan Huang | , Deputy<br>*(Adjunto)* |
|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*



[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):* Condé Nast Digital

under: ☒ CCP 416.10 (corporation)   ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership)   ☐ CCP 416.90 (authorized person)
☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

**Page 1 of 1**

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465<br>*www.courts.ca.gov* |
|---|---|---|

**For your protection and privacy, please press the Clear This Form button after you have printed the form.**

[ Print this form ]   [ Save this form ]   [ Clear this form ]

ELECTRONICALLY FILED
Superior Court of California,
County of Alameda
03/07/2025 at 04:14:45 PM
By: Chan Huang,
Deputy Clerk

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Emily A. Horne (State Bar No. 347723)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
            ehorne@bursor.com

*Attorneys for Plaintiff*

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF ALAMEDA

| | |
|---|---|
| AARON DEIVAPRAKASH, individually and on behalf of all other persons similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CONDÉ NAST DIGITAL,<br><br>Defendant. | Case No. 25CV115106<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

1

## <u>TABLE OF CONTENTS</u>

**PAGE**

NATURE OF THE ACTION ........................................................................................3

THE PARTIES ...........................................................................................................4

JURISDICTION AND VENUE ..................................................................................4

FACTUAL ALLEGATIONS ......................................................................................6

I.      THE CALIFORNIA INVASION OF PRIVACY ACT ...................................6

II.     DEFENANT VIOLATES THE CIPA ...........................................................8

        A.      The Mechanics And Privacy Implications Of IP Addresses ...................9

                1.      Differentiating Between A Public Versus Private IP Address ...............9

                2.      Privacy Implications Of Public IP Addresses ...........................12

        B.      The Trackers Are "Pen Registers" ...........................................15

                1.      The PubMatic Tracker On Both Websites.......................................17

                2.      The Audiencerate Tracker On The Wired Website ..................25

                3.      The AGKN Tracker On The Wired Website..............................28

III.    DEFENDANT'S CONDUCT CONSTITUTES AN INVASION OF PLAINTIFF'S AND CLASS MEMBERS' PRIVACY ........................................................31

        A.      Data Brokers and Real-Time Bidding: The Information Economy .........32

                1.      Data Brokers ...........................................................................32

                2.      Real-Time Bidding ..................................................................36

                3.      Cookie Syncing ......................................................................41

        B.      Defendant Uses The PubMatic Tracker For Identity Resolution, Targeted Advertising, And Data Monetization ........................................................44

        C.      Defendant Uses The Audiencerate Tracker For Identity Resolution, Targeted Advertising, And Data Monetization ........................................................47

        D.      Defendant Uses The AGKN Tracker For Identity Resolution, Targeted Advertising, And Data Monetization ........................................................49

IV.     PLAINTIFF'S EXPERIENCE ........................................................................51

CLASS ALLEGATIONS...........................................................................................52

CAUSES OF ACTION...............................................................................................54

PRAYER FOR RELIEF.............................................................................................55

JURY DEMAND........................................................................................................56

Plaintiff Aaron Deivaprakash ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      Defendant Condé Nast Digital ("Defendant") owns and operates the websites newyorker.com (the "New Yorker Website") and wired.com (the "Wired Website") (collectively, the "Websites").

2.      When users visit the Website, causes three Trackers—the DoubleClick Tracker, Audiencerate Tracker, and AGKN Tracker (collectively, the "Trackers")—to be installed on the Website visitors' internet browsers.  The Trackers are operated by separate and distinct third parties: Google, Audiencerate, and AGKN, respectively (the "Third Parties').  Through these Trackers, each of the Third Parties collect Website users' internet protocol ("IP") addresses and other device identifier information such as device type, and browser type ("Device Metadata").  The Third Party Trackers also set a cookie that includes a unique user identifier, which the Trackers collect on subsequent visits and which is used by the Third Parties to identify and de-anonymize the user.

3.      Defendant and these Third Parties use the data collected by the Trackers to identify and de-anonymize users, hyper-target advertisements to users, and to enrich themselves.

4.      Because the Trackers capture Website visitors' "routing, addressing, or signaling information," the Trackers constitute a "pen register" under Section 638.50(b) of the California Invasion of Privacy Act ("CIPA").  (Cal. Penal Code § 638.50(b).)

5.      By installing and using the Trackers without Plaintiff's prior consent and without a court order, Defendant violated CIPA § 638.51(a).

6.      The allegations here are made more invasive by the entities operating the Trackers and collecting Plaintiff's and Class Members' IP Addresses and Device Metadata.  All three Third Parties are registered data brokers in California who focus on identifying and de-anonymizing users through identity resolution services.  The purpose of this is to enrich the value of Defendant's

Website users by linking those users' IP addresses and Device Metadata to profiles that contain as much personal and demographic information as possible. Users are then offered up for sale with all this collated information to interested advertisers through platforms like PubMatic's. Advertisers can then better target Website users based on these attributes and will therefore pay Defendant more to show advertisements to Defendant's users. And the Third Parties share all this data between each other and with various other entities through a process called "cookie syncing," meaning Plaintiff's and Class Member's information winds up in the hands of untold numbers of third parties without consent. All of this enriches Defendant through advertising revenue, makes the Third Parties' services (*i.e.*, their Trackers) more valuable to Defendant and other customers, and strips Plaintiff and Class Members of their anonymity and privacy in the process.

7.    Plaintiff brings this action to prevent Defendant from further violating the privacy rights of California residents, and to recover statutory damages for Defendant's violation of CIPA § 638.51.

## THE PARTIES

8.    Plaintiff Deivaprakash resides in Dublin, California and has an intent to remain there, and is therefore a citizen of California. Plaintiff Deivaprakash was in California when he visited the Website.

9.    Defendant Condé Nast Digital is a New York corporation with its principal place of business in New York, New York.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over this action pursuant to Article VI, section 10 of the California Constitution and California Code of Civil Procedure § 382.

11.    This Court has personal jurisdiction over Defendant. *First*, using the information collected by the Trackers (as alleged in more detail below), Defendant targets Californians with advertisements based in parr on their California residence. For instance, the PubMatic Tracker allows users to be targeted in geography-based campaigns. (See Figure 21, *infra*). The ability to use

IP addresses for "geomarketing" is also described in more detail below.  (See Factual Allegations § II.A.2, *infra*).

12.    Defendant also reaps substantial revenue by selling its California Website users to advertisers.  For instance, the traffic from Plaintiff's browser shows advertisers being willing to pay Defendant to show him and other users an advertisement at a rate of approximately $0.39 to approximately $2.14 per one thousand impressions:

**Figure 1:**



13.    "CPM (cost per mille) is a paid advertising option where companies pay a price for every 1,000 impressions an ad receives.  An 'impression' refers to when someone sees a campaign on social media, the search engines or another marketing platform."[1]

14.    Further, because an IP address identifies a user's approximate geographic location, Defendant knows that the users it is enabling to be sold by the Trackers are from California.

---

[1] https://sproutsocial.com/glossary/cpm/

15.     Thus, Defendant has purposefully availed itself of the California market by (i) knowingly offering up its California Website users for sale to advertisers, and (ii) deriving substantial revenue from the sale of California Website users to interested advertisers.

16.     *Second*, Plaintiff's claims relate to Defendant's contacts with California because it was in California that the Websites caused the Trackers to be installed on Plaintiff's browser, and it was in California that the Trackers instructed Plaintiff's browser to send his IP address, Device Metadata, and unique user IDs to the Third Parties to identify him and sell his information to advertisers.  (See *Popa v. Harriet Carter Gifts, Inc.* (3d Cir. 2022) 52 F.4th 121, 131.)

17.     *Finally*, it is reasonable to exercise jurisdiction over Defendant.  Indeed, Defendant maintains offices in both San Francisco and Los Angeles.[2]

18.     Venue is proper in this District because the conduct alleged in this Complaint occurred in this County.

**FACTUAL ALLEGATIONS**

**I.      THE CALIFORNIA INVASION OF PRIVACY ACT**

19.     The California Legislature enacted CIPA to protect certain privacy rights of California citizens.  The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."  (Cal. Penal Code § 630.)

20.     As relevant here, CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

21.     A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."  (Cal. Penal Code § 638.50(b).)

---

[2] *Global Offices*, CONDÉ Nast, https://www.condenast.com/contact

22.     A "trap and trace device" is a "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."  (Cal. Penal Code § 638.50(b).)

23.     In plain English, a "pen register" is a "device or process" that records *outgoing* information, while a "trap and trace device" is a "device or process" that records *incoming* information.

24.     Historically, law enforcement used "pen registers" to record the numbers of outgoing calls from a particular telephone line, while law enforcement used "trap and trace devices" to record the numbers of incoming calls to that particular telephone line.  As technology advanced, however, courts have expanded the application of these surveillance devices to Internet technologies.

25.     For example, if a user sends an email, a "pen register" might record the email address it was sent from, the email address the email was sent to, and the subject line—because this is the user's *outgoing* information.  On the other hand, if that same user receives an email, a "trap and trace device" might record the email address it was sent from, the email address it was sent to, and the subject line—because this is *incoming* information that is being sent to that same user.

26.     Although CIPA was enacted before the dawn of the Internet, "the California Supreme Court regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme."  (*In re Google Inc.* (N.D. Cal. Sep. 26, 2013) 2013 WL 5423918, at *21.

27.     Accordingly, courts have applied the CIPA to internet tracking technologies, including CIPA § 638.50 specifically.  See, e.g., *Shah v. Fandom, Inc* (N.D. Cal. Oct. 21, 2024) --- F. Supp. 3d ---, 2024 WL 4539577, at *21 [finding trackers similar to those at issue here were "pen registers" and noting "California courts do not read California statutes as limiting themselves to the traditional technologies or models in place at the time the statutes were enacted"]; *Mirmalek v. Los Angeles Times Communications LLC* (N.D. Cal. Dec. 12, 2024) 2024 WL 5102709, at *3-4 [same]; *Lesh v. Cable News Network, Inc.* (S.D.N.Y. Feb. 20, 2025) 2025 WL 563358, at *3-5 [same]; *Moody v. C2 Educ. Sys. Inc.* (C.D. Cal. 2024) 742 F. Supp. 3d 1072, 1076 ["Plaintiff's

allegations that the TikTok Software is embedded in the Website and collects information from visitors plausibly fall within the scope of §§ 638.50 and 638.51."]; *Greenley v. Kochava, Inc.* (S.D. Cal. 2023) 684 F. Supp. 3d 1024, 1050 [referencing CIPA's "expansive language" when finding software was a "pen register"]; see also *Javier v. Assurance IQ, LLC* (9th Cir. May 31, 2022) 2022 WL 1744107, at *1 ["Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications."].)

28.     This accords with the fact that, "when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection." (*Matera v. Google Inc.* (N.D. Cal. Aug. 12, 2016) 2016 WL 8200619, at *19).

29.     Individuals may bring an action against the violator of any provision of CIPA—including CIPA § 638.51—for $5,000 per violation. (Cal. Penal Code § 637.2(a)(1).)

## II.    DEFENANT VIOLATES THE CIPA

30.     To make Defendant's Website load on a user's internet browser, the browser sends an "HTTP request" or "GET" request to Defendant's server where the relevant Website data is stored. In response to the request, Defendant's server sends an "HTTP response" back to the browser with a set of instructions. A general diagram of this process is pictured at Figure 2, which explains how Defendant's Website transmits instructions back to users' browsers in response to HTTP requests.

**Figure 2:**



31.     The server's instructions include how to properly display the Website—*e.g.*, what images to load, what text should appear, or what music should play.

32.     In addition, the server's instructions cause the Trackers to be installed on a user's browser.  The Trackers then cause the browser to send identifying ("addressing") information to PubMatic, Audiencerate, and Neustar.

33.     The Third Parties' Trackers will also set a cookie corresponding with a user ID unique to their Tracker that also allows the user to be tracked across the Internet and have their information synced between multiple entities.

34.     Because, as described below, the Trackers collect users' addressing, routing, or signaling information—IP addresses, Device Metadata, and/or the unique cookie IDs—the Trackers are pen registers.

**A.      The Mechanics And Privacy Implications Of IP Addresses**

35.     An IP address is a unique identifier for a device, which is expressed as four sets of numbers separated by periods (*e.g.*, 192.168.123.132).  The traditional format of IP addresses is called IPv4, and it has a finite amount of combinations and thus is limited to approximately 4.3 billion addresses.  Because this proved to be insufficient as the Internet grew, IPv6 was introduced.  IPv6 offers a vastly larger address space with 340 undecillion possible addresses.  While IPv6 adoption has been increasing, many networks still rely on IPv4.[3]

36.     Much like a telephone number, an IP address guides or routes an intentional communication signal (*i.e.*, a data packet) from one device to another.  An IP address is essential for identifying a device on the internet or within a local network, facilitating smooth communication between devices.

*1.      Differentiating Between A Public Versus Private IP Address*

37.     A public IP address is accessible from anywhere on the internet; it is assigned by an Internet Service Provider ("ISP") and it is unique globally.  Public IP addresses are required for devices that need direct internet access.

---

[3]   See, e.g., *What is the Internet Protocol*, CLOUDFLARE, https://www.cloudflare.com/learning/network-layer/internet-protocol/; Stefano Gridelli, *What is an RFC1918 Address?*, NETBEEZ (Jan. 22, 2020), https://netbeez.net/blog/rfc1918/.

38.     While public IP addresses are unique, they are not necessarily "public" in the sense that they are freely accessible.  If an individual is not actively sending data packets out, the public IP address remains private and is not broadcast to the wider internet.

39.     Public IP addresses can be used to determine the approximate physical location of a device.  For example, services like iplocation.io use databases that map IP addresses to geographic areas—often providing information about the country, city, approximate latitude and longitude coordinates, or even the internet service provider associated with the public IP.  This geolocation capability is leveraged by online advertising and user identification services.

40.     A private IP address is used within an internal network and is not routable on the public internet.  The Internet Assigned Numbers Authority ("IANA") reserves specific ranges of numbers to be exclusively used for private IP addresses (*e.g.*, 172.16.0.0 through 172.31.255.255).  Thus, private IP addresses can be used repeatedly across different networks because they are isolated from the global internet.  For example, a home network in New York and an office network in Tokyo can both use the same private IP address (*e.g.*, 192.168.1.1) for their routers without conflict.

41.     The distinction between a public and private IP address is fundamental to the architecture of modern networks.  Public IP addresses facilitate global communication, while private IP addresses conserve the finite amount of combinations to make an IP address through local network communication.   And crucially, a private IP address does not divulge a user's geolocation, whereas a public IP address does and is thus extensively used in advertising.

42.     An analogy is useful.  A public IP address is like the number for a landline telephone for a household.  A private IP address is like each handset that is connected to that landline number (*e.g.*, "Handset #1," "Handset #2").  Nothing can be gleaned from knowing Handset #1 versus Handset #2 is making a call.  But a lot can be gleaned from knowing the phone number who is making the call.

43.     The same is true of IP addresses.  Nothing can be gleaned from determining whether a user is using their laptop or smartphone to access a website by itself.[4]  But the public IP address

---

[4] That being said, as discussed below, the Trackers also collect "device identifier information," which is used alongside the IP address to digitally "fingerprint" individuals.  So, by installing the Trackers

divulges the approximate location of the user that is connecting to the Internet and the router directing those communications (presumably the user's house or workplace), and it is the means through which the user actually communicates with the website and the Internet at large.

44.     Thus, the differences between public and private IP addresses are as follows:[5]

**Figure 3:**

| Category | Private IP address | Public IP address |
|---|---|---|
| Scope | The private IP address only has a local scope in your own network. | The public IP address's scope is global. |
| Communication | It is used so devices within a network can communicate with each other. | It allows access to the internet and is used for communication outside of your own network. |
| Uniqueness | It's an address from a smaller range that's used by other devices in other local networks. | It's a unique address that's not used by other devices on the internet. |
| Provider | The router assigns a private IP address to a specific device on the local network. | The internet service provider assigns the public IP address. |
| Range | Private IP address ranges:<br><br>10.0.0.0 – 10.255.255.255,<br><br>172.16.0.0 – 172.31.255.255,<br><br>192.168.0.0 – 192.168.255.255 | Any IP address that isn't within a private IP address range. |

45.     A public IP address is therefore "routing, addressing, or signaling information."

46.     A public IP address is "addressing" information because it determines the general geographic coordinates of the user who is accessing a website.

47.     A public IP address is "routing" or "signaling" information because it is sending or directing the user's communication from the router in their home or work to the website they are

---

on Website users' browsers, Defendant allows third parties to collect information that is analogous to a telephone number (the public IP address) and the specific handset that is making the call (the device identifier information).

[5] *What's The Difference Between A Public And Private IP Address?*, AVIRA (Jan. 31, 2024), https://www.avira.com/en/blog/public-vs-private-ip-address.

communicating with, and ensuring that "emails, websites, streaming content, and other data reaches you correctly"[6]:

**Figure 4:**



*Each device on a network has a private IP address, and the router has a public IP address to communicate with the rest of the internet.*

2.      *Privacy Implications Of Public IP Addresses*

48.      Through a public IP address, a device's state, city, zip code, and approximate latitude and longitude can be determined.   Thus, knowing a user's public IP address—and therefore geographical location—"provide[s] a level of specificity previously unfound in marketing."[7]

49.      A public IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and … postal code"[8] and (ii) "to target specific households, businesses[,] and even individuals with ads that are relevant to their interests."[9]  Indeed, "IP targeting is one of the most targeted marketing techniques [companies] can employ to spread the word about [a] product or

---

[6]  Anthony Freda, *Private IP vs Public IP: What's the Difference?*, AVG (June 4, 2021), https://www.avg.com/en/signal/public-vs-private-ip-address.

[7]  *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[8]  *Location-Based Targeting That Puts You in Control*, CHOOZLE, https://choozle.com/geotargeting-strategies/.

[9]  Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LINKEDIN (Nov. 29, 2023),      https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-williams-z7bhf.

service"[10] because "[c]ompanies can use an IP address … to personally identify individuals."[11]

50.     In fact, a public IP address is a common identifier used for "geomarketing," which is "the practice of using location data to identify and serve marketing messages to a highly-targeted audience.  Essentially, geomarketing allows [websites] to better serve [their] audience by giving [them] an inside look into where they are, where they have been, and what kinds of products or services will appeal to their needs."[12]  For example, for a job fair in specific city, companies can send advertisements to only those in the general location of the upcoming event.[13]

51.     "IP targeting is a highly effective digital advertising technique that allows you to deliver ads to specific physical addresses based on their internet protocol (IP) address. IP targeting technology works by matching physical addresses to IP addresses, allowing advertisers to serve ads to specific households or businesses based on their location."[14]

52.     "IP targeting capabilities are highly precise, with an accuracy rate of over 95%. This means that advertisers can deliver highly targeted ads to specific households or businesses, rather than relying on more general demographics or behavioral data."[15]

53.     In addition to "reach[ing] their target audience with greater precision," businesses are incentivized to use a customer's public IP address because it "can be more cost-effective than other forms of advertising."[16]  "By targeting specific households or businesses, businesses can avoid

---

[10] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[11] Trey Titone, *The Future Of Ip Address As An Advertising Identifier*, AD TECH EXPLAINED (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/.

[12] See, e.g., *The Essential Guide to Geomarketing: Strategies, Tips & More*, DEEP SYNC (Nov. 20, 2023), https://deepsync.com/geomarketing/.

[13] See, e.g., *Personalize Your Website And Digital Marketing Using IP Address*, GEOFLI, https://geofli.com/blog/how-to-use-ip-address-data-to-personalize-your-website-and-digital-marketing-campaigns.

[14] *IP Targeting*, SAVANT DSP, https://www.savantdsp.com/ip-targeting?gad_source=1&gclid=Cj 0KCQjw1Yy5BhD-ARIsAI0RbXZJKJSqMI6p1xAxyqai1WhAiXRJTbX8qYhNuEvIfSCJ4jfOV 5-5maUaAgtNEALw_wcB.

[15] *Id.*

[16] Herbert Williams, *The Benefits of IP Address Targeting for Local Busines*ses, LINKEDIN (Nov. 29, 2023),     https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-williams-z7bhf.

---

wasting money on ads that are unlikely to be seen by their target audience."[17]

54.    In addition, "IP address targeting can help businesses to improve their overall marketing strategy."[18] "By analyzing data on which households or businesses are responding to their ads, businesses can refine their targeting strategy and improve their overall marketing efforts."[19]

55.    The collection of IP addresses here is particularly invasive here given Audiencerate's and Neustar's status as a data broker.  As a report from NATO found:

> [a] data broker may receive information about a[] [website] user, including his … IP address.  The user then opens the [website] while his phone is connected to his home Wi-Fi network.  When this happens, the data broker can use the IP address of the home network to identify the user's home, and append this to the unique profile it is compiling about the user.  If the user has a computer connected to the same network, this computer will have the same IP address. The data broker can then use the IP address to connect the computer to the same user, and identify that user when their IP address makes requests on other publisher pages within their ad network. Now the data broker knows that the same individual is using both the phone and the computer, which allows it to track behaviour across devices and target the user and their devices with ads on different networks.[20]

56.    Indeed, as McAfee (a data security company) notes, "data brokers can … even place trackers or cookies on your browsers … [that] track your IP address and browsing history, which third parties can exploit."[21]

57.    In other words, not only does the collection of IP addresses by the Third Parties cause harm in and of itself, the Third Parties specifically attach IP addresses to comprehensive user profiles, tracking Plaintiff and Class Members across the Internet using their IP addresses in conjunction with other data and compiling vast reams of other personal information in the process.

---

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] HENRIK TWETMAN & GUNDARS BERGMANIS-KORATS, NATO STRATEGIC COMMUNICATIONS CENTRE OF EXCELLENCE, DATA BROKERS AND SECURITY at 11 (2020), https://stratcomcoe.org/cuploads/pfiles/data_brokers_and_security_20-01-2020.pdf.

[21] Jasdev Dhaliwal, *How Data Brokers Sell Your Identity*, MCAFEE (June 4, 2024), https://www.mcafee.com/blogs/tips-tricks/how-data-brokers-sell-your-identity/.

58.     For these reasons, under Europe's General Data Protection Regulation, IP addresses are considered "personal data, as they can potentially be used to identify an individual."[22]

**B.     The Trackers Are "Pen Registers"**

59.     Defendant owns and operates the Websites.  The New Yorker Website is "a daily source of news and cultural coverage, plus an expansive audio division, an award-winning film-and-television arm, and a range of live events featuring people of note."[23]   The New Yorker Website provides news on books & culture, fiction & poetry, humor & cartoons, magazine, puzzle & games, video, podcasts, etc.

60.     The Wired Website "illuminates how technology is changing every aspect of our lives—from culture to business, science to design."[24]   The Wired Website provides news on security, politics, business, science, and culture.

61.     When companies build their websites, they install or integrate various third-party scripts into the code of the website in order to collect data from users or perform other functions.[25]

62.     Often times, third-party scripts are installed on websites "for advertising purposes."[26]

63.     Further, "[i]f the same third-party tracker is present on many sites, it can build a more complete profile of the user over time."[27]

64.     Defendant has long incorporated the Trackers' code into the code of its Websites, including when Plaintiff and Class Members visited the Websites.  Thus, when Plaintiff visited the Websites, the Websites caused the Trackers to be installed on Plaintiff's and other users' browsers.

---

[22] *Is an IP Address Personal Data?,* CONVESIO, https://convesio.com/knowledgebase/article/is-an-ip-address-personal-data/; see also *What Is Personal Data?,* EUROPEAN COMMISSION, https://commission.europa.eu/law/law-topic/data-protection/reform/what-personal-data_en.

[23] *About Us,* NEWYORKER https://www.newyorker.com/about/us.

[24] *Frequently Asked Questions,* WIRED, https://www.wired.com/about/faq/.

[25] See *Third-party Tracking,* PIWIK, https://piwik.pro/glossary/third-party-tracking/ ("Third-party tracking refers to the practice by which a tracker, other than the website directly visited by the user, traces or assists in tracking the user's visit to the site. Third-party trackers are snippets of code that are present on multiple websites. They collect and send information about a user's browsing history to other companies…").

[26] *Id.*

[27] *Id.*

---

65.     As described below, when a user visits the Websites, the Websites' code—as programmed by Defendant—installs the Trackers onto the user's browser.  This allows the Third Parties—through their respective Trackers—to collect Plaintiff's and Class Members' IP addresses and Device Metadata, and pervasively track them across the Internet.

66.     Because users' IP addresses identify the outgoing "routing, addressing, or signaling information" of the user, the Trackers are "pen registers"

67.     In addition, as described in more detail below, the Trackers install cookies associated with a unique identifier, which is sent from Plaintiff's and Class Members' browser to the Third Parties (and then shared by the Third Parties with even further entities).  These unique identifiers are meant to uniquely identify users across sessions and devices.

68.     Further, and as described in more detail below, the Trackers call in other third-party entities to the Websites (and thus, the user's browser) who receive the unique identifier cookie associated with the Tracker.  This allows the Trackers to perform identity verification and resolution by connecting their own information with that of other third parties.

69.     The Trackers are thus also "pen registers" because the unique user ID that the Trackers assign to the user are used to identify the user, and thus, records the user's "addressing" information.

70.     Defendant and the Third Parties then use the public IP addresses, Device Metadata, and other information of Website visitors that are collected and set by the Trackers, including those of Plaintiff and Class Members, to deanonymize Plaintiff and Class Members, serve hyper-targeted advertisements, and unjustly enrich themselves through this improperly collected information.

71.     At no time prior to the installation and use of the Trackers on Plaintiff's and Class Members's browsers, or prior to the use of the Trackers, did Defendant procure Plaintiff's and Class Members's consent for such conduct.  Nor did Defendant obtain a court order to install or use the Trackers.

### 1.    The PubMatic Tracker On Both Websites

72.    PubMatic is a software-as-a-service company that develops the PubMatic Tracker, which it provides to website owners like Defendant for a fee. PubMatic is a registered data broker in California.[28]

73.    According to PubMatic, it is "one of the world's leading scaled digital advertising platforms" and "offer[s] more transparent advertising solutions to publishers, media buyers and data owners, allowing [their clients] to harness the power and potential of the open internet to drive better business outcomes."[29]

74.    As described in more detail below, PubMatic is a "supply side platform" that enables companies like Defendant to sell their user inventory to advertisers, thereby earning revenue and monetizing data. To achieve this, PubMatic uses its Tracker to receive, store, and analyze information collected from website visitors, such as visitors of Defendant's Website.

75.    The first time a user visits Defendant's Websites, the user's browser sends an HTTP request to Defendant's server, and Defendant's server sends the HTTP response. This response also includes directions to install the PubMatic Tracker on the user's browser.

76.    As PubMatic admits, its Tracker "automatically collects" "Browser and Device Information, such as the IP address you use to connect to an online service; device type and model; manufacturer; operating system type and version (e.g. iOS or Android); web browser type and version (e.g., Chrome or Safari); user-agent; carrier name; time zone; network connection type (e.g., Wi-Fi or cellular); and information about our Publisher's apps and versions currently active on a device."[30]

77.    The PubMatic Tracker also stores a cookie along with the user's Device Metadata in the user's browser cache. When the user subsequently visits Defendant's Website, the PubMatic

---

[28] DATA BROKER REGISTRATION FOR PUBMATIC, INC., https://oag.ca.gov/data-broker/registration/186702.

[29] *The Supply Chain Of The Future. Delivered*, PUBMATIC, https://pubmatic.com/about-us (last visited Jan. 18, 2024).

[30] ADVERTISER PLATFORM PRIVACY POLICY, https://pubmatic.com/legal/privacy-policy/#userinfowecollect

Tracker locates the cookie identifier stored on the user's browser.  If the cookie is stored on the browser, the PubMatic Tracker causes the browser to send the cookie (the unique identifier, "KADUSERCOOKIE" in Figures 6-7 below) along with the user's Device Metadata to PubMatic. The KADUSERCOOKIE is specifically used to "uniquely identify each browser or device from which an individual user visits our partners' websites."[31]

78.    Using the KADUSERCOOKIE, IP address, and Device Metadata, PubMatic can track and identify Website users across the Internet.  A general diagram of this process is pictured as Figure 5, which explains how the Websites cause the PubMatic Tracker to install a cookie on the user's browser and instructs the user's browser to send the user's Device Metadata along with the cookie.

**Figure 5:**



79.    If the user clears his or her cookies, then the user wipes out the PubMatic Tracker from its cache.  Accordingly, the next time the user visits Defendant's Websites, the process begins over again: (i) Defendant's server installs the PubMatic Tracker on the user's browser, (ii) the PubMatic Tracker instructs the browser to send PubMatic the user's Device Metadata, (iii) the PubMatic Tracker stores a cookie in the browser cache, and (iv) PubMatic will continue to receive the user's Device Metadata on subsequent Website visits with the cookie transmission.

80.    In all cases, however, PubMatic receives a user's Device Metadata (the "user-agent" string in the screenshots below) and unique user ID each and every time its Tracker is loaded by the

---

[31] PLATFORM COOKIE & OTHER SIMILAR TECHNOLOGIES POLICY,  https://pubmatic.com/legal/platform-cookie-policy/

Websites, as the below screenshots of traffic from Plaintiff's browser indicate (relevant portions highlighted in red boxes).  (See Figure 6 [New Yorker Website]; Figure 7 [Wired Website].)

**Figure 6:**



**Figure 7:**



81.     The PubMatic Tracker will also call other third parties to the Websites and share the user's KADUSERCOOKIE value with these other third parties.  The explicit purpose of this process—which is called "cookie syncing" and is alleged in more detail below—is to identify the user by matching that user with any profiles PubMatic and/or these other third parties may have on the user, which are then provided by PubMatic for sale to advertisers.

82.     For instance, the PubMatic Tracker calls the Tapad Pixel to the Websites and syncs its KADUSERCOOKIE with Tapad, as the below screenshot indicates.  The "referrer" header shows PubMatic is bringing in Tapad, and the value of the "partner_device_id" parameter matches the value

of the KADUSERCOOKIE parameter in Figures 6 and 7.  Finally, Tapad is enhancing this user information by installing its own cookie on the user's browser.  This is pictured in the screenshot below from Plaintiff's browser.

**Figure 8:**



83.     Tapad is a registered data broker in California[32] and is owned by Experian,[33] another registered data broker.[34]  The purpose of the Tapad Pixel, especially in conjunction with Experian's services, is to perform identity resolution.  As Experian describes it:

> [i]dentity resolution matches fragmented identifiers to a single profile. This creates a unified, cross-channel view of a consumer that helps marketers understand a customer's demographics, lifestyle, interests, and where and how they engage with your brand. Identity resolution improves campaign targeting and enables marketers to deliver personalized marketing messages.[35]

84.     Tapad identifies users by by "crunching 150 billion data points—from cookies, cellphone IDs (which link individual phones to app downloads and Web browsing), Wi-Fi

---

[32] DATA BROKER REGISTRATION FOR TAPAD, INC., https://oag.ca.gov/data-broker/registration/ 187511.

[33] Allison Schiff, *Telenor Sells Tapad to Experian for $280 Million*, ADEXCHANGER (Nov. 19, 2020), https://www.adexchanger.com/privacy/telenor-sells-Tapad-to-experian-for-280-million/.

[34] DATA BROKER REGISTRATION FOR EXPERIAN INFORMATION SOLUTIONS, INC., https://oag.ca.gov/ data-broker/registration/186691.

[35] https://www.experian.com/marketing/consumer-sync/identity-resolution.

---

connections, website registrations, browsing history and other inputs."[36]  Tapad then aggregated these inputs into what it called a "Device Graph," which allows advertisers to connect individuals to all the devices those individuals use for the purpose of delivering targeted advertisements.[37]

85.    Tapad integrates with Experian's "offline consumer data set (purchase behaviors, interests, lifestyle info)."[38]  This includes "first-party data such as names, physical addresses, email addresses, mobile ad identifiers (MAIDs), IP addresses, and other information."[39]

86.    As another example, the PubMatic Tracker calls the Dotomi Pixel (which is operated by Epsilon) to the Websites and syncs its KADUSERCOOKIE with Epsilon, as the below screenshot indicates.  The "referrer" header shows PubMatic is bringing in the Dotomi Pixel, and the value of the "nuid" parameter matches the value of the KADUSERCOOKIE parameter in Figures 6 and 7. Indeed, the "pubmatic-match.dotomi.com" value leaves little doubt that PubMatic is matching its cookies with the Dotomi Pixel to obtain any information Epsilon has about the user.  Finally, Epsilon is enhancing this user information by installing its own cookie on the user's browser.  This is pictured in the screenshot below from Plaintiff's browser:

**Figure 9:**



---

[36] *Id.*

[37] https://techcrunch.com/2016/02/01/telenor-jumps-into-ad-tech-acquires-Tapad-for-360m/.

[38] *Id.*

[39] *Id.* (cleaned up).

87.    The Dotomi Pixel is operated by Epsilon, another registered data broker in California.[40]  Epsilon is a global advertising and marketing technology company and "is the only digital advertising services partner that connects every display, online video, connected TV and audio impression to a real person."[41]

88.    Epsilon recognizes that its clients want "[t]o move potential customers from awareness to action" and thus "need to know who [the clients are] reaching."[42]  Thus, with Epsilon's "CORE ID, the industry's only identity solution using all available online and offline identifiers, brands can reach the right person across their favorite content on any device."[43]

89.    Epsilon boasts that it has "[u]nrivaled accuracy at an individual level" because its technology requires a "complete name and address validated by transactions" to "ensure marketers reach the right person with maximum precision and efficiency."[44]  "The CORE ID graph of 200M+ U.S. consumers is the only solution grounded in offline names and address.  This allows us to enable omnichannel people-based activation, measurement and waste reduction."[45]

90.    Epsilon advertisers it procures consumers' identities from "public records (including voter registration files, phone books, deeds, and permits), surveys ('self-reported data from 20 million households'), partners (data from corporate sources), and 'multi-sourced' information, which it describes as 'real transactional data' on categories of purchases."[46]  Thus, Epsilon provides all of this information to PubMatic when PubMatic syncs its KADUSERCOOKIE with the Dotomi Pixel.

---

[40] DATA BROKER REGISTRATION FOR EPSILON DATA MANAGEMENT, LLC, https://oag.ca.gov/data-broker/registration/186453.

[41] *Epsilon Digital*, EPSILON, https://www.epsilon.com/us/products-and-services/epsilon-digital (last visited Dec. 22, 2024).

[42] *Epsilon Digital | Online Video*, EPSILON, https://www.epsilon.com/us/products-and-services/epsilon-digital/online-video (last visited Dec. 23, 2024).

[43] *Id.*

[44] *Identity: CODE ID*, EPSILON, https://www.epsilon.com/us/products-and-services/identity-core-id (last visited Dec. 22, 2024).

[45] *Id.*

[46] JUSTIN SHERMAN, DUKE SANFORD CYBER POLICY PROGRAM, DATA BROKERS AND SENSITIVE DATA ON U.S. INDIVIDUALS: THREATS TO AMERICAN CIVIL RIGHTS, NATIONAL SECURITY, AND DEMOCRACY, 7 (DUKE SANFORD CYBER POLICY PROGRAM, 2021), https://tinyurl.com/hy9fewhs.

91.     As final examples, and as alleged in more detail below, PubMatic also syncs KADUSERCOOKIE with Audiencerate and Neustar—both of whom are also registered data brokers.  This allows PubMatic to obtain whatever information Audiencerate and Neustar have on the user.

92.     In addition, PubMatic also brings into the Websites the RLCDN Pixel, which is owned and operated by LiveRamp, another registered data broker in California.[47]   Among other services, LiveRamp provides "identity resolution," which "[b]ring in data from across identity spaces" "to enable the delivery of more personalised and meaningful customer experiences."[48]

93.     LiveRamp does this through its "LiveRamp Identity Graph," which "is a people-based map connecting de-identified offline touchpoints and online devices" that (i) "[r]esolv[es] separate emails, postal addresses, and phone numbers to a single individual"; (ii) "[m]atch[es] disparate devices to people-based pseudonymous identifiers"; and (iii) "[m]erg[es] these offline and online identity spaces into a unified … people-based ID space."[49]

94.     As before, LiveRamp's RLCDN Pixel is brought into the Websites by PubMatic and syncs with PubMatic's KADUSERCOOKIE (the value of the "partner_uid" parameter matches the value of the KADUSERCOOKIE parameter in Figures 6 and 7), sharing the data about the user between the two entities.  This can be seen in the following screenshot from Plaintiff's browser:

**Figure 10:**



```
:authority idsync.rlcdn.com
   :method GET
      :path /420486.gif?partner_uid=0AF6314C-9361-4B42-8A26-6767BAAAC454
   :scheme https
     accept image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8
accept-encoding gzip, deflate, br, zstd
accept-language en-US,en;q=0.9
       dnt 1
    referer https://ads.pubmatic.com/
sec-ch-ua "Chromium";v="122", "Not(A:Brand";v="24", "Google Chrome";v="122"
sec-ch-ua-mobile ?0
sec-ch-ua-platform "macOS"
sec-fetch-dest image
sec-fetch-mode no-cors
```

[47] DATA BROKER REGISTRATION FOR LIVERAMP, INC., https://oag.ca.gov/data-broker/registration/560496.

[48] *Identity Resolution*, LIVERAMP, https://liveramp.uk/identity-resolution/.

[49] RAMPID METHODOLOGY, https://docs.liveramp.com/identity/en/rampid-methodology.html

95.   However, the RLCDN Pixel (among other third party tradckers)also collects another user identifier, the XID:

**Figure 11:**



```
       :authority idsync.rlcdn.com
          :method GET
             :path /709387.gif partner_uid=50a022cf-58ff-4774-bf1b-447dd466b9cb &gtmcb=1694048635
          :scheme https
           accept image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8
  accept-encoding gzip, deflate, br, zstd
  accept-language en-US,en;q=0.9
              dnt 1
           referer https://www.wired.com/
        sec-ch-ua "Chromium";v="122", "Not(A:Brand";v="24", "Google Chrome";v="122"
```

96.   The "XID" is set by Defendant and is unique to a particular Website user.  That is, a Wired Website user will have a unique XID that will be different from another Wired Website user's XID.

97.   The XID for the first Wired Website user will be different than if that user also visits the New Yorker Website.  This is immaterial, however, because the RLCDN Pixel syncs with the PubMatic Tracker through the KADUSERCOOKIE, meaning LiveRamp, PubMatic, and any of the entities PubMatic syncs with can determine that both XIDs belong to the same user because the value of the KADUSERCOOKIE is identical.  In addition, through this cookie syncing process, PubMatic and any of the entities PubMatic syncs with learn the user's XID.

98.   Crucially, although the XID will be reset when the user clears his or her cookies, *the XID remains on the browser cache*.  That means that, even if a user clears his or her cookies, revisits the Websites, and gets a new XID, the RLCDN Pixel can retrieve the older XID from the browser cache, link it to the new XID, and send both values to PubMatic and any of the entities PubMatic syncs by syncing with PubMatic's KADUSERCOOKIE.  PubMatic would then be able to tie any information it knows about the user to this new XID, removing any ability for users to remain anonymous *even after clearing their cookies*.

99.    Thus, PubMatic is syncing its user cookie with numerous registered data brokers to collect as much information about a user as possible and de-anonymize the user, all of which is used for advertising purposes.

100.    The PubMatic Tracker is at least a "process" because it is "software that identifies consumers, gathers data, and correlates that data." (*Greenley*, *supra*, 684 F. Supp. 3d at 1050.)

101.    Further, the PubMatic Tracker is a "device" because "in order for software to work, it must be run on some kind of computing device."  (See, e.g., *James v. Walt Disney Co.* (N.D. Cal. 2023) 701 F. Supp. 3d 942, 952.)

102.    Because the PubMatic Tracker captures the outgoing information—the IP address, Device Metadata, and unique user IDs—from visitors to the Websites, it is a "pen register" for the purposes of CIPA § 638.50(b).   The PubMatic Tracker is also a "pen register" because its KADUSERCOOKIE is used to ascertain the identity of the user communicating with the Websites, and thus constitutes "addressing" information.

### 2.    The Audiencerate Tracker On The Wired Website

103.    Audiencerate LTD ("Audiencerate") is a software-as-a-service company that develops the Audiencerate Tracker, which it provides to website owners, like Defendant for a fee. Audiencerate is a registered data broker in California.[50]

104.    According to Audiencerate, it "enable[s] data-driven advertising via [its] proprietary technology and platforms."[51]

105.    "One side of [Audiencerate's] business is dedicated to helping data owners monetize their data and license audiences in the world's largest programmatic media buying marketplaces. The other side provides targeting data to marketers, enabling them to model and target audiences with more complexity and sophistication."[52]

---

[50]  DATA BROKER REGISTRATION FOR AUDIENCERATE LTD, https://oag.ca.gov/data-broker/registration/189411

[51]  AUDIENCERATE, https://www.audiencerate.com/.

[52]  *AWS Enables Audiencerate to Process Over a Billion Requests per Week*, AWS (2020), https://aws.amazon.com/solutions/case-studies/audiencerate-case-study/.

106.    In other words, Audiencerate facilities the selling of Defendant's Website users to interested advertisers, who will bid to show those users advertisements targeted to their identity and location.  This process enables Defendant to monetize its Websites.  To achieve this, Audiencerate uses its Tracker to receive, store, and analyze information collected from website visitors, such as visitors of Defendant's Wired Website.

107.    Similar to above, the first time a user visits Defendant's Wired Website, the user's browser sends an HTTP request to Defendant's server, and Defendant's server sends an HTTP response with directions to install the Audiencerate Tracker on the user's browser.  The Audiencerate Tracker, in turn, instructs the user's browser to send Audiencerate the user's IP address and Device Metadata.

108.    Moreover, as pictured below, Audiencerate stores several cookies with the user's browser cache, as the screenshot below from Plaintiff's browser indicates (relevant portions highlighted in red boxes)[53]:

**<u>Figure 12:</u>**



109.    The first cookie, "arcki2," is a specific cookie unique to Audiencerate.  This cookie is stored along with a unique user ID, the user's IP address, the date the cookie appears to have been first created (here, September 8, 2022), and the last time the cookie was accessed, which is displayed

---

[53] All but the first two digits of Plaintiff's IP address have been redacted throughout this Complaint to protect Plaintiff's privacy.

in Unix time.[54]

**Figure 13:**



          Unique User ID               First And Last Access Date       IP Address

110.    Through this cookie, if a user subsequently visits Defendant's Wired Website, the Audiencerate Tracker locates the cookie identifier stored on the user's browser.  If the cookie is stored on the browser, the Audiencerate Tracker cases the browser to send the cookie along with the user's IP address and Device Metadata to Audiencerate.  A general diagram of this process is pictured as Figure 5, which explains how the Wired Website causes the Audiencerate Tracker to install a cookie on the user's browser and instructs the user's browser to send the user's IP address and Device Metadata along with the cookie.

111.    However, the Audiencerate Tracker also sets other cookies on the user's browser.  Among those is the "arcki2_pubmatic" cookie, which includes the same KADUSERCOOKIE value as in Figues 6 and 7 above, as well as the first and last access date (the latter in Unix timestamp).

**Figure 14:**

arcki2_pubmatic=0AF6314C-9361-4B42-8A26-6767BAAAC454 20220908!1709935597575;

112.    Thus, this cookie allows Audiencerate to sync whatever data it has on the user with PubMatic and vice versa.

113.    Further, because PubMatic's cookie is being synced by multiple other third parties (Neustar, Tapad, Epsilon, etc.), Audience is also learning what those entities know about a user by syncing with PubMatic.

114.    Through this process, Audience combines whatever information it has about a user with at least PubMatic (and whatever other entities PubMatic integrates with) to uniquely identify and de-anonymize a user.

---

[54] "The unix time stamp is a way to track time as a running total of seconds.  This count starts at the Unix Epoch on January 1st, 1970 at UTC.  Therefore, the unix time stamp is merely the number of seconds between a particular date and the Unix Epoch."  THE CURRENT EPOCH UNIX TIMESTAMP, https://www.unixtimestamp.com/.  Here, the Unix timestep, "1709935597575," is March 8, 2024.

115.    If the user clears his or her cookies, then the user wipes out the Audiencerate Tracker from its cache.  Accordingly, the next time the user visits Defendant's Wired Website the process begins over again: (i) Defendant's server installs the Audiencerate Tracker on the user's browser, (ii) the Audiencerate Tracker instructs the browser to send Audiencerate the user's IP address, (iii) the Audiencerate Tracker stores a cookie in the browser cache, and (iv) Audiencerate will continue to receive the user's IP address on subsequent Wired Website visits as part of the cookie transmission. (See Figure 6.)

116.    In all cases, however, Audiencerate receives a user's IP address, Device Metadata, and user information each and every time its Tracker is loaded by the Wired Website, as the above screenshot of traffic from Plaintiff's browser indicates. (See Figures 12-14, *supra*.)

117.    The Audiencerate Tracker is at least a "process" because it is "software that identifies consumers, gathers data, and correlates that data." (*Greenley*, *supra*, 684 F. Supp. 3d at 1050.)

118.    Further, the Audiencerate Tracker is a "device" because "in order for software to work, it must be run on some kind of computing device." (*James*, *supra*, 701 F. Supp. 3d at 952.)

119.    Because the Audiencerate Tracker captures the outgoing information—the IP address, Device Metadata, and unique user IDs—from visitors to websites, it is a "pen register" for the purposes of CIPA § 638.50(b).  The Audiencerate Tracker is also a "pen register" because its arcki2 cookies are used to ascertain the identity of the user communicating with the Websites, and thus constitute "addressing" information.

### 3.    The AGKN Tracker On The Wired Website

120.    Neustar is a software-as-a-service company that develops the AGKN Tracker, which it provides to website owners like Defendant for a fee.  Neustar is a registered data broker in California,[55] as described in more detail below.  Neustar is also owned by, and its services are integrated with, TransUnion, who is also a registered data broker in California.[56]

---

[55] DATA BROKER REGISTRATION FOR NEUSTAR, INC., https://oag.ca.gov/data-broker/registration/562353.

[56] DATA BROKER REGISTRATION FOR TRANSUNION DIGITAL LLC, https://oag.ca.gov/data-broker/registration/562235.

121.    According to Neustar, the company "[t]ransform[s] omnichannel media performance with the next generation of identity-driven marketing capabilities."[57]

122.    In other words, Neustar facilities the selling of Defendant's Website users to interested advertisers, who will bid to show those users advertisements targeted to their identity and location.  This process enables Defendant to monetize its Websites.  To achieve this, Neustar uses its AGKN Tracker to receive, store, and analyze information collected from website visitors, such as visitors of Defendant's Wired Website.

123.    The first time a user visits Defendant's Wired Website, the user's browser sends an HTTP request to Defendant's server, and Defendant's server sends an HTTP response with directions to install the AGKN Tracker on the user's browser.  The AGKN Tracker, in turn, instructs the user's browser to send Neustar the user's IP address and Device Metadata.

124.    Similar to above, the first time a user visits Defendant's Wired Website, the user's browser sends an HTTP request to Defendant's server, and Defendant's server sends an HTTP response with directions to install the AGKN Tracker on the user's browser.  The AGKN Tracker, in turn, instructs the user's browser to send Neustar the user's IP address.

125.    Moreover, Neustar stores a cookie (the unique identifier, "u" in the screenshot below) in the user's browser cache. When the user subsequently visits Defendant's Website, the AGKN Tracker locates the cookie identifier stored on the user's browser.  If the cookie is stored on the browser, the AGKN Tracker causes the browser to send the cookie along with the user's IP address and Device Metadata to Neustar.  A general diagram of this process is pictured as Figure 5, which explains how the Website causes the AGKN Tracker to install a cookie on the user's browser and instructs the user's browser to send the user's IP address and Device Metadata along with the cookie.

126.    If the user clears his or her cookies, then the user wipes out the AGKN Tracker from its cache.  Accordingly, the next time the user visits Defendant's Wired Website the process begins over again: (i) Defendant's server installs the AGKN Tracker on the user's browser, (ii) the AGKN Tracker instructs the browser to send Neustar the user's IP address, (iii) the AGKN Tracker stores a

---

[57] TruAudience, TransUnion, https://www.transunion.com/solution/truaudience.

cookie in the browser cache, and (iv) Neustar will continue to receive the user's IP address on subsequent Wired Website visits as part of the cookie transmission.

127.    In all cases, however, Neustar receives a user's IP address,[58] Device Metadata, and user information each and every time its Tracker is loaded by the Wired Website, as the below screenshot of traffic from Plaintiff's browser indicates (relevant portions highlighted in red boxes).

**Figure 15:**



128.    Further, while Neustar has its own identity resolution capabilities, Neustar enhances those capabilities and the capabilities of the other Third Parties by also syncing with PubMatic's KADUSERCOOKIE, as the below screenshot from Plaintiff's browser traffic indicates:

**Figure 16:**



129.    As the above screenshot indicates, the "puid" value above is the same as the KADUSERCOOKIE value in all previous screenshots, and the "u=" cookie value is consistent across Figures 15 and 16 above.  That means Neustar is sending all of the information it knows about a user to PubMatic, and Neustar is also receiving all of the information PubMatic knows about a user.  And, because PubMatic integrates with numerous other third parties (such as Audiencerate, Epsilon, and Tapad), Neustar is also learning what information those entities know about a user, and vice versa.

---

[58] Neustar collects the IP address in IPV6 versus IPV4 format.

130.    The AGKN Tracker is at least a "process" because it is "software that identifies consumers, gathers data, and correlates that data." (*Greenley*, 684 F. Supp. 3d at 1050.)

131.    Further, the AGKN Tracker is a "device" because "in order for software to work, it must be run on some kind of computing device." (*James*, *supra*, 701 F. Supp. 3d at 952.)

132.    Because the AGKN Tracker captures the outgoing information—the IP address, Device Metadata, and unique user ID—from visitors to the Wired Website, it is a "pen register" for the purposes of CIPA § 638.50(b).  The AGKN Tracker is also a "pen register" because its cookies are used to ascertain the identity of the user communicating with the Websites, and thus constitute "addressing" information.

## III.    DEFENDANT'S CONDUCT CONSTITUTES AN INVASION OF PLAINTIFF'S AND CLASS MEMBERS' PRIVACY

133.    The collection of Plaintiff's and Class Members' personally identifying, de-anonymized information through Defendant's installation and use of the Trackers constitutes an invasion of privacy.

134.    As alleged herein, the Trackers are designed to conduct targeted advertising and boost Defendant's revenue, all through their surreptitious collection of Plaintiff's and Class Members' personal information.

135.    To put the invasiveness of Defendant's violations of the CIPA into perspective, however, it is important to understand three concepts: data brokers, real-time bidding, and cookie syncing.

136.    In short, the import of these concepts is that: (i) all of the Third Parties are data brokers that collect user information from Website visitors to uniquely identify and de-anonymize users by combining their IP addresses, Device Metadata, and unique ID values with whatever information those Third Parties have on a user from other sources; (ii) the Third Parties share that information amongst one another and with other entities to create the most complete user profile they can (through cookie syncing); and (iii) those profiles are offered up for sale through the real-time bidding process.

### A.    Data Brokers and Real-Time Bidding: The Information Economy

#### 1.    Data Brokers

137.    While "[t]here is no single, agreed-upon definition of data brokers in United States law,"[59] California law defines a "data broker" as "a business that knowingly collects and sells to third parties the personal information of a consumer with whom the business does not have a direct [*i.e.*, consumer-facing] relationship," subject to certain exceptions.  (Cal. Civ. Code § 1798.99.80(c).)

138.    Any entity that qualifies as a "data broker" under California law must specifically register as such pursuant to Cal. Civ. Code § 1798.99.82(a), which PubMatic,[60] Audiencerate,[61] and Neustar[62] all do.

139.    "Data brokers typically offer pre-packaged databases of information to potential buyers," either through the "outright s[ale of] data on individuals" or by "licens[ing] and otherwise shar[ing] the data with third parties."[63]  Such databases are extensive, and can "not only include information publicly available [such as] from Facebook but also the user's exact residential address, date and year of birth, and political affiliation," in addition to "inferences [that] can be made from the combined data."[64]

140.    Some data brokers prefer to characterize themselves as "identity graph providers," but this is a distinction without a difference.  "An identity graph provides a single unified view of customers and prospects based on their interactions with a product or website across a set of devices and identifiers.  An identity graph is used for real-time personalization and advertising targeting for

---

[59] SHERMAN, *supra*, at 2.

[60] DATA BROKER REGISTRATION FOR PUBMATIC, INC., https://oag.ca.gov/data-broker/registration/186702.

[61] DATA BROKER REGISTRATION FOR AUDIENCERATE LTD, https://oag.ca.gov/data-broker/registration/189411

[62] DATA BROKER REGISTRATION FOR NEUSTAR, INC., https://oag.ca.gov/data-broker/registration/562353.

[63] SHERMAN, *supra*, at 2.

[64] Tehila Minkus et al., *The City Privacy Attack: Combining Social Media and Public Records for Detailed Profiles of Adults and Children*, COSN '15: PROCEEDINGS OF THE 2015 ACM ON CONFERENCE ON ONLINE SOCIAL NETWORKS 71, 71 (2015), https://dl.acm.org/doi/pdf/10.1145/2817946.2817957.

---

millions of users."[65]  This is exactly what data brokers do, and indeed, the entities that provide identity graphs are by and large required to register as data brokers under California law.  An "identity graph provider" is therefore just a euphemism for "data broker."

141.    For instance, the NATO report noted that data brokers collect two sets of information: "observed and inferred (or modelled)."  The former "is data that has been collected and is actual," such as websites visited."  Inferred data "is gleaned from observed data by modelling or profiling," meaning what users may be *expected* to do.  On top of this, "[b]rokers typically collect not only what they immediately need or can use, but hoover up as much information as possible to compile comprehensive data sets that might have some future use."[66]

142.    Likewise, a report by the Duke Sanford Cyber Policy Program "examine[d] 10 major data brokers and the highly sensitive data they hold on U.S. individuals."[67]  The report found that "data brokers are openly and explicitly advertising data for sale on U.S. individuals' sensitive demographic information, on U.S. individuals' political preferences and beliefs, on U.S. individuals' whereabouts and even real-time GPS locations, on current and former U.S. military personnel, and on current U.S. government employees."[68]

143.    This data collection has grave implications for Americans' right to privacy.   For instance, "U.S. federal agencies from the Federal Bureau of Investigation [] to U.S. Immigration and Customs Enforcement [] purchase data from data brokers—without warrants, public disclosures, or robust oversight—to carry out everything from criminal investigations to deportations."[69]

144.    As another example:

> Data brokers also hold highly sensitive data on U.S. individuals such as race, ethnicity, gender, sexual orientation, immigration status, income level, and political preferences and beliefs (like support for the NAACP or National LGBTQ Task Force) that can be used to directly undermine individuals' civil rights.  Even if data brokers do

---

[65] IDENTITY GRAPHS ON AWS, https://aws.amazon.com/neptune/identity-graphs-on-aws/.

[66] TWETMAN & BERGMANIS-KORATS, *supra*, at 11.

[67] SHERMAN, *supra*, at 1.

[68] *Id.*

[69] *Id.* at 9.

not explicitly advertise these types of data (though in many cases they do), everything from media reporting to testimony by a Federal Trade Commission commissioner has identified the risk that data brokers use their data sets to make "predictions" or "inferences" about this kind of sensitive information (race, gender, sexual orientation, etc.) on individuals.

This data can be used by commercial entities within the U.S. to discriminately target goods and services, akin to how Facebook advertising tools allow advertisers to exclude certain groups, such as those who are identified as people with disabilities or those who are identified as Black or Latino, from seeing advertisements. 59 Many industries from health insurance to life insurance to banking to e-commerce purchase data from data brokers to run advertisements and target their services.

…

Given identified discrimination problems in machine learning algorithms, there is great risk of these predictive tools only further driving up costs of goods and services (from insurance to housing) for minority groups.[70]

145.    Similarly, as the report from NATO noted, corporate data brokers cause numerous privacy harms, including but not limited to depriving users of the right to control who does and does not acquire their personal information, unwanted advertisements that can even go as far as manipulating viewpoints, and spam and phishing attacks.[71]

//
//
//
//
//
//
//
//
//
//

---

[70] *Id.*

[71] Twetman & Bergmanis-Korats, *supra*, at 8.

**Figure 17:**



146.    As noted above, data brokers like the Third Parties are able to compile such wide swaths of information in part by collecting users' IP addresses, Device Metadata, and unique user IDs, which are used by the Third Parties to track users across the Internet.[72]  These Third Parties also share their information amongst one another and other entities to create even more replete user profiles.

147.    These data brokers will then:

> take that data and pair it with other data they've collected about you, pool it together with other data they've got on you, and then share all of it with businesses who want to market to you. They can

_____

[72] *Id.* at 11.

eventually build large datasets about you with things like: "browsed gym shorts, vegan, living in Los Angeles, income between $65k-90k, traveler, and single." Then, they sort you into groups of other people like you, so they can sell those lists of like-people and generate their income.[73]

148.    In short, by collecting IP addresses and Device Metadata, data brokers, like Sharethrough, can track users across the Internet, compiling various bits of information about users, building comprehensive user profiles that include an assortment of information, interests, and inferences, and offering up that information for sale to the highest bidder. The "highest bidder" is a literal term, as explained below.

149.    As a result of Defendant's installation the trackers of data brokers, like Sharethrough, on the browsers of users of Defendant's Website, the information of Plaintiff and Class Members is linked to any profiles these data brokers may have about them using their IP addresses and Device Metadata (or new profiles are created for Plaintiff and Class Members). These profiles are then served up to any companies that want to advertise on Defendant's Website, and Defendant's users become more valuable as a result of having their IP addresses and Device Fingerprint Information linked to these data broker profiles. Thus, Defendant is unjustly enriched through advertising revenue by installing the Trackers on Plaintiff's and Class Members' browsers, and thus, enabling the Third Parties to collect Plaintiff's and Class Members' IP addresses and Device Metadata without consent.

### 2.    Real-Time Bidding

150.    So, once data brokers like the Third Parties collect Website users' information and create or link that information to comprehensive user profiles, how do the data brokers "sell" or otherwise help Defendant monetize that information? This is where real-time bidding comes in.

151.    "Real Time Bidding (RTB) is an online advertising auction that uses sensitive personal information to facilitate the process to determine which digital ad will be displayed to a user on a given website or application."[74]

---

[73] Paul Jarvis, *The Problem with Data Brokers: Targeted Ads and Your Privacy*, FATHOM ANALYTICS (May 10, 2022), https://usefathom.com/blog/data-brokers.

[74] Sara Geoghegan, *What is Real Time Bidding?*, ELECTRONIC PRIVACY INFORMATION CENTER (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/.

152.    "There are three types of platforms involved in an RTB auction: Supply Side Platforms (SSPs), Advertising Exchanges, and Demand Side Platforms (DSPs)."  An SSP, which is at least one function of the PubMatic Tracker here,[75] "work[s] with website or app publishers to help them participate in the RTB process."  "DSPs primarily work with advertisers to help them evaluate the value of user impressions and optimize the bid prices they put forth."[76]  And an Advertising Exchange allows advertisers and publishers to use the same technological platform, services, and methods, and "speak the same language" in order to exchange data, set prices, and ultimately serve an ad.

153.    In other words, SSPs like the PubMatic Tracker provide user information to advertisers that might be interested in those users, DSPs help advertisers select which users to advertise and target, and an Advertising Exchange is the platform on which all of this happens.

154.    The RTB process works as follows:

> After a user loads a website or app, an SSP [here, PubMatic] will send user data to Advertising Exchanges … The user data, often referred to as "bidstream data," contains information like device identifiers, IP address, zip/postal code, GPS location, browsing history, location data, and more.  After receiving the bidstream data, an Advertising Exchange will broadcast the data to several DSPs.  The DSPs will then examine the broadcasted data to determine whether to make a bid on behalf of their client.
>
> Ultimately, if the DSP wins the bid, its client's advertisement will appear to the user. Since most RTB auctions are held on the server/exchange side, instead of the client/browser side, the user only actually sees the winner of the auction and would not be aware of the DSPs who bid and lost.  But even the losing DSPs still benefit because they also receive and collect the user data broadcasted during the RTB auction process.  This information can be added to existing dossiers DSPs have on a user.[77]

---

[75] *See*, *e.g.*, PUBMATIC SSP, https://pubmatic.com/products/pubmatic-ssp-for-publishers/

[76] Geoghegan, *supra*.

[77] Geoghegan, *supra*; see also REAL-TIME BIDDING, APPSFLYER, https://www.appsflyer.com/glossary/real-time-bidding/.

**Figure 18:**



155.    Facilitating this real-time bidding process means SSP like PubMatic and DSPs must have as much information as possible about Defendant's users to procure the greatest interest from advertisers and the highest bids.  These entities receive assistance because Defendant also installs the Audiencerate and AGKN Trackers on its users' browsers, among others, and the PubMatic Tracker syncs with those Trackers to obtain complete user profiles:

> the economic incentives of an auction mean that DSP [or SSP] with more specific knowledge of individuals will win desirable viewers due to being able to target them more specifically and out-bid other entities.  As a consequence, the bid request is not the end of the road. The DSP [or SSP] enlists a final actor, the data management platform (DMP) [or data brokers/identity graph providers like Audiencerate and Neustar].  DSPs send bid requests to DMPs, who enrich them by attempting to identify the user in the request and use a variety of data sources, such as those uploaded by the advertiser, collected from other sources, or bought from data brokers … thus enabling easier linkage of the data to the user's profile in the future.[78]

---

[78] Michael Veale & Federik Zuiderveen Borgesius, *Adtech and Real-Time Bidding under European Data Protection Law*, 23 GERMAN L. J. 226, 232-33 (2022), https://tinyurl.com/yjddt5ey; *see also* PERION, WHAT IS A SUPPLY-SIDE PLATFORM (SSP): DEFINITION AND IMPORTANCE, https://perion.com/publishers/what-is-a-supply-side-platform-ssp-definition-and-importance/.

**Figure 19:**



156.    In other words, an SSP like PubMatic is able to solicit the highest bids for Website users by identifying and de-anonymizing those users by combining the information PubMatic knows about that user with the information Audiencerate, Neustar, and many other data brokers know about that user.  This includes users IP addresses and Device Metadata, which are used in conjunction with the unique IDs to match to users in those data brokers' repositories.  If there is a match, then PubMatic will have significantly more information to provide about users, and that will solicit significantly higher bids from prospective advertisers (because the advertisers will have more information about the user to target their bids).  This naturally enriches Defendant, as its users have now become more valuable.

157.    As the Federal Trade Commission ("FTC") has noted, "[t]he use of real-time bidding presents potential concerns," including but not limited to:

(a)    "incentiviz[ing] invasive data-sharing" by "push[ing] publishers [*i.e.*, Defendant] to share as much end-user data as possible to get higher valuation for their ad inventory—particularly their location data and cookie cache, which can be used to ascertain a person's browsing history and behavior."

(b)    "send[ing] sensitive data across geographic borders."

(c)    sending consumer data "to potentially dozens of bidders simultaneously, despite only one of those parties—the winning bidder actually using that data to serve a targeted ad.  Experts have previously cautioned that there are few (if

any) technical controls ensuring those other parties do not retain that data for use in unintended ways."[79]

158.    Likewise, the Electronic Privacy Information Center ("EPIC") has warned that "[c]onsumers' privacy is violated when entities disclose their information without authorization or in ways that thwart their expectations."[80]

159.    For these reasons, some have characterized "real-time bidding" as "[t]he biggest data breach ever recorded" because of the shear number of entities that receive personal information[81]:

**Figure 20:**



160.    All of this is in line with protecting the right to determine who does and does not get to know one's information, a harm long recognized at common law and one the CIPA was enacted to protect against.  (*Ribas v. Clark* (1986) 38 Cal. 3d 355, 361 [noting the CIPA was drafted with a two-party consent requirement to protect "the right to control the nature and extent of the firsthand dissemination of [one's] statements"]; *Dep't of Justice v. Reporters Comm. for Freedom of the Press*

---

[79] Federal Trade Commission, Unpacking Real Time Bidding through FTC's case on Mobilewalla (Dec. 3, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/12/unpacking-real-time-bidding-through-ftcs-case-mobilewalla.

[80] Geoghegan, *supra*.

[81] Dr. Johnny Ryan, "RTB" Adtech & GDPR, https://assortedmaterials.com/rtb-evidence/ (video).

(1989) 489 U.S. 749, 763-64 ["[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person."].)

        *3.     Cookie Syncing*

161.    It should now be clear both the capabilities of the Third Parties (*i.e.*, data brokers who de-anonymize users) and the reasons Defendant installs their Trackers (to provide for advertisers in real-time bidding). The final question is how do these Third Parties share information amongst each other and with others to offer the most complete user profiles up for sale? This occurs through "cookie syncing."

162.    Cookie syncing is a process that "allow[s] web companies to share (synchronize) cookies, and match the different IDs they assign for the same user while they browse the web."[82] This allows entities like the Third Parties to circumvent "the restriction that sites can't read each other cookies, in order to better facilitate targeting and real-time bidding."[83]

163.    Cookie syncing works as follows:

> Let us assume a user browsing several domains like website1.com and website2.com, in which there are 3rd-parties like tracker.com and advertiser.com, respectively. Consequently, these two 3rd-parties have the chance to set their own cookies on the user's browser, in order to re-identify the user in the future. Hence, tracker.com knows the user with the ID user123, and advertiser.com knows the same user with the ID userABC.
>
> Now let us assume that the user lands on a website (say website3.com), which includes some JavaScript code from tracker.com but not from advertiser.com. Thus, advertiser.com does not (and cannot) know which users visit website3.com. However, *as soon as the code of tracker.com is called, a GET request is issued by the browser to tracker.com (step 1), and it responds back with a REDIRECT request (step 2), instructing the user's browser to issue another GET request to its collaborator advertiser.com this time, using a specifically crafted URL (step 3)*.
>
> …

---

[82] Panagiotis Papadopoulos et al., *Cookie Synchronization: Everything You Always Wanted to Know But Were Afraid to Ask*, 1 WWW '19: THE WORLD WIDE WEB CONFERENCE 1432, 1432 (2019), https://dl.acm.org/doi/10.1145/3308558.3313542.

[83] Gunes Acar et al., *The Web Never Forgets: Persistent Tracking Mechanisms in the Wild*, 6B CCS'14: ACM SIGSAC CONFERENCE ON COMPUTER AND COMMUNICATIONS SECURITY 674, 674 (2014)

---

When advertiser.com receives the above request along with the cookie ID userABC, it finds out that userABC visited website3.com. *To make matters worse, advertiser.com also learns that the user whom tracker.com knows as user123, and the user userABC is basically one and the same user.* Effectively, CSync enabled advertiser.com to collaborate with tracker.com, in order to: (i) find out which users visit website3.com, and (ii) *synchronize (i.e., join) two different identities (cookies) of the same user on the web.*[84]

**Figure 21:**



164.    Through this process, third party trackers are not only able to resolve user identities (*e.g.*, learning that who Third Party #1 knew as "userABC" and Third Party #2 knew as "user123" are the same person), they can "track a user to a much larger number of websites," even though that "do not have any collaboration with" the third party.[85]

---

[84] Papadopoulos, *supra*, at 1433.

[85] Papadopoulos, *supra*, at 1434.

165.    On the flip side, "CSync may re-identify web users even after they delete their cookies."[86] "[W]hen a user erases her browser state and restarts browsing, trackers usually place and sync a new set of userIDs, and eventually reconstruct a new browsing history."[87] But if a tracker can "respawn" its cookie or like to another persistent identifier (like an IP address), "then through CSync, all of them can link the user's browsing histories from before and after her state erasure. Consequently: (i) users are not able to abolish their assigned userIDs even after carefully erasing their set cookies, and (ii) trackers are enabled to link user's history across state resets."[88]

166.    Thus, "syncing userIDs of a given user increases the user identifiability while browsing, thus reducing their overall anonymity on the Web."[89]

167.    Cookie syncing is precisely what is happening here. When the PubMatic Tracker is installed on Website users' browsers, it is calling other third parties to the Websites (*e.g.*, Tapad, Epsilon), and PubMatic is syncing its cookies with these entities. Likewise, PubMatic is also syncing its cookies with Audiencerate and AGKN. The result of this process is not only that a single user is identified as one person by these multiple third parties, but they share all of the information about that user with one another (because the cookie is linked to a specific user profile). This prevents users from actually being anonymous when they visit the Websites.

*            *            *

168.    To summarize the proceeding allegations, the Third Parties are data brokers that focus on collecting as much information about Website users as possible to create comprehensive user profiles. The Third Parties may collect IP Addresses, Device Metadata, and unique user IDs in the first instance, but those are connected to information the Third Parties glean from other sources to build comprehensive profiles. Through "cookie syncing," those profiles are shared amongst the Third Parties and with other entities to form the most fulsome picture with the most attributes as possible. And those profiles are offered up for sale to interest advertisers through real-time bidding,

---

[86] *Id.*

[87] *See id*.

[88] *Id.*

[89] *Id.* at 1441.

where users will command more value the more advertisers know about a user.  Thus, the Third Parties enrich the value Defendant's users would otherwise command by tying the data they obtain directly from users on the Websites (*e.g.*, IP addresses, Device Metadata, unique IDs) with comprehensive user profiles.

169.    Accordingly, Defendant is using the Trackers in conjunction with the Third Parties to (i) de-anonymize users, (ii) offer its users up for sale in real-time bidding, and (iii) monetize its Websites by installing the Trackers and allowing the Third Parties to collect as much information about Website users as possible (without consent).

170.    Thus, Defendant is unjustly enriched through its installation and use of the Trackers, which causes data to be collected by Third Parties without Plaintiff's and Class Members' consent, and that enable the Third Parties to sell Defendant's user inventory in an ad-buying system.  In addition, Plaintiff and Class Members lose the ability to control their information, as their information ends up in the hands of data brokers, advertising inventory sellers, and advertisers themselves without knowledge or consent.  And, because Defendant installs the Trackers on Plaintiff's and Class Members' browsers, the Third Parties continue to track Plaintiff and Class Members wherever they go online, this building even more comprehensive user profiles over time that are provider to the third parties' other clients (or further enrich Defendant here).

**B.    Defendant Uses The PubMatic Tracker For Identity Resolution, Targeted Advertising, And Data Monetization**

171.    As noted above, PubMatic is a registered data broker in California that describes itself as a digital advertising platform that "exist[s] to enable content creators to run a more profitable advertising business, which in turn allows them to invest back into the multi-screen and multi-format content that consumers demand."[90]

---

[90] *The Supply Chain Of The Future. Delivered*, PUBMATIC, https://pubmatic.com/about-us (last visited Jan. 18, 2024).

172.    PubMatic helps companies like Defendant monetize the data of Website users.  As noted above, PubMatic is a "supply side platform" that helps website operators like Defendant "[m]aximize advertising revenue and control how your audiences are accessed."[91]

173.    To do this, PubMatic provides a "unique, supply path optimized and addressable brand demand—from the SSP of choice for the top advertisers and agencies in the world."[92]

**Figure 22:**



174.    Likewise, PubMatic provides identity resolution the "Identity Hub" service, "a leading ID management tool for publishers that leverages specialized technology infrastructure to simplify the complex alternative identifier marketplace."[93]  Notably, this allows website operators like Defendant to "drive monetization in cookie-restricted environments" by "[c]onnect[ing] seamlessly with buyers to drive programmatic revenue."[94]

175.    Notably, PubMatic also touts its ability to integrate with multiple other third parties— including "over 75 identity and data providers"—"leverage leading identifiers" to "help data owners [like Defendant] drive monetization and help media buyers [*i.e.*, advertisers] drive performance"[95]:

//

---

[91] PUBMATIC SSP, https://pubmatic.com/products/pubmatic-ssp-for-publishers/.

[92] *Id.*

[93] IDENTITY HUB, https://pubmatic.com/products/identity-hub/.

[94] *Id.*

[95] *Id.*

**Figure 23:**



176.    While PubMatic enables website operators like Defendant to sell their users to advertisers with a variety of characteristics, one of those characteristics is, notably, geography:

**Figure 24:**



177.    PubMatic also helps advertisers select where to place their ads, to help companies "[s]mash [their] campaign KPIs [key performance indicators]" and "reach [their] target audiences

more effectively."[96]  One of the ways in which PubMatic accomplishes this is by selling "action packages," which are data sets—pulled together from different sources—to help advertisers target specific customers.[97]  In other words, PubMatic utilizes third-party data, as well as data from the publisher where the ad is ultimately placed (*i.e.*, first-party), to determine where to place advertisers' ads and who to place them in front of.

178.    By way of example, PubMatic sells a "Ramadan Auction Package" that targets consumers who observe Ramadan.[98]  This package helps companies target people who have indicated interest in Ramadan Events through consumer behavior, have internet search history such as "Prayer & Fasting," have location data that is "[f]requently seen at places of worship," or have "[d]emographic data" that shows they are married or live with people "who have shown interest towards Ramadan."[99]

179.    Thus, when users visit Defendant's Website, PubMatic collects users' IP addresses, Device Metadata, and unique user ID (the KADUSERCOOKIE) through its PubMatic Tracker so that Defendant and PubMatic can identify its users with PubMatic's suite of identity resolution services, sell Defendant's users to prospective advertisers, and ultimately reap substantial revenue through the programmatic advertising PubMatic assists with. All of this helps Defendant monetize its Websites and maximize revenue by enabling PubMatic to collect as much information about Defendant's users as possible.

### C.    Defendant Uses The Audiencerate Tracker For Identity Resolution, Targeted Advertising, And Data Monetization

180.    As noted above, Audiencerate is a registered Data Broker in California, and is a data platform that "enable[s] data-driven advertising via [its] proprietary technology and platforms."[100]

---

[96] *Connect With PubMatic's Auction Packages*, PUBMATIC, https://pubmatic.com/auction-packages (last visited Jan. 18, 2024).

[97] *Connect With PubMatic's Auction Packages*, PUBMATIC, https://pubmatic.com/auction-packages-apac (last visited Jan. 18, 2024).

[98] *Connect With PubMatic's Auction Packages: Ramadan*, PUBMATIC, https://pubmatic.com/auction-packages-apac (last visited Jan. 18, 2024).

[99] *Id.*

[100] AUDIENCERATE, https://www.audiencerate.com/ (last visited Jan. 4, 2024).

181.    Audiencerate unifies the data of customers like Defendant to create "[h]yper-targeted audiences for [] campaigns."[101]

**Figure 25:**



182.    These consolidated audiences can then be offered up in marketing campaigns by licensing them to "premium platforms"[102] like PubMatic.[103]

183.    Indeed, PubMatic boasted in a press release in September 2021 that "[d]ata from Audiencerate is onboarded via a sell-side integration and leveraged in PubMatic's private marketplaces delivering superior performance for publishers and brands."[104]

184.    Specifically, "[t]he partnership … sees Audiencerate becoming an official PubMatic data channel partner, using their proprietary technology to provide PubMatic with access to vast [allegedly] privacy-compliant data sets … across all channels."[105]  This is the exact process shown in Figures 12-14 above.

185.    The data Audiencerate offers to PubMatic does not just come from Defendant, however.  In addition to syncing with PubMatic, Audiencerate syncs with other IDs "including the

---

[101] *Data Offering*, AUDIENCERATE, https://www.audiencerate.com/#data-offering.

[102] *License an Audience*, AUDIENCERATE, https://app.audiencerate.com/doc/license

[103] *Data Platform*, AUDIENCERATE, https://www.audiencerate.com/#data-platform.

[104] *Audiencerate Partners with Pubmatic in Connect Integration to Meet Europe's Private Marketplace Trend*, PUBMATIC, https://pubmatic.com/news/audiencerate-partners-with-pubmatic/.
[105] *Id.*

---

Trade Desk, Xandr, Adform, Lotame, & Adobe," which each allow Audiencerate to access those entities' repositories of data.[106]

186.    Companies such as Defendant share their users' data with Audiencerate through "daily synchronization" via the Audiencerate Tracker.[107]  Audiencerate claims to anonymize the data and organize it into segments.[108]  Then, companies use the segmented data to run targeted campaigns and perform data analysis through Audiencerate's platform.[109]  (See Figures 12-14, *supra*.)

187.    In other words, the entire purpose of Audiencerate's services to provide as much information about a user from as many sources as possible to advertisers in conjunction with SSPs like PubMatic, such that the user is de-anonymized and has a plethora of personal and demographic information attached to them when offered up for sale.  Audiencerate does this through the Audiencerate Tracker, which links the information the Tracker collects about the user from the Websites with Audiencerate's store of data and offers all that information to SSPs like PubMatic for use in advertising.

188.    All of this helps Defendant monetize its Websites and maximize revenue by making Defendant's users as un-anonymous and valuable as possible to prospective advertisers.

### D.    Defendant Uses The AGKN Tracker For Identity Resolution, Targeted Advertising, And Data Monetization

189.    As noted above, Neustar is a registered Data Broker in California, and is "a global information services and technology company specializing in real-time identity resolution and data analytics" that "helps businesses identify and verify customer identities."[110]

190.    In October 2013, Neustar purchased Aggregate Knowledge (AGKN) for $119 million.  This combined Neustar's "access to a large dataset of telephone numbers and location data through relationships with major ISPs and wireless carriers" and "geo-targeted online advertising" with AGKN's "ability to help clients allocate media dollars, and expand cross-sell opportunities with

---

[106] *Data Platform*, AUDIENCERATE, https://www.audiencerate.com/#data-platform.

[107] *Id.*

[108] *Product Overview*, AUDIENCERATE, https://app.audiencerate.com/doc/home.

[109] *Id.*

[110] WHAT IS NEUSTAR?, https://docs.metarouter.io/docs/neustar.

marketers and agencies."[111]

191.    In or about December 2021, TransUnion acquired Neustar for $3.1 billion.  The press release stated Neustar was "a premier identity resolution company … [that] enables customers to build connected consumer experiences by combining decision analytics with real-time identity resolution services driven by its OneID™ platform."[112]  Thus, "Neustar Marketing Solutions is now part of TransUnion TruAudience," "Neustar Fraud Solutions is now part of TransUnion TruValidate," and "Neustar Communications Solutions is now part of TransUnion TruContact."[113]

192.    Neustar's services, as integrated with TransUnion's, enable advertisers to target specific people.  This is done through TruAudience Identity Solutions, which "[e]stablish a single view of each customer across offline and online touchpoints with advanced identity resolution and data enrichment capabilities."[114]  Indeed, TruAudience "[e]nhance[s] your view of the customer with fresh contact information and predictive demographic data for insights, audience building, and engagement," which can be compiled into a "first-party identity graph to power prospecting, media monetization, or agency operations."[115]

193.    TruAudience also allows website operators like Defendant to "[c]reate audiences using your first-party data, third-party audiences, and/or TransUnion's marketing attributes." Defendant can then "[m]ake the most of [its] first party data assets with advanced identity resolution and audience building capabilities, alongside a broad distribution network," and "[a]ccess audiences

---

[111] Zach Rodgers, *Neustar Acquires DMP Aggregate Knowledge For $119M*, ADEXCHANGER (Oct. 30, 2013), https://www.adexchanger.com/data-exchanges/neustar-acquires-aggregate-knowledge-for-119m/.

[112] TRANSUNION AND NEUSTAR ANNOUNCE TRANSACTION CLOSE, https://newsroom.transunion.com/transunion-and-neustar-announce-transaction-close/

[113] Neustar, https://home.neustar/.

[114] TRUAUDIENCE IDENTITY SOLUTIONS, https://www.transunion.com/solution/truaudience/identity.

[115] *Id.*

from trusted third-party data providers to reach your ideal customers across all verticals."[116]   This includes "[u]sing TransUnion data,"[117] which is obviously extensive.

194.    In other words, the entire purpose of Neustar's (and now, TransUnion's) services to provide as much information about a user from as many sources as possible to advertisers, such that the user is de-anonymized and has a plethora of personal and demographic information attached to them when offered up for sale.  Neustar does this through the AGKN Tracker, which links the information the Tracker collects about the user from the Websites with Neustar/TransUnion's vast repository of data and offers all that information to SSPs like PubMatic for use in advertising.

195.    All of this helps Defendant monetize its Websites and maximize revenue by making Defendant's users as un-anonymous and valuable as possible to prospective advertisers.

## IV.    PLAINTIFF'S EXPERIENCE

196.    Plaintiff has visited the Websites multiple times—as recent as March 2024 and as long ago as 2012—on his desktop browser.

197.    When Plaintiff visited the Websites, the Websites' code—as programmed by Defendant—caused the Trackers to be installed on Plaintiff's browser.  (See Figures 6-7, 12, 15, *supra*.)  Through their respective Trackers, the Third Parties collected Plaintiff's IP address, Device Metadata, and set a cookie with a unique user ID that allowed the Third Parties to pervasively track Plaintiff across multiple Website sessions and even other websites, as well as de-anonymize Plaintiff by synchronizing their user profiles amongst each other and with other entities.  See Figures 8-14, 16, *supra*.)

198.    Defendant and the Third Parties used the information collected by the Trackers to (i) identity Plaintiff and either create a new profile of him in the Third Parties' databases or match

---

[116] AUDIENCE SOLUTIONS, https://www.transunion.com/solution/truaudience/audiences.  For clarity, "[f]irst-party data is collected directly from a company's own customers through platforms like websites, mobile apps, or physical stores … Third-party data is procured from external data brokers and aggregators, providing information about consumers but without a direct relationship between the data collector and the consumer."  Derek Andersen, *What Marketers Need to Know About 1st, 2nd, and 3rd-Party Data*, INVOCA BLOG (Mar. 3, 2025), https://www.invoca.com/blog/marketers-need-to-know-first-second-third-party-data.

[117] *Id.*

Plaintiff to a pre-existing profile (either in the Third Parties' own databases or with another entity's profile), (ii) sell Plaintiff's information to advertisers for hyper-targeted advertising based (in part) on Plaintiff's location, (iii) actually target Plaintiff with advertisements based (in part) on Plaintiff's location, and (iv) boost Defendant's, advertisers', and the Third Parties' revenue and the value of the Third Parties' services by de-anonymizing Plaintiff and selling his data.

199.    Plaintiff did not provide his prior consent to Defendant to install or use the Trackers on his browser.  Nor did Defendant obtain a court order before installing or using the Trackers.

200.    Thus, Plaintiff has had his privacy invaded by Defendant's violations of CIPA § 638.51(a), and Defendant has likewise been unjustly enriched through the Third Parties' surreptitious and unconsented-to collection of Plaintiff's data.  Accordingly, Plaintiff has been injured by Defendant's violation of the CIPA.

## CLASS ALLEGATIONS

201.    Pursuant to Cal. Code Civ. Proc. § 382, Plaintiff seeks to represent a class defined as all California residents who accessed the Website in California and had their IP address collected by the Trackers (the "Class").

202.    The following people are excluded from the Class: (i) any Judge presiding over this action and members of her or her family; (ii) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or their parents have a controlling interest (including current and former employees, officers, or directors); (iii) persons who properly execute and file a timely request for exclusion from the Class; (iv) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (v) Plaintiff's counsel and Defendant's counsel; and (vi) the legal representatives, successors, and assigns of any such excluded persons.

203.    **Numerosity:** The number of people within the Class is substantial and believed to amount to thousands, if not millions of persons.  It is, therefore, impractical to join each member of the Class as a named plaintiff.  Further, the size and relatively modest value of the claims of the individual members of the Class renders joinder impractical.  Accordingly, utilization of the class

action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation.   Moreover, the Class is ascertainable and identifiable from Defendant's records.

204.    **Commonality and Predominance:** There are well-defined common questions of fact and law that exist as to all members of the Class and that predominate over any questions affecting only individual members of the Class.   These common legal and factual questions, which do not vary between members of the Class, and which may be determined without reference to the individual circumstances of any Class Member, include, but are not limited to, the following:

  (a) Whether Defendant violated CIPA section 638.51(a);

  (b) Whether the Trackers are "pen registers" pursuant to Cal. Penal Code § 638.50(b);

  (c) Whether Defendant sought or obtained prior consent—express or otherwise—from Plaintiff and the Class;

  (d) Whether Defendant sought or obtained a court order for its use of the Trackers; and

  (e) Whether Plaintiff and members of the Class are entitled to actual and/or statutory damages for the aforementioned violations.

205.    **Typicality:** The claims of the named Plaintiff are typical of the claims of the Class because the named Plaintiff, like all other members of the Class Members, visited the Website and had his IP address collected by the Trackers, which were installed and used by Defendant.

206.    **Adequate Representation:** Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class Members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously.   The interests of members of the Class will be fairly and adequately protected by Plaintiff and his counsel.

207.    **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of members of the Class.   Each individual member of the Class may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.   Individualized

litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

### CAUSES OF ACTION
### COUNT I
### Violation Of The California Invasion Of Privacy Act, Cal. Penal Code § 638.51(a)

208.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

209.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

210.    CIPA section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

211.    A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." (Cal. Penal Code § 638.50(b).)

212.    The Trackers are "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—the IP address and Device Metadata—from the electronic communications transmitted by Plaintiff's and the Class's computers or smartphones. (Cal. Penal Code § 638.50(b).)

213.    Likewise, the Trackers are "pen registers" because they are "device[s] or process[es]" that "capture[d]" the unique user identifiers associated with each Tracker from the electronic communications transmitted by Plaintiff's and the Class's computers or smartphones. (Cal. Penal

Code § 638.50(b).)  The unique IDs are "addressing" information because they are used to tie a Website user to the Third Parties' databases and repositories of information about the user and ascertain the user's identity.

214.    At all relevant times, Defendant installed the Trackers—which are pen registers—on Plaintiff's and Class Members' browsers, and used the Trackers to collect Plaintiff's and Class Members' IP addresses.

215.    The Trackers do not collect the content of Plaintiff's and the Class's electronic communications with the Website.  (See *In re Zynga Privacy Litig.* (9th Cir. 2014) 750 F.3d 1098, 1108 ["IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…"] [cleaned up].)

216.    Plaintiff and Class Members did not provide their prior consent to Defendant's installation or use of the Trackers.

217.    Defendant did not obtain a court order to install or use the Trackers.

218.    Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA § 638.51(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 638.51(a).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)    For an order certifying the Class, naming Plaintiff as the representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b)    For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c)    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d)    For statutory damages of $5,000 for each violation of CIPA § 638.51(a);

(e)    For pre- and post-judgment interest on all amounts awarded;

(f)    For an order of restitution and all other forms of equitable monetary relief; and

(g)    For an order awarding and the Class their reasonable attorney's fees and expenses and costs of suit.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated: March 7, 2025             Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: _____
             Emily A. Horne

L. Timothy Fisher (State Bar No. 191626)
Emily A. Horne (State Bar No. 347723)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
          ehorne@bursor.com

*Attorneys for Plaintiff*

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|

Emily A. Horne (State Bar No. 347723)
Bursor & Fisher, P.A., 1990 N. California Blvd., 9th Floor, Walnut Creek, CA 94596

TELEPHONE NO.: (925) 300-4455          FAX NO. : (925) 407-2700
EMAIL ADDRESS: ehorne@bursor.com
ATTORNEY FOR *(Name):* Plaintiff Aaron Deivaprakash

**ELECTRONICALLY FILED**
Superior Court of California,
County of Alameda
03/07/2025 at 04:14:45 PM
By: Chan Huang,
Deputy Clerk

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA**
STREET ADDRESS: 1225 Fallon Street
MAILING ADDRESS:
CITY AND ZIP CODE: Oakland, CA 94612
BRANCH NAME:

CASE NAME:
Aaron Deivaprakash v. Condé Nast Digital

| **CIVIL CASE COVER SHEET** | **Complex Case Designation** | CASE NUMBER: |
|---|---|---|
| [x] Unlimited (Amount demanded exceeds $35,000) | [ ] Limited (Amount demanded is $35,000 or less) | [ ] Counter   [ ] Joinder | 25CV115106 |

Filed with first appearance by defendant
(Cal. Rules of Court, rule 3.402)

JUDGE:

DEPT.:

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [x] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [ ] Breach of contract/warranty (06)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition *(not specified above)* (43)

2. This case [x] is  [ ] is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [x] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [x] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [x] monetary  b. [x] nonmonetary; declaratory or injunctive relief  c. [ ] punitive
4. Number of causes of action *(specify):* One
5. This case [x] is  [ ] is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date: March 7, 2025

Emily A. Horne
_____
(TYPE OR PRINT NAME)          (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. January 1, 2024]          **CIVIL CASE COVER SHEET**          Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courts.ca.gov

**INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET**                                                       CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

**CASE TYPES AND EXAMPLES**

**Auto Tort**
  Auto (22)–Personal Injury/Property Damage/Wrongful Death
  Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
  Asbestos (04)
    Asbestos Property Damage
    Asbestos Personal Injury/ Wrongful Death
  Product Liability *(not asbestos or toxic/environmental)* (24)
  Medical Malpractice (45)
    Medical Malpractice– Physicians & Surgeons
    Other Professional Health Care Malpractice
  Other PI/PD/WD (23)
    Premises Liability (e.g., slip and fall)
    Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
    Intentional Infliction of Emotional Distress
    Negligent Infliction of Emotional Distress
    Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
  Business Tort/Unfair Business Practice (07)
  Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
  Defamation (e.g., slander, libel) (13)
  Fraud (16)
  Intellectual Property (19)
  Professional Negligence (25)
    Legal Malpractice
    Other Professional Malpractice *(not medical or legal)*
  Other Non-PI/PD/WD Tort (35)

**Employment**
  Wrongful Termination (36)
  Other Employment (15)

**Contract**
  Breach of Contract/Warranty (06)
    Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
    Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
    Negligent Breach of Contract/ Warranty
    Other Breach of Contract/Warranty
  Collections (e.g., money owed, open book accounts) (09)
    Collection Case–Seller Plaintiff
    Other Promissory Note/Collections Case
  Insurance Coverage *(not provisionally complex)* (18)
    Auto Subrogation
    Other Coverage
  Other Contract (37)
    Contractual Fraud
    Other Contract Dispute

**Real Property**
  Eminent Domain/Inverse Condemnation (14)
  Wrongful Eviction (33)
  Other Real Property (e.g., quiet title) (26)
    Writ of Possession of Real Property
    Mortgage Foreclosure
    Quiet Title
    Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
  Commercial (31)
  Residential (32)
  Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
  Asset Forfeiture (05)
  Petition Re: Arbitration Award (11)
  Writ of Mandate (02)
    Writ–Administrative Mandamus
    Writ–Mandamus on Limited Court Case Matter
    Writ–Other Limited Court Case Review
  Other Judicial Review (39)
    Review of Health Officer Order
    Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
  Antitrust/Trade Regulation (03)
  Construction Defect (10)
  Claims Involving Mass Tort (40)
  Securities Litigation (28)
  Environmental/Toxic Tort (30)
  Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
  Enforcement of Judgment (20)
    Abstract of Judgment (Out of County)
    Confession of Judgment *(non-domestic relations)*
    Sister State Judgment
    Administrative Agency Award *(not unpaid taxes)*
    Petition/Certification of Entry of Judgment on Unpaid Taxes
    Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
  RICO (27)
  Other Complaint *(not specified above)* (42)
    Declaratory Relief Only
    Injunctive Relief Only *(non-harassment)*
    Mechanics Lien
    Other Commercial Complaint Case *(non-tort/non-complex)*
    Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
  Partnership and Corporate Governance (21)
  Other Petition *(not specified above)* (43)
    Civil Harassment
    Workplace Violence
    Elder/Dependent Adult Abuse
    Election Contest
    Petition for Name Change
    Petition for Relief From Late Claim
    Other Civil Petition

**For your protection and privacy, please press the Clear This Form button after you have printed the form.**

[ Print this form ]    [ Save this form ]    [ Clear this form ]

F. ADDENDUM TO CIVIL CASE COVER SHEET

| Short Title: | | Case Number: |
|---|---|---|
| Aaron Deivaprakash v. Condé Nast Digital | | |

## CIVIL CASE COVER SHEET ADDENDUM

**THIS FORM IS REQUIRED IN ALL NEW <u>UNLIMITED</u> CIVIL CASE FILINGS IN THE
SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA**

| | |
|---|---|
| [ x ] Oakland, Rene C. Davidson Alameda County Courthouse (446) | [   ] Hayward Hall of Justice (447)<br>[   ] Pleasanton, Gale-Schenone Hall of Justice (448) |

| Civil Case Cover Sheet Category | Civil Case Cover Sheet Case Type | Alameda County Case Type (check only one) | |
|---|---|---|---|
| Auto Tort | Auto tort (22) | [ ] 34 Auto tort (G)<br>**Is this an uninsured motorist case? [ ] yes [ ] no** | |
| Other PI /PD / WD Tort | Asbestos (04) | [ ] 75 Asbestos (D) | |
| | Product liability (24) | [ ] 89 Product liability (<u>not</u> asbestos or toxic tort/environmental) (G) | |
| | Medical malpractice (45) | [ ] 97 Medical malpractice (G) | |
| | Other PI/PD/WD tort (23) | [ ] 33 Other PI/PD/WD tort (G) | |
| Non - PI /PD / WD Tort | Bus tort / unfair bus. practice (07) | [ ] 79 Bus tort / unfair bus. practice (G) | |
| | Civil rights (08) | [ ] 80 Civil rights (G) | |
| | Defamation (13) | [ ] 84 Defamation (G) | |
| | Fraud (16) | [ ] 24 Fraud (G) | |
| | Intellectual property (19) | [ ] 87 Intellectual property (G) | |
| | Professional negligence (25) | [ ] 59 Professional negligence - non-medical (G) | |
| | Other non-PI/PD/WD tort (35) | [x] 03 Other non-PI/PD/WD tort (G) | |
| Employment | Wrongful termination (36) | [ ] 38 Wrongful termination (G) | |
| | Other employment (15) | [ ] 85 Other employment (G) | |
| | | [ ] 53 Labor comm award confirmation | |
| | | [ ] 54 Notice of appeal - L.C.A. | |
| Contract | Breach contract / Wrnty (06) | [ ] 04 Breach contract / Wrnty (G) | |
| | Collections (09) | [ ] 81 Collections (G) | |
| | Insurance coverage (18) | [ ] 86 Ins. coverage - non-complex (G) | |
| | Other contract (37) | [ ] 98 Other contract (G) | |
| Real Property | Eminent domain / Inv Cdm (14) | [ ] 18 Eminent domain / Inv Cdm (G) | |
| | Wrongful eviction (33) | [ ] 17 Wrongful eviction (G) | |
| | Other real property (26) | [ ] 36 Other real property (G) | |
| Unlawful Detainer | Commercial (31) | [ ] 94 Unlawful Detainer - commercial | **Is the deft. in possession** |
| | Residential (32) | [ ] 47 Unlawful Detainer - residential | **of the property?** |
| | Drugs (38) | [ ] 21 Unlawful detainer - drugs | **[ ] Yes    [ ] No** |
| Judicial Review | Asset forfeiture (05) | [ ] 41 Asset forfeiture | |
| | Petition re: arbitration award (11) | [ ] 62 Pet. re: arbitration award | |
| | Writ of Mandate (02) | [ ] 49 Writ of mandate | |
| | | **Is this a CEQA action (Publ.Res.Code section 21000 et seq) [ ] Yes [ ] No** | |
| | Other judicial review (39) | [ ] 64 Other judicial review | |
| Provisionally Complex | Antitrust / Trade regulation (03) | [ ] 77 Antitrust / Trade regulation | |
| | Construction defect (10) | [ ] 82 Construction defect | |
| | Claims involving mass tort (40) | [ ] 78 Claims involving mass tort | |
| | Securities litigation (28) | [ ] 91 Securities litigation | |
| | Toxic tort / Environmental (30) | [ ] 93 Toxic tort / Environmental | |
| | Ins covrg from cmplx case type (41) | [ ] 95 Ins covrg from complex case type | |
| Enforcement of Judgment | Enforcement of judgment (20) | [ ] 19 Enforcement of judgment | |
| | | [ ] 08 Confession of judgment | |
| Misc Complaint | RICO (27) | [ ] 90 RICO (G) | |
| | Partnership / Corp. governance (21) | [ ] 88 Partnership / Corp. governance (G) | |
| | Other complaint (42) | [ ] 68 All other complaints (G) | |
| Misc. Civil Petition | Other petition (43) | [ ] 06 Change of name | |
| | | [ ] 69 Other petition | |

# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF ALAMEDA

COURTHOUSE ADDRESS:
Rene C. Davidson Courthouse
Administration Building, 1221 Oak Street, Oakland, CA 94612

PLAINTIFF:
Aaron Deivaprakash

DEFENDANT:
Conde Nast Digital

**NOTICE OF CASE MANAGEMENT CONFERENCE**

Reserved for Clerk's File Stamp

**FILED**
Superior Court of California
County of Alameda

03/07/2025

Chad Finke , Executive Officer / Clerk of the Court

By: _C. Huang_ Deputy

CASE NUMBER:
25CV115106

TO THE PLAINTIFF(S)/ATTORNY(S) FOR PLAINTIFF(S) OF RECORD:

You are ordered to serve all named defendants and file proofs of service on those defendants with the court within 60 days of the filing of the complaint (Cal. Rules of Court, 3.110(b)).

Give notice of this conference to all other parties and file proof of service.

Your Case Management Conference has been scheduled on:

Date: 07/07/2025        Time: 8:30 AM        Dept.: 21

Location: Rene C. Davidson Courthouse
Administration Building, 1221 Oak Street, Oakland, CA 94612

TO DEFENDANT(S)/ATTORNEY(S) FOR DEFENDANT(S) OF RECORD:

The setting of the Case Management Conference does not exempt the defendant from filing a responsive pleading as required by law, you must respond as stated on the summons.

TO ALL PARTIES who have appeared before the date of the conference must:

Pursuant to California Rules of Court, 3.725, a completed Case Management Statement (Judicial Council form CM-110) must be filed and served at least 15 calendar days before the Case Management Conference. The Case Management Statement may be filed jointly by all parties/attorneys of record or individually by each party/attorney of record.

**Meet and confer**, in person or by telephone as required by Cal. Rules of Court, rule 3.724.

**Post jury fees** as required by Code of Civil Procedure section 631.

If you do not follow the orders above, the court may issue an order to show cause why you should not be sanctioned under Cal. Rules of Court, rule 2.30. Sanctions may include monetary sanctions, striking pleadings or dismissal of the action.

The judge may place a Tentative Case Management Order in your case's on-line register of actions before the conference. This order may establish a discovery schedule, set a trial date or refer the case to Alternate Dispute Resolution, such as mediation or arbitration. Check the court's eCourt Public Portal for each assigned department's procedures regarding tentative case management orders at https://eportal.alameda.courts.ca.gov.

Expedited Jury Trials

If the parties agree, they may try the case in an Expedited Jury Trial. Code of Civ. Proc. § 630.01 et seq. In short, the parties would agree to the following: 8 jurors (6 must agree); 3 peremptory challenges per side; 5-hour time limit per side, unless otherwise agreed and approved; one to two court days for completion, unless otherwise agreed and approved; high/low arrangement option; and limited right to appeal. For additional information, please see the following links:

• EJT-010-INFO* Expedited Jury Trial Information Sheet (ca.gov)
• EJT-008 Agreement of Parties (Mandatory Expedited Jury Trial Procedures) (ca.gov)
• EJT-020 [Proposed] Consent Order for Voluntary Expedited Jury Trial (ca.gov)

Form Approved for Mandatory Use
Superior Court of California,
County of Alameda
ALA CIV-100 [Rev. 10/2021]

# NOTICE OF
# CASE MANAGEMENT CONFERENCE

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF ALAMEDA | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Rene C. Davidson Courthouse<br>1225 Fallon Street, Oakland, CA 94612 | **FILED**<br>Superior Court of California<br>County of Alameda<br>03/07/2025<br>Chad Finke, Executive Officer / Clerk of the Court<br>By: _clmhng_ Deputy<br>C. Huang |
| PLAINTIFF/PETITIONER:<br>Aaron Deivaprakash | |
| DEFENDANT/RESPONDENT:<br>Conde Nast Digital | |
| **CERTIFICATE OF MAILING** | CASE NUMBER:<br>25CV115106 |

**I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the attached document upon each party or counsel named below by placing the document for collection and mailing so as to cause it to be deposited in the United States mail at the courthouse in Oakland, California, one copy of the original filed/entered herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid, in accordance with standard court practices.**

Lawrence Timothy Fisher
Bursor & Fisher, P.A.
1990 N California Blvd., 9th Floor
Walnut Creek, CA 94596

Emily A. Horne
Bursor & Fisher, P.A.
1990 N. California Blvd. 9th Floor
Walnut Creek, CA 94596

Chad Finke, Executive Officer / Clerk of the Court

Dated: 03/20/2025

By:

_clmhng_

C. Huang, Deputy Clerk

**CERTIFICATE OF MAILING**

POS-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NO: 347723 | FOR COURT USE ONLY |
|---|---|---|

NAME: Emily A. Horne
FIRM NAME: Bursor & Fisher, P.A.
STREET ADDRESS: 19990 N. California Blvd., 9th Floor
CITY: Walnut Creek    STATE: CA    ZIP CODE: 94596
TELEPHONE NO.: (925) 300-4455    FAX NO.: (925) 407-2700
E-MAIL ADDRESS: ehorne@bursor.com
ATTORNEY FOR (Name): Plaintiff Barton Golub

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** ALAMEDA
STREET ADDRESS: 1221 Oak Street
MAILING ADDRESS:
CITY AND ZIP CODE: Oakland, 94612
BRANCH NAME:

Plaintiff/Petitioner: Aaron Deivaprakash
Defendant/Respondent: Conde Nast Digital

| **NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL** | CASE NUMBER: 25CV115106 |
|---|---|

TO *(insert name of party being served):* Defendant Conde Nast Digital

---

**NOTICE**

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

---

Date of mailing: March 21, 2025

Emily A. Horne
(TYPE OR PRINT NAME)

(SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

**ACKNOWLEDGMENT OF RECEIPT**

This acknowledges receipt of *(to be completed by sender before mailing):*

1. [x] A copy of the summons and of the complaint.
2. [x] Other *(specify):*

    Civil Case Cover Sheet
    Notice of Case Management Conference

*(To be completed by recipient):*

Date this form is signed: April 9, 2025

Matthew D. Pearson
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,
ON WHOSE BEHALF THIS FORM IS SIGNED)

(SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
POS-015 [Rev. January 1, 2005]

**NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL**

Code of Civil Procedure,
§§ 415.30, 417.10
www.courtinfo.ca.gov

**For your protection and privacy, please press the Clear This Form button after you have printed the form.**

Print this form    Save this form    Clear this form