Matthew D. Pearson (SBN 294302)
Matthew.Pearson@wbd-us.com
Jack F. Altura (SBN 297314)
Jack.Altura@wbd-us.com
WOMBLE BOND DICKINSON (US) LLP
400 Spectrum Center Drive, Suite 1700
Irvine, California 92618
Telephone: (714) 557-3800
Facsimile: (714) 557-3347

*Attorneys for Defendant*
ADVANCE MAGAZINE PUBLISHERS, INC. D/B/A
CONDÉ NAST DIGITAL (ERRONEOUSLY SUED
AS CONDÉ NAST DIGITAL)

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AARON DEIVAPRAKASH, individually and on behalf of all other persons similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CONDÉ NAST DIGITAL,<br><br>Defendant. | Case No.: 3:25-cv-04021-RFL<br><br>*The Honorable Rita F. Lin presiding*<br><br>**NOTICE OF MOTION AND MOTION TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>[Filed Notice of Motion; Declaration of Matthew D. Pearson; and (Proposed) Order]<br><br>**DATE: August 26, 2025**<br>**TIME: 10:00 a.m.**<br>**COURTROOM: 15**<br><br>Action Filed: March 7, 2025 |

1

**TABLE OF CONTENTS**

2

3    I.    INTRODUCTION ........................................................................................ 2

     II.   PLAINTIFF'S ALLEGATIONS ................................................................. 5
4
     III.  MOTION TO DISMISS STANDARD .......................................................... 5
5
     IV.   ARGUMENT ............................................................................................... 6
6
           A.    The Trackers Are Not Pen Registers.................................................. 6
7
                 (i)    The Trackers Do Not "Record or Decode" Anything................. 7
8
                 (ii)   The Trackers Cannot Be Pen Registers Because They Collect More
9                       Than Just "Dialing, Routing, Addressing, or Signaling Information.".......... 8

10               (iii)  The Trackers Cannot Be Pen Registers Because Any "Dialing,
                        Routing, Addressing, or Signaling Information" They Transmitted
11                      Related to Plaintiff's Transmissions to the Third Parties Directly. .......... 11

12         B.    Condé Nast Did Not "Use" or "Install" a Pen Register. ................................... 13

13         C.    Plaintiff Was Not "Injured by a Violation" of CIPA. ........................................ 16

14               (i)    Condé Nast Did Not Invade Plaintiff's Privacy........................................ 17

15                      1.    The data at issue does not give rise to a cognizable privacy
                              interest. ........................................................................................ 18
16
                        2.    Condé Nast did not cause Plaintiffs' alleged privacy injuries. ..... 20
17
                 (ii)   Plaintiff's Unjust Enrichment Allegations Do Not Save His Claim........ 22
18
           D.    The Rule of Lenity Compels This Court to Dismiss Plaintiff's Complaint.......... 23
19
     V.    CONCLUSION ........................................................................................... 25
20

21

22

23

24

25

26

27

28

i

1

# TABLE OF AUTHORITIES

2

Cases

3

*ACA Int'l v. Fed. Commc'ns Comm'n,*

4
   885 F.3d 687 (D.C. Cir. 2018) ................................................................ 13

5

*Aiken v. Obledo,*

6
   442 F. Supp. 628 (E.D. Cal. 1977) ............................................................ 4

7

*Apatow v. Am. Bankers Ins. Co. of Fla.,*
   No. 16-198 MWF (MRWX), 2016 WL 7422288 (C.D. Cal. Dec. 21, 2016) ........ 5, 6

8

*Ashcroft v. Iqbal,*

9
   556 U.S. 662 (2009) ................................................................................ 5

10

*Aviles v. Liveramp, Inc.,*
    No. 24STCV19869, 2025 WL 487196 (Cal.Super. Jan. 28, 2025) ................... passim

11

*Bell Atlantic Corp. v. Twombly,*

12
    550 U.S. 544 (2007) ............................................................................... 5

13

*Bittner v. United States,*

14
    598 U.S. 85 (2023) ............................................................................... 25

15

*Boorstein v. Men's J. LLC,*
    No. CV 12-771 DSF EX, 2012 WL 2152815 (C.D. Cal. June 14, 2012) ........... 17

16

*Brace v. Lifeguard, Inc.,*

17
    No. CIV. 92-20509 SW, 1995 WL 32868 (N.D. Cal. Jan. 25, 1995) ............... 17

18

*Brodsky v. Apple Inc.,*

19
    445 F. Supp. 3d 110 (N.D. Cal. 2020) .......................................................... 8

20

*Brown v. Google LLC,*
    685 F. Supp. 3d 909 (N.D. Cal. 2023) .................................................. 11, 12

21

*Capitol Recs. Inc. v. Thomas-Rasset,*

22
    No. CIV 06-1497(MJD/RLE), 2009 WL 1664468 (D. Minn. June 11, 2009) ......... 12

23

*Carolus v. Nexstar Media Inc.,*

24
    No. 24-CV-07790-VC, 2025 WL 1338193 (N.D. Cal. Apr. 9, 2025) ............... 4, 19

25

*Casillas v. Transitions Optical, Inc.,*
    No. 23STCV30742, 2024 WL 4873370 (Cal.Super. Sep. 09, 2024) ................... 3

26

*Cetacean Cmty. v. Bush,*

27
    386 F.3d 1169 (9th Cir. 2004) ................................................................ 16

28

*Corbett v. Pharmacare U.S., Inc.*,
    544 F. Supp. 3d 996 (S.D. Cal. 2021) ................................................................. 16

*Crandon v. United States*,
    494 U.S. 152 (1990) ............................................................................................ 23

*F.A.A. v. Cooper*,
    566 U.S. 284 (2012) ............................................................................................ 17

*Gabrielli v. Insider, Inc.*,
    No. 24-CV-01566 (ER), 2025 WL 522515 (S.D.N.Y. Feb. 18, 2025) .................... 2, 13, 19, 22

*Heeger v. Facebook, Inc.*,
    509 F. Supp. 3d 1182 (N.D. Cal. 2020) ................................................................ 18

*Hill v. Nat'l Collegiate Athletic Assn.*,
    7 Cal. 4th 1 (1994) .............................................................................................. 20

*In re Application of U.S. for an Ord. Authorizing use of A Pen Reg. & Trap On (XXX) Internet Serv. Acct./User Name, (xxxxxxxx@xxx.com)*,
    396 F. Supp. 2d 45 (D. Mass. 2005) ...................................................................... 9

*In re Google Location Hist. Litig.*,
    428 F. Supp. 3d 185 (N.D. Cal. 2019) .................................................................. 18

*In re iPhone Application Litig.*,
    844 F. Supp. 2d 1040 (N.D. Cal. 2012) ................................................................. 8

*In re U.S.*,
    622 F. Supp. 2d 411 (S.D. Tex. 2007) .................................................................... 9

*In re Zynga Priv. Litig.*,
    750 F.3d 1098 (9th Cir. 2014) ............................................................................... 9

*James v. Walt Disney Co.*,
    701 F. Supp. 3d 942 (N.D. Cal. 2023) .................................................................. 11

*Jewel v. Nat'l Sec. Agency*,
    673 F.3d 902 (9th Cir. 2011) ............................................................................... 16

*Khamooshi v. Politico LLC*,
    No. 24-CV-07836-SK, 2025 WL 1408896 (N.D. Cal. May 13, 2025) .................... 4, 9, 19, 22

*Licea v. Hickory Farms LLC*,
    No. 23STCV26148, 2024 WL 1698147 (Cal.Super. Mar. 13, 2024) ...................... 3, 24

*Malibu Media, LLC v. Pontello*,
    No. 13-12197, 2013 WL 12180709 (E.D. Mich. Nov. 19, 2013) ........................... 12

iii

*Maya v. Centex Corp.*,
  658 F.3d 1060 (9th Cir. 2011) ................................................................ 16

*Mirmalek v. L.A. Times Communs. LLC*,
  No. 24-cv-01797-CRB, 2024 U.S. Dist. LEXIS 227378 (N.D. Cal. Dec. 12, 2024) ................. 3

*Palacios v. Fandom, Inc.*,
  No. 24STCV11264, 2024 WL 5184412 (Cal.Super. Sep. 24, 2024) ........................ 24

*People v. Nuckles*,
  56 Cal. 4th 601 (Cal. 2013) ................................................................ 23

*People v. Reynoza*,
  15 Cal. 5th 982 (Cal. 2024) ................................................................ 23

*Price v. Headspace, Inc.*,
  No. 24STCV19921, 2025 WL 1237977 (Cal.Super. Apr. 01, 2025) ..................... 9, 10

*Rodriguez v. Autotrader.com, Inc.*,
  No. 2:24-CV-08735-RGK-JC, 2025 WL 1085787 (C.D. Cal. Apr. 4, 2025) ................. 4

*Rodriguez v. Plivo Inc.*,
  No. 24STCV08972, 2024 WL 5184413 (Cal.Super. Oct. 02, 2024) ..................... 3

*Sanchez v. Cars.com Inc.*,
  No. 24STCV13201, 2025 WL 487194 (Cal.Super. Jan. 27, 2025) ................ passim

*Smith v. Google, LLC*,
  735 F. Supp. 3d 1188 (N.D. Cal. 2024) ..................................................... 19

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ................................................................ 17

*United States v. Balint*,
  201 F.3d 928 (7th Cir. 2000) ................................................................ 23

*United States v. Devorce*,
  526 F. Supp. 191 (D. Conn. 1981) .............................................................. 7

*United States v. Dote*,
  371 F.2d 176 (7th Cir. 1966) ............................................................ 7, 8

*United States v. Forrester*,
  512 F.3d 500 (9th Cir. 2008) ................................................................ 18

*United States v. Kail*,
  612 F.2d 443 (9th Cir. 1979) .............................................................. 8

*United States v. Kidd*,
  394 F. Supp. 3d 357 (S.D.N.Y. 2019) .................................................. 11, 18

iv

*United States v. Kozminski*,
   487 U.S. 931 (1988) ........................................................................................... 23

*United States v. Nosal*,
   676 F.3d 854 (9th Cir. 2012) ............................................................................ 23

*United States v. Reed*,
   575 F.3d 900 (9th Cir. 2009) .............................................................................. 8

*United States v. Saathoff*,
   708 F. Supp. 2d 1020 (S.D. Cal. 2010) ........................................................... 24

*United States v. Santos*,
   553 U.S. 507 (2008*)* ....................................................................................... 25

*United States v. Simpson*,
   319 F.3d 81 (2d Cir. 2002) .............................................................................. 23

*United States v. Thompson/Ctr. Arms Co.*,
   504 U.S. 505 (1992) ........................................................................................ 23

*Vishal Shah v. Fandom, Inc.*,
   754 F. Supp. 3d 924 (N.D. Cal. 2024) ........................................................ 3, 24

*Vita v. New England Baptist Hosp.*,
   No. SJC-13542, 2024 WL 4558621 (Mass. Oct. 24, 2024) ............................ 25

*Xu v. Reuters News & Media Inc.*,
   No. 24 CIV. 2466 (PAE), 2025 WL 488501 (S.D.N.Y. Feb. 13, 2025) ......... 2, 19

Statutes

18 U.S.C. § 2510(8) ................................................................................................ 8

18 U.S.C. § 3127(3) .............................................................................................. 10

Cal. Civ. Code § 1798.120 (a)(1) .................................................................... 15, 21

Cal. Pen. Code § 638.50 ....................................................................................... 14

Cal. Penal Code § 637.2(a) ................................................................................... 16

Cal. Penal Code § 637.2(c) ................................................................................... 17

Cal. Penal Code § 638.50(b) ............................................................................... 6, 8

Cal. Penal Code § 638.50(c) ................................................................................. 10

Cal. Penal Code § 638.51(a) ......................................................................... passim

Cal. Penal Code § 638.51(c) ................................................................................. 23

### NOTICE OF MOTION

**NOTICE IS HEREBY GIVEN** that on August 26, 2025, at 10:00 a.m. in Courtroom 15 of the United States District Court, Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, Defendant Advance Magazine Publishers, Inc. d/b/a Condé Nast Digital (erroneously sued as Conde Nast Digital) ("Condé Nast") will and hereby does move, pursuant to Fed. R. Civ. P. 12(b)(6), for an order dismissing Plaintiff Aaron Deivaprakash's ("Plaintiff") Class-Action Complaint ("Complaint").

This motion is made on the grounds that Plaintiff has failed to state against Condé Nast a plausible claim under California's Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 638.51(a), because Plaintiff has not plausibly alleged (1) that Condé Nast installed or used a pen register; (2) that Plaintiff was injured by Condé Nast's alleged installation or use of a pen register; and (3) that CIPA § 638.51(a) should apply to Condé Nast's conduct, as alleged in the Complaint.

This motion is based on this Notice of Motion; the accompanying Memorandum of Points and Authorities; the Declaration of Matthew D. Pearson; the Court's file and records in this action; and such other evidence and arguments as may be made or presented at or before the hearing on this Motion.

Respectfully submitted,

Dated: June 9, 2025          **WOMBLE BOND DICKINSON (US) LLP**

By:  */s/ Matthew D. Pearson*
MATTHEW D. PEARSON

*Attorney for Defendant*
ADVANCE MAGAZINE PUBLISHERS, INC. D/B/A CONDÉ NAST DIGITAL (ERRONEOUSLY SUED AS CONDÉ NAST DIGITAL)

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.     INTRODUCTION

This Court was not Aaron Deivaprakash's ("Plaintiff") first choice of venue. Nine months ago, Plaintiff filed in the United States District Court for the Southern District of New York a class-action complaint that was nearly identical to the one he filed here—same defendant (Advance Magazine Publishers, Inc. d/b/a Condé Nast Digital (erroneously sued as Conde Nast Digital) ("Condé Nast")) and same claim (violation of California's Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 638.51(a) (the "Pen-Register Statute")). [*See Deivaprakash v. Conde Nast Digital*, Case No. 1:24-cv-6503 (S.D.N.Y.).] Plaintiff alleged then, just as he alleges now, that Condé Nast installed and used on its websites – www.newyorker.com and www.wired.com (collectively, the "Sites") – certain JavaScript[1] that acted as a pen register by collecting from users (1) public IP addresses, (2) information about the users' devices, and, at times, (3) unique device identifiers.

Condé Nast moved to dismiss Plaintiff's complaint. [*id.* at Dkt. Nos. 13-17.] Plaintiff amended, [*id.* at Dkt. No. 24], so Condé Nast moved to dismiss again, [*id.* at Dkt. Nos. 34-37]. With no free amendments left, on March 7, 2025, Plaintiff voluntarily dismissed. [*Id.* at Dkt. No. 38.]

Plaintiff's dismissal, however, was short-lived. On the same day he dismissed, he filed this action in the Superior Court of California, County of Alameda.

Plaintiff's circuitous path was strategic. Believing he could convince the Southern District of New York to apply an antiquated California statute (CIPA) to modern-day technology (JavaScript) being used by a New York company (Condé Nast) in New York, Plaintiff filed in the Southern District. Plaintiff's mind changed when, in the month preceding his deadline to file his opposition to Condé Nast's motion to dismiss, the Southern District of New York issued opinions in two difference cases – *Xu v. Reuters News & Media Inc.,* No. 24 CIV. 2466 (PAE), 2025 WL 488501 (S.D.N.Y. Feb. 13, 2025) and *Gabrielli v. Insider, Inc.,* No. 24-CV-01566 (ER), 2025 WL

---

[1] JavaScript is a computer coding language that is used to create websites and that is interpreted through web browsers, like Google Chrome or Microsoft Edge.

522515 (S.D.N.Y. Feb. 18, 2025) – dismissing for lack of Article III standing pen-register claims nearly identical to the one asserted here. Plaintiff chose to dismiss and refile over opposing Condé Nast's motion.

Put simply, Plaintiff is before this Court because he believes this Court gives him a better chance of surviving a motion to dismiss than the Southern District of New York did. He is wrong.

Since claims like Plaintiff's first surfaced about 18 months ago, California courts faced the challenge of how to apply CIPA to modern-day technology. Some courts dismissed the cases outright, finding the technology at issue did not meet the definition of a pen register.[2] Others dismissed because the claims effectively sought to make the internet illegal.[3] And still others allowed the claims to survive dismissal, relying heavily on CIPA's broad language and presumed legislative intent.[4] This lack of consistency is unsurprising, given that CIPA was enacted long before the internet became an everyday part of Californians' lives and certainly was not intended to address the issues raised in this case.

But with time comes clarity, and recently, more and more California courts have rejected

---

[2] *Rodriguez v. Plivo Inc.*, No. 24STCV08972, 2024 WL 5184413, at *2 (Cal.Super. Oct. 02, 2024) (finding tracking technologies not to be pen registers because "Plaintiff's IP address is not the type of information that parties are prohibited from collecting by CIPA"); *Sanchez v. Cars.com Inc.*, No. 24STCV13201, 2025 WL 487194, at *3 (Cal.Super. Jan. 27, 2025) ("[T]he legislative history of the CIPA suggests that "pen register" and "track and trace devices" refer to devices or processes that are used to record or decode dialing, routing, addressing, or signaling information from telephone numbers, and not internet communications such as websites.").

[3] *See, e.g., Licea v. Hickory Farms LLC*, No. 23STCV26148, 2024 WL 1698147, at *4 (Cal.Super. Mar. 13, 2024) ("The court also finds public policy strongly disputes Plaintiff's potential interpretation of privacy laws as one rendering every single entity voluntarily visited by a potential plaintiff, thereby providing an IP address for purposes of connecting the website, as a violator."); *Casillas v. Transitions Optical, Inc.*, No. 23STCV30742, 2024 WL 4873370, at *4 (Cal.Super. Sep. 09, 2024) ("The pen register statute did not, and does not, criminalize the process by which all websites communicate with all users who choose to access them.").

[4] *See, e.g., Mirmalek v. L.A. Times Communs. LLC*, No. 24-cv-01797-CRB, 2024 U.S. Dist. LEXIS 227378, at *8-9 (N.D. Cal. Dec. 12, 2024) (denying motion to dismiss because "under the inclusive language of CIPA's definition of a pen register, Plaintiff sufficiently alleges that the Trackers are a 'device or process' under Section 638.50."); *Vishal Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924 (N.D. Cal. 2024) (denying motion to dismiss and stating that "[g]iving effect to CIPA's broad statutory language is consistent with the California Legislature's stated intent to protect privacy interests").

these claims outright.[5] Crucially, multiple California federal courts have dismissed pen-register actions for lack of injury-in-fact for purposes of Article III standing.[6]

This lack of injury-in-fact is fatal to CIPA claims under Federal Rule of Civil Procedure 12(b)(6), as well. Under CIPA, only a person "who has ***been injured by a violation of this chapter*** may bring an action against the person who committed the violation." And if plaintiffs asserting pen-register claims have not suffered an injury-in-fact for standing purposes, which merely requires a "trifling injury," *Aiken v. Obledo,* 442 F. Supp. 628, 641 (E.D. Cal. 1977), they certainly have not been "injured by a violation of" CIPA.

This fact explains Plaintiff's decision to dismiss his prior complaint before the Southern District of New York could rule on Condé Nast's motion to dismiss: his claim simply cannot withstand a finding of lack of standing.

It also explains why Plaintiff's Complaint focuses so heavily on third-party conduct that otherwise has no impact on his pen-register claim. For example, Plaintiff goes to great lengths to explain what certain third parties, including Pubmatic, Audiencerate, and Neustar, do with the information once they have it. The pen-register statute, however, only regulates how certain information is ***collected***, not how it is ***used*** thereafter. Despite Plaintiff's suggestions otherwise, CIPA does not prevent anyone from combining otherwise pseudonymous information with "profiles" on internet users. [Dkt. No. 1-1, ¶ 81.] Nor does it preclude anyone from offering those "profiles" "for sale to advertisers." [*Id.*] As it pertains to this litigation, CIPA merely precludes a

---

[5] *See, e.g., Aviles v. Liveramp, Inc*., No. 24STCV19869, 2025 WL 487196, at *2 (Cal.Super. Jan. 28, 2025) (because "Plaintiff does not allege that the Beacon - or any other software installed on users' devices by the Website -collects the outgoing addressing information from visitors' devices or browser," he "has not alleged the use of a pen register"); *Sanchez*, 2025 WL 487194, at *3 (dismissing pen-register claim because "the legislative history of the CIPA suggests that 'pen register' and 'track and trace devices' [sic] refer to devices or processes that are used to record or decode dialing, routing, addressing, or signaling information from telephone numbers, and not internet communications such as websites").

[6] *See, e.g., Khamooshi v. Politico LLC,* No. 24-CV-07836-SK, 2025 WL 1408896, at *3 (N.D. Cal. May 13, 2025) (dismissing for lack of injury-in-fact); *Rodriguez v. Autotrader.com, Inc.,* No. 2:24-CV-08735-RGK-JC, 2025 WL 1085787 (C.D. Cal. Apr. 4, 2025) (dismissing *sua sponte* for lack of injury-in-fact); *Carolus v. Nexstar Media Inc.*, No. 24-CV-07790-VC, 2025 WL 1338193, at *1 (N.D. Cal. Apr. 9, 2025) (dismissing pen-register claim for lack of injury-in-fact).

person, like Condé Nast, from installing a pen register without prior court approval, which Plaintiff has not alleged and cannot allege.

In truth, the fact that the majority of Plaintiff's allegations have nothing to do with the one claim he has asserted against Condé Nast demonstrates what Condé Nast has been arguing all along: the "Trackers" are not pen registers.

Plaintiffs' Complaint should be dismissed and, given the number of times Plaintiff has now been able to amend, this time it should be with prejudice.

## II.    PLAINTIFF'S ALLEGATIONS

Despite Plaintiff's Complaint including 218 paragraphs, the allegations relevant to his one claim here are included in just a handful of them. Plaintiff, a "citizen of California" [Dkt. 1-1, ¶ 8], alleges that, while located in California [*id.*], he "visited the [Sites] multiple times—as recent[ly] as March 2024 and as long ago as 2012—on his desktop browser" [*id.* at ¶ 196]. He further claims that, at the time he visited the Sites, the Sites were running three different "Trackers" (i.e., JavaScript embedded in the Sites' HTML code) that collected certain information about him. [*Id. at* ¶ 2.] Specifically, Plaintiff alleges that the Sites were running the Pubmatic Tracker, the Audiencerate Tracker, and the AGKN Tracker (collectively, the "Trackers") and that the Trackers instructed his browser to send his IP address; Device Metadata, which Plaintiff describes as "device type[] and browser type"; and unique cookie ID to Pubmatic, Audiencerate, and Neustar (individually, a "Third Party," and collectively, the "Third Parties"), respectively. [*Id.* at ¶ 2.]

Based on the above, Plaintiff asserts that Condé Nast violated the Pen-Register Statute and, therefore, owes $5,000 in statutory damages to him and every member of the putative class.

## III.    MOTION TO DISMISS STANDARD

"In ruling on a motion under Rule 12(b)(6), [this] Court follows *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)." *Apatow v. Am. Bankers Ins. Co. of Fla.*, No. 16-198 MWF (MRWX), 2016 WL 7422288, at *2 (C.D. Cal. Dec. 21, 2016). "To survive a motion to dismiss, a complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face." *Id*. (internal quotation marks and alterations omitted). The Court "need not accept as true . . . threadbare recitals of the elements of a cause of

action, supported by mere conclusory statements." *Id.* (internal citation and quotation marks omitted). Indeed, the "Court, based on judicial experience and common-sense, must determine whether a complaint plausibly states a claim for relief." *Id.*

## IV.    ARGUMENT

### A.    The Trackers Are Not Pen Registers.

CIPA's "pen register" definition is clear: "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but ***not*** the contents of a communication." Cal. Penal Code § 638.50(b). Broken down, the definition has four elements: (1) a device or process that (2) records or decodes (3) dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted but (4) does not collect the contents of a communication.

Before delving into whether Plaintiff has sufficiently alleged each of these four elements, it is crucial to identify what—exactly—Plaintiff claims the pen registers are here.

Plaintiff devotes a significant amount of his Complaint to describing what ***other parties,*** none of which Plaintiff has sued, do with the information once it is in their possession. He claims that one party, Tapad, uses the information collected to create "a 'Device Graph,' which allows advertisers to connect individuals to all the devices those individuals use for the purpose of delivering targeted advertisements." [Dkt. No. 1-1, ¶ 84.] He also alleges that another party, LiveRamp, leverages the data to "provide[] 'identity resolution,' which '[b]ring[s] in data from across identity spaces' 'to enable the delivery of more personali[z]ed and meaningful customer experiences.'" [*Id.* at ¶ 92.] But as the Court in *Aviles*, 2025 WL 487196, correctly noted, the post-collection use of data is irrelevant to a claim under Pen-Register Statute because "downstream use of data is not a part of the definitions of pen registers or trap and trace devices." *Id.* at *3. What matters is "the method of data collection itself…."[7] *Id.* And neither Tapad's "Device Graph,"

---

[7] That is not to say that Condé Nast can sell, share, or use the data in any manner it pleases. The California Consumer Privacy Act ("CCPA") regulates post-collection use of the data including the right to opt out of future collection or use, but Plaintiff does not allege that Condé Nast violated the CCPA.

LiveRamp's "identity resolution," nor any of the products offered by the other parties identified in the Complaint is the method of collection. Per Plaintiff's own allegations, the method of collection is "the [Pubmatic][8] Tracker, Audiencerate Tracker, and AGKN Tracker" "installed on the Website visitors' internet browsers." [Dkt. No. 1-1, ¶ 2; *see also id.* at ¶ 34.]

Therefore, the question presented here is whether the Trackers themselves meet CIPA's definition of a pen register. They do not.

### (i)     The Trackers Do Not "Record or Decode" Anything.

The Trackers identified in the complaint—the Pubmatic Tracker, the Audiencerate Tracker, and the AGKN Tracker—all do the same thing. They instruct a user's browser (1) to save a cookie (i.e., a text file) that includes an "ID unique to" the individual tracker itself and (2) to send certain information, including, at times, the cookie's unique ID, back to the Third Party who developed the Tracker. [Dkt. No. 1-1, ¶¶ 32-33.]

Notably missing from Plaintiff's description of the Trackers is any reference to "recording" or "decoding." The reason for this is simple: as a line of JavaScript embedded in the Sites' HTML code, the Trackers can neither record nor decode anything. All they can do is provide instructions to a user's browser.

For example, Plaintiff alleges that the Trackers instructed his browser "to send identifying ('addressing') information to PubMatic, Audiencerate, and Neustar." [Compl., ¶ 32.] But Plaintiff does not allege that the Trackers "record" any of this information. For example, he does ***not*** allege that the Trackers, ***themselves***, create "a permanent and complete record of outgoing calls" (i.e., "GET" request), "as well as the numbers called on the particular line" (i.e., websites to which the GET requests are sent). *United States v. Dote*, 371 F.2d 176, 178 (7th Cir. 1966) (discussing the capabilities of a pen register). Nor does he allege that the Trackers "automatically record[] telephone numbers dialed" (i.e., websites viewed). *United States v. Devorce*, 526 F. Supp. 191, 195 (D. Conn. 1981) (same). He merely alleges that the Trackers tell his browser to send his IP

---

[8] Although Plaintiff identifies the DoubleClick tracker in Paragraph 2 of his Complaint, Condé Nast assumes this was a typographical error and likely a remnant from a prior complaint against a different defendant.

address, device information, and device ID to PubMatic, Audiencerate, and Neustar.

Similarly, Plaintiff does ***not*** allege that the Trackers "decode" any information. Courts have described what it means for a pen register to "decode" information. In *United States v. Kail*, 612 F.2d 443 (9th Cir. 1979), the Ninth Circuit noted that a pen register "automatically translat[es] electrical impulses into the numbers dialed." *Id.* at 778. Similarly, in *Dote*, 371 F.2d 176, the Seventh Circuit explained that a pen register works by converting a "pulsation of the dial on a line to which the pen register is attached" to "the number dialed." *Id.* at 178. No similar "decoding" is alleged here. Indeed, Plaintiff includes in the Complaint screenshots of the information he alleges was sent from his browser directly to PubMatic, Audiencerate, and Neustar. [Dkt. 1-1, Figures 6 through 12.] He does not, however, allege whether, how, or when the Trackers "decoded" it.

Absent any recording or decoding by the Trackers themselves, the Trackers cannot be pen registers under the plain language of CIPA § 638.50(b). Plaintiff's Complaint must be dismissed.

### (ii)    The Trackers Cannot Be Pen Registers Because They Collect More Than Just "Dialing, Routing, Addressing, or Signaling Information."

Although CIPA does not affirmatively define "dialing, routing, addressing, or signaling information," CIPA does state what it ***cannot be***—namely, "the contents of a communication." Cal. Penal Code § 638.50(b). CIPA likewise does not define "contents of a communication," but its federal counterpart—the Wiretap Act—does. The Wiretap Act, upon which California courts frequently rely when interpreting CIPA[9], states that "'contents', when used with respect to any wire, oral, or electronic communication, includes any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8). Put simply, content is "the words spoken in a phone call," *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1061 (N.D. Cal. 2012), that are "transmitted to or received by the parties to [the]…call," *United States v. Reed*, 575 F.3d 900, 916 (9th Cir. 2009).

Therefore, if a "device or process" "records or decodes" "any information concerning the

---

[9] *See, e.g., Brodsky v. Apple Inc.,* 445 F. Supp. 3d 110, 127 (N.D. Cal. 2020) ("The analysis for a violation of CIPA is the same as that under the federal Wiretap Act." (internal quotations omitted).)

substance, purport, or meaning of [a] communication," **it cannot be a pen register.** *See In re Application of U.S. for an Ord. Authorizing use of A Pen Reg. & Trap On (XXX) Internet Serv. Acct./User Name, (xxxxxxxx@xxx.com)*, 396 F. Supp. 2d 45, 48 (D. Mass. 2005) ("[G]enerally speaking, routine pen registers and trap and trace devices installed on telephones record only the numbers dialed out or dialed in and not the contents of any communication.").

Even assuming that Plaintiff had alleged that the Trackers "record" or "decode" anything (he has not), Plaintiff has still failed to plausibly allege that the Trackers are pen registers because, as Plaintiff admits, the Trackers instructed his browser to transmit far more information than just "dialing, routing, addressing, or signaling information."

Public IP addresses have been held to be "dialing, routing, addressing, or signaling information." *See, e.g., In re Zynga Priv. Litig.,* 750 F.3d 1098, 1108 (9th Cir. 2014) ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication than do phone numbers." (internal quotations omitted).) And Plaintiff does allege that the Trackers caused his browser to transmit his public IP address to the third Parties. [Dkt. No. 1-1, ¶ 2.]  But just because a device or process transmits "dialing, routing, addressing, or signaling information" does not mean that the "device or process" **is** a pen register. If it did, every device connected to the internet would be a pen register.  *Khamooshi*, 2025 WL 1408896, at *3 (N.D. Cal. May 13, 2025) ("When internet users visit a website, their devices automatically send their IP addresses to the website's server as part of the communication process."). Plaintiff must also plead that the "device[s] or process[es]"—here, the Trackers— do **not** transmit "any information concerning the substance, purport, or meaning" of the communication to which the "dialing, routing, addressing, or signaling information" relates. *Price v. Headspace, Inc.,* No. 24STCV19921, 2025 WL 1237977, at *3 (Cal.Super. Apr. 01, 2025) ("[T]he crucial distinction from other devices is that…'pen registers'…are designed to capture **information about the communication**, but **not** the content of the communication itself." (emphasis added)); *In re U.S.*, 622 F. Supp. 2d 411, 421 (S.D. Tex. 2007) ("The definition of a 'pen register' contains an express and clear statement that information collected by a pen register 'shall not include the contents of any communication.'" (quoting 18 U.S.C. § 3127(3)).)

In fact, on April 1, 2025, the Superior Court of California, County of Los Angeles dismissed a CIPA § 638.51(a) claim because the plaintiff alleged that the tracker captured not only the user's IP address, but also "as much data as it can about an otherwise anonymous visitor to the Website." *Price*, 2025 WL 1237977, at *3. And, according to the Court, "if the device is capturing the content of the communications, it is definitionally not a [pen register]."[10] *Id.*

The same is true here. Plaintiff does not allege that the Trackers transmitted **only** IP addresses; he alleges that the Trackers transmitted IP addresses; "Device Metadata, and/or the unique cookie IDs" [Dkt. No. 1-1, ¶ 34]; and a whole host of additional information as shown in Figures 6 through 12 of the Complaint. Take, for example, Figure 6 of the Complaint, included in-full below.

**Figure 6:**



[*Id.* at ¶ 80, Figure 6.]

Figure 6, according to Plaintiff, shows the "traffic" (i.e., the transmission) from a user's "browser…[to] Pubmatic" that includes the user's "Device Metadata (the 'user-agent' string in the screenshot [above]) and [a] unique [cookie] ID…." [Dkt. 1-1, ¶ 80.] What Plaintiff fails to explain,

---

[10] Although the court in *Price* was discussing trap-and-trace devices, the *Price* court's logic applies with equal force and effect here. CIPA's definitions of a pen register and a trap-and-trace device both exclude the capture of the "contents of communications." Cal. Penal Code § 638.50(c) ("'Trap and trace device' means a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication.").

however, is that the information in Figure 6 is not the "dialing, routing, addressing, or signaling information" of a user's transmission to Condé Nast. *Aviles*, 2025 WL 487196, at *2 (noting that, in online pen-register claims, the "dialing, routing, addressing, or signaling information" is "the IP address and related information of a website accessed by a computer - but not the computer's own IP address or identifying information"). Instead, it is the ***actual transmission*** between the user's browser and Pubmatic.

That Figure 6 does not include any IP addresses proves this fact. As it relates to internet transmissions, IP addresses are like "to" and "return" addresses on the envelope of a mailed letter. *United States v. Kidd*, 394 F. Supp. 3d 357, 362 (S.D.N.Y. 2019) (analogizing "IP address information to information historically considered voluntarily disclosed to third parties, such as 'envelope markings'"). Figure 6, and each of the other Figures included in Plaintiff's Complaint, do not include IP addresses because the Figures are not just the envelopes (i.e., the "dialing, routing, addressing, or signaling information"). They are the letters (i.e., the actual transmissions). And since they include more than just "dialing, routing, addressing, or signaling information'" the Trackers cannot be pen registers.

Plaintiff has failed to allege that the Trackers are pen registers. Therefore, his claim must be dismissed.

> **(iii)    The Trackers Cannot Be Pen Registers Because Any "Dialing, Routing, Addressing, or Signaling Information" They Transmitted Related to Plaintiff's Transmissions to the Third Parties Directly.**

As numerous courts have explained, trackers, like Pubmatic's, Audiencerate's, and Neustar's, do not intercept a user's transmission to the website operator. Instead, they instruct a user's browser to send an entirely ***separate transmission*** to a third party. For example:

1.    "When a user visits a website, the user's browser sends a 'GET' request to the website to retrieve it." *Brown v. Google LLC*, 685 F. Supp. 3d 909, 919 (N.D. Cal. 2023).

2.    "The [website] server responds by sending HTML code to the user's browser." *James v. Walt Disney Co.*, 701 F. Supp. 3d 942, 945 (N.D. Cal. 2023), *motion to*

11

*certify appeal denied*, No. 23CV02500EMCEMC, 2024 WL 664811 (N.D. Cal. Feb. 16, 2024).

3.      If the HTML code sent back to the user['s browser] includes a tracker's JavaScript, that JavaScript "directs the user's browser to send a **separate communication** to [the third party]." *Brown*, 685 F. Supp. 3d at 919 (emphasis added).

There are, therefore, two lines of transmissions at issue: one between the user and Condé Nast and one between the user and the Third Party (i.e., Pubmatic, Audiencerate, or Neustar). [Dkt. No. 1-1, ¶ 67 (alleging that information "is sent from Plaintiff's and Class Members' browser to the Third Parties").] Each line of transmission has an "envelope" (i.e., the IP addresses), and each line of transmission has a "letter" (i.e., the information transmitted).

Furthermore, just as letters sent to different addresses have different envelopes, the two transmissions from Plaintiff's browser had different "dialing, routing, addressing, or signaling information." The transmission from Plaintiff to Condé Nast was "addressed" to the IP address of Condé Nast's web server; how else would Plaintiff request the HTML code to the Sites he was voluntarily trying to access? The transmission from Plaintiff to the Third Parties was "addressed" to the IP address of those Third Parties' web servers. That means, to the extent the Trackers did collect "dialing, routing, addressing, or signaling information," they collected the "dialing, routing, addressing, or signaling information" of Plaintiff's transmission directly to the Third Parties operating the Trackers.

That is not a violation of the Pen-Register Act.  *See Capitol Recs. Inc. v. Thomas-Rasset*, No. CIV 06-1497(MJD/RLE), 2009 WL 1664468, at *3 (D. Minn. June 11, 2009) ("[T]he Pen Register Act," the Pen-Register Statute's federal counterpart, "cannot be intended to prevent individuals who receive electronic communications from recording the IP information sent to them."); *see also Malibu Media, LLC v. Pontello*, No. 13-12197, 2013 WL 12180709, at *4 (E.D. Mich. Nov. 19, 2013) ("Because the IP address was voluntarily sent [to Defendant], the Pen Register Act cannot prevent [the Defendant's] investigator from recording that information.").

Put simply, Plaintiff is upset not because Condé Nast or any of the Third Parties "installed or used" a pen register; there is no pen register. Rather, Plaintiff is upset because his browser sent

to the Third Parties a transmission he did not want it to send. That is not a violation of CIPA or any other California law. In fact, the transmission about which Plaintiff complains is expressly authorized by the CCPA provided Plaintiff did not opt out of that transmission. Cal. Civ. Code § 1798.120 (a)(1) ("A consumer shall have the right, at any time, to direct a business that sells or shares personal information about the consumer to third parties not to sell or share the consumer's personal information. This right may be referred to as the right to opt out of sale or sharing."). And Plaintiff does not allege that he opted out. [*See generally* Dkt. No. 1-1.]

## B.  Condé Nast Did Not "Use" or "Install" a Pen Register.

Even if this Court were to find that the Trackers *could be* pen registers, Plaintiff's claim still fails because Condé Nast neither installed nor used them. The Pen-Register Statute prohibits a "person" from doing two things "without first obtaining a court order pursuant to Section 638.52 or 638.53": (1) *installing* a pen register or (2) *using* a pen register. Cal. Penal Code § 638.51(a). Plaintiff conclusorily asserts that Condé Nast did both. [Dkt. 1-1, ¶ 5 ("By installing and using the Trackers without Plaintiff's prior consent and without a court order, Defendant violated CIPA § 638.51(a).").] But prior case law, as well as Plaintiffs' own allegations, makes clear that Condé Nast did neither.

As an initial matter, to the extent Plaintiff is alleging that Condé Nast itself *used* the pen register, his allegation makes little sense. A website that records the IP address of a device that has visited it is not unlawfully using a pen register; it is merely operating a website. *See Gabrielli*, 2025 WL 522515, at *6 ("[A]n IP address is necessary to access [Defendant's] website because an IP address enables an individual's web browser to communicate with the website server."). To hold otherwise would render unlawful the use of the "most ubiquitous type of…equipment known, used countless times each day for routine communications by the vast majority of people in the country," which courts have refused and should refuse to do. *ACA Int'l v. Fed. Commc'ns Comm'n*, 885 F.3d 687, 698 (D.C. Cir. 2018). This would even include the Court's own website, www.cand.uscourts.gov, which, as shown below, includes a tracker that, under Plaintiff's theory, would qualify as a pen register.

| Court's Website | Figure 7 of the Complaint |
|---|---|
|  |  |

[*Compare* Transmission to Google Analytics, available at www.cand.uscourts.gov (last visited: May 6, 2025) *with* Dkt. No. 1-1, Figure 7.]

In apparent recognition of this fact, Plaintiff tacitly admits that his claim is based on Condé Nast's alleged *installation* of pen registers, not their *use*. [*See, e.g.,* Dkt. 1-1, ¶ 2 ("The Trackers are *operated* by separate and distinct third parties: [Pubmatic][11], Audiencerate, and AGKN…." (emphasis added)); ¶ 32 ("[Condé Nast's] server's instructions cause the Trackers to be *installed* on a user's browser." (emphasis added).); ¶ 43 n. 4 ("So, by *installing* the Trackers on Website users' browsers, Defendant allows third parties to collect information…." (emphasis added).); ¶ 65 ("As described below, when a user visits the Websites, the Websites' code—as programmed by Defendant—*installs* the Trackers onto the user's browser." (emphasis added).).]

Although CIPA does not define what it means to "install" a pen register, Cal. Pen. Code § 638.50, the plain meaning is straightforward. "To install" means "to set up for use or service." *See* https://www.merriam-webster.com/dictionary/install (last visited: April 24, 2025). Condé Nast did not "install" anything, let alone the Trackers.

To start, the Trackers are not actually "installed" on a user's browser. The Trackers are pieces of code embedded in the *website's* HTML code that, when read by the user's browser, instruct the user's browser to take certain actions (i.e., send certain information to the Third Party

---

[11] Although Plaintiff identifies Google as one of the Third Parties, this appears to be a typo. Throughout the rest of the Complaint, Plaintiff refers to this Third Party as PubMatic.

14

1

2    who developed the Tracker and save a cookie that includes a unique ID, [Dkt. No. 1-1, ¶¶ 32-33].).

3    *See also Aviles,* 2025 WL 487196, at *3 ("Without alleging that ***Defendant installed*** software on

4    Plaintiff's…browser that collected incoming contact information to Plaintiff's device, Plaintiff has

     not alleged anything above and beyond how the internet normally works." (emphasis added).)

5        But even if the Court were to assume that the Trackers were "installed," Plaintiff repeatedly

6    admits in the Complaint that Condé Nast, itself, did not "install" them. Instead, as Plaintiff avers,

7    Condé Nast's website code instructed ***Plaintiff's*** browser to install the Trackers. [*Id.* at ¶¶ 30-32

8    (alleging that Condé Nast's servers responded to Plaintiff's 'GET' request by sending an 'HTTP

9    response' that included "instructions" on "what images to load, what text should appear, or what

10   music should play," as well as instructions to Plaintiff's browser to "install[]" the Trackers).]

11       There is a big difference between Condé Nast installing the Trackers on Plaintiff's browser

12   and the Sites' HTML code instructing Plaintiff's browser to do so because Plaintiff and his browser

13   ***were not required*** to comply with the instructions. Every user, including Plaintiff, has the ability

14   to ignore them and prevent the Trackers from operating by preemptively activating a Global

15   Privacy Control[12] signal (usually through his or her browser settings) or by opting out of

16   sales/shares on either the www.wired.com or www.newyorker.com websites[13].

17       This optionality clearly distinguishes the Trackers from pen registers. As Plaintiff admits,

18   pen registers were historically installed by law enforcement on the telephone line of a suspect in a

19

20

21   _____

     [12] A Global Privacy Control signal notifies every website a user visits that the user wants to
     "opt[] out of as much data sharing as possible," including the use of the Trackers. *See*
22   https://globalprivacycontrol.org/GPC_for_Users.pdf (last visited: April 25, 2025).

23   In March 2024—the month of Plaintiffs' most "recent" visit to the Sites, [Dkt. No. 1-1, ¶ 197],
     Condé Nast's Privacy Policy expressly stated that "[y]ou may also Opt-Out of such uses through
24   privacy preference signals recognized under applicable local law, such as the Global Privacy
     Control (GPC), but please note that this signal will be linked to your browser only." [*See* Condé
25   Nast Privacy Policy (effective December 14, 2023), § 6 "Your Privacy Choices And Rights;
     Submitting Requests Under Applicable Local Laws," "Submitting Requests" subsection,
26   available at: https://web.archive.org/web/20240301013534/https://www.condenast.com/privacy-
     policy#privacypolicy (last visited: May 31, 2025).]

27   [13] Under the CCPA, companies meeting certain requirements must allow site users the ability to
     opt out of sales or shares of their information.  Both www.wired.com and www.newyorker.com
28   allow California customers to opt out of sales or shares of their information, including opting out
     of the use of the Trackers. *See* Cal. Civ. Code § 1798.120 (a)(1).

criminal investigation so that law enforcement could determine who that person was calling. [Dkt. No. 1-1, ¶ 24.] If the suspect could opt out of having the telephone numbers of his outgoing calls recorded, like Plaintiff here can, then pen registers would be useless. The suspect would simply opt out.

Throughout the Complaint, Plaintiff tries to paint Condé Nast's conduct as nefarious or somehow underhanded. What he fails to mention, however, is that, like every user who visits www.wired.com and www.newyorker.com, he had control over what his own browser did or did not do. Condé Nast did not commandeer Plaintiff's computer and force it to install the Trackers. The Site's HTML code instructed Plaintiff's browser to do so, and Plaintiff's browser, which is controlled by Plaintiff, complied. Plaintiff also ignores the benefit many internet users may derive from the Trackers. Advertisements on websites are not going away any time soon. So the only question is whether the ads being shown are being selected at random or if they are being chosen based on a particular device's history. The user of the device—here, Plaintiff—must answer that question for himself. That choice is what the CCPA requires and what Condé Nast here provided. Condé Nast did not install a pen register in violation of CIPA. Plaintiff's Complaint should be dismissed.

## C.    Plaintiff Was Not "Injured by a Violation" of CIPA.

Even if Plaintiff had plausibly alleged that Condé Nast installed a pen register in violation of the Pen-Register Statute (he has not), Plaintiff's claim would still fail because Plaintiff lacks statutory standing to bring suit.[14]

CIPA provides a private right of action to "[a]ny person who has been injured by a violation of this chapter." Cal. Penal Code § 637.2 (a). Courts have interpreted similar statutory-standing

---

[14]  To be clear, Condé Nast is not arguing, at this point in the case, that Plaintiff lacks Article III standing. "Article III standing and statutory standing are distinct legal analyses." *Corbett v. Pharmacare U.S., Inc.*, 544 F. Supp. 3d 996, 1005 (S.D. Cal. 2021). Unlike Article III standing, statutory standing is not jurisdictional. *Jewel v. Nat'l Sec. Agency*, 673 F.3d 902, 907 n. 4 (9th Cir. 2011). Instead, statutory standing requires consideration of the merits of the plaintiff's claim and asks: has the plaintiff "been granted a right to sue by the specific statute under which he or she brings suit"? *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1175 (9th Cir. 2004) (internal quotations omitted). Any plaintiff who fails to establish statutory standing has failed to state a cause of action upon which relief can be granted. *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011) ("[L]ack of statutory standing requires dismissal for failure to state a claim").

provisions to require something beyond a mere violation of the law. For example, when interpreting the statutory-standing provision under California Civil Code § 1798.84, which states that "[a]ny customer injured by a violation of this title may institute a civil action to recover damages," *id.* at § 1798.84(c), the United States District Court for the Central District of California found that the private right of action "does not allow a cause of action based solely upon a failure to comply with the statute" but, instead, "expressly requires an injury resulting from a violation." *Boorstein v. Men's J. LLC*, No. CV 12-771 DSF EX, 2012 WL 2152815, at *3 (C.D. Cal. June 14, 2012). The same is true under CIPA.

That does not mean, however, that the injury required under CIPA must come in the form of "actual damages." In fact, CIPA expressly states that, to be injured under the statute, the plaintiff need not have "suffered, or be[en] threatened with, actual damages." Cal. Penal Code § 637.2(c). That is, injury under CIPA does not require "special damages for proven pecuniary loss." *See F.A.A. v. Cooper,* 566 U.S. 284, 298, 304 (2012) (interpreted "actual damages" in the privacy context to mean "special damages for proven pecuniary loss").

Read together, these two provisions of CIPA mean that while a bare violation of CIPA will not give rise to statutory standing, a plaintiff need not have suffered pecuniary loss before bringing suit under CIPA, either. Put simply, statutory standing under CIPA is similar, if not identical, to standing under Article III. *See Spokeo, Inc. v. Robins,* 578 U.S. 330, 341 (2016), as revised (May 24, 2016) ("Article III standing requires a concrete injury even in the context of a statutory violation."); *see also Brace v. Lifeguard, Inc*., No. CIV. 92-20509 SW, 1995 WL 32868, at *3 (N.D. Cal. Jan. 25, 1995) ("An injury-in-fact need not be monetary, but it must be distinct and palpable, and of a type redressible by the court.").

Plaintiff here relies on two theories of injury, either or both of which he claims satisfies CIPA's statutory-standing requirements: (1) invasion of privacy and (2) unjust enrichment. As several courts have held, those two theories do not suffice for injury-in-fact and, therefore, cannot suffice for statutory standing under CIPA.

### (i)    Condé Nast Did Not Invade Plaintiff's Privacy.

Plaintiff identifies two privacy injuries that he claims he suffered from Condé Nast's

conduct: (1) the loss of the "right to determine who does and does not get to know [his] information," [Dkt. No. 1-1, ¶ 160], and (2) the loss of his "anonymity" when visiting the Sites, [*id.* at ¶ 167]. These two alleged injuries have been likened to the common law's "public disclosure of private facts" and "intrusion upon seclusion," respectively. Both have been rejected before and should be rejected again.

### 1. The data at issue does not give rise to a cognizable privacy interest.

As a threshold matter, there can be no invasion-of-privacy injury if the plaintiff lacks a "legally protected privacy interest" in the information allegedly disclosed. *See In re Google Location Hist. Litig.*, 428 F. Supp. 3d 185, 196 (N.D. Cal. 2019) (listing as a "threshold element[]" to an invasion-of-privacy claim, "a legally protected privacy interest"). In the Complaint, Plaintiff focuses on three types of information that he claims Condé Nast shared with the Third Parties: IP address, Device Metadata, and, potentially, unique cookie ID. None of this information gives rise to a cognizable privacy interest.

Internet users, like Plaintiff, have no reasonable expectation of privacy in the public IP address they are using while browsing the internet. *See, e.g., Heeger v. Facebook, Inc.,* 509 F. Supp. 3d 1182, 1189 (N.D. Cal. 2020) ("[T]here is no legally protected privacy interest in IP addresses."); *Kidd*, 394 F. Supp. 3d at 362 ("[M]ost courts have adopted a categorical approach holding that users have no reasonable expectation of privacy in such IP address information."). Similarly, internet users, like Plaintiff, have no reasonable expectation of privacy in the IP addresses of the websites they visit. *United States v. Forrester*, 512 F.3d 500, 510 (9th Cir. 2008) ("[I]nternet users have no expectation of privacy in the…IP addresses of the websites they visit because they should know that this information is provided to and used by Internet service providers for the specific purpose of directing the routing of information.").

Device Metadata is equally unprotected because it is equally, if not more, innocuous. The "user-agent" string in Figure 6 of the Complaint shows the Device Metadata allegedly shared with the Third Parties.

**Figure 6:**

:authority hbopenbid.pubmatic.com
:method POST
:path /translator?source=prebid-client
:scheme https
accept */*
accept-encoding gzip, deflate, br, zstd
accept-language en-US,en;q=0.9
content-length 1293
content-type text/plain
cookie KADUSERCOOKIE=0AF6314C-9361-4B42-BA26-6767BAAAC454;KRTBCOOKIE_148=19421-uid:351CD07575B64B45A48B86969FE28563&KRTB&23486-uid:3!
dnt 1
origin https://www.newyorker.com
referer https://www.newyorker.com/
sec-browsing-topics ()p=P00000000000000000000000000000000
sec-ch-ua "Chromium";v="122", "Not(A:Brand";v="24", "Google Chrome";v="122"
sec-ch-ua-mobile ?0
sec-ch-ua-platform "macOS"
sec-fetch-dest empty
sec-fetch-mode cors
sec-fetch-site cross-site
user-agent Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/122.0.0.0 Safari/537.36

As Plaintiff admits, it includes the device type (Macintosh) and browser type (Chrome or Safari). [Dkt. No. 1-1, ¶ 2.] That is all. It does not include Plaintiff's name, date of birth, telephone number, address, email address, or any other information that could be tied back to Plaintiff individually. At most, Device Metadata might be able to distinguish one *device* from another *device*, provided that the devices are not the same make and model.

That leaves just the unique cookie ID. Contrary to how Plaintiff describes it, the unique cookie ID, highlighted by Plaintiff in Figure 6 above, does not actually *identify* anyone. Instead, it *differentiates* one device on a website from other devices on the same website. The unique cookie ID, therefore, is, as the United States District Court for the Northern District of California described it, "pseudonymous information." *Smith v. Google, LLC*, 735 F. Supp. 3d 1188, 1193 (N.D. Cal. 2024) ("When a user visits a website with [the tracker] installed, the tracking code collects pseudonymous information about how the user interacts with the webpage.").

In sum, Plaintiff claims that Condé Nast invaded his privacy by allowing the Third Parties to collect (1) his IP address and the IP address of the site he visited, neither of which he has a reasonable expectation of privacy in; (2) his Device Metadata, which may, but does not necessarily, differentiate his device from another device on the Sites; and (3) a pseudonymous cookie ID that is assigned to his browser regardless of who is actually using it (i.e., plaintiff, his significant other, his child, his friend, etc.). As the United States District Court for the Southern District of New York found on two different occasions, because Plaintiff "does not allege that anyone could actually identify him *from the [information] allegedly collected by the Tracker*," he has failed to establish an injury arising from Condé Nast's conduct. *Gabrielli*, 2025 WL 522515, at *4 (emphasis added); *see also Xu*, 2025 WL 488501, at *3 (dismissing for lack of injury-in-fact

because plaintiff did not "allege that Reuters collected sensitive or personally identifying information data that could be used to…inflict…harm"); *see also Khamooshi*, 2025 WL 1408896, at *3 (N.D. Cal. May 13, 2025) ("[I]njury arises only where the alleged harm involves personal information—and specifically, information whose disclosure would be considered 'highly offensive to a reasonable person.'"); *Carolus,* 2025 WL 1338193, at *1 (disclosure of information similar to the information at issue here "does not cause the kind of harm that can be vindicated in federal court"); *Sanchez*, 2025 WL 487194, at *5 ("[E]ven if, arguendo, the collection of Plaintiff's IP address constitutes operation of a pen register, Plaintiff has no reasonable expectation in the privacy of her computer's IP address since she chose to access the Website.")

Beyond that, even if Plaintiff could be identified from the information collected, Plaintiff would still not possess a protected privacy interest in the information. As the California Supreme Court explained in *Hill v. Nat'l Collegiate Athletic Assn*., 7 Cal. 4th 1 (1994): "A particular class of information is private when well-established social norms recognize the need to maximize individual control over its dissemination and use to prevent unjustified embarrassment or indignity." *Id.* at 35. Nowhere in Plaintiff's Complaint does he explain how disclosing that he visited one or both of the Sites could have resulted in "embarrassment or indignity." It strains credulity to believe that, had Plaintiff purchased *Wired Magazine* or *The New Yorker* magazine in hardcopy, he would have shielded his purchase or possession of the magazines from those around him. "Social norms" simply do not "recognize the need to maximize individual control over" whether Plaintiff did or did not visit the Sites because disclosure of that information does not result in "embarrassment or indignity." Indeed, his repeated, unredacted public filings publicizing the exact information he alleges ought have remained private reveals the disingenuousness of these privacy claims.

### 2.    Condé Nast did not *cause* Plaintiffs' alleged privacy injuries.

Plaintiff goes to great lengths in the Complaint to show that the Third Parties could, in fact, identify him as the Site visitor about whom the otherwise pseudonymous information related.  But, in making this claim, Plaintiff actually proves Condé Nast's point. Nothing **Condé Nast** did invaded his privacy: the Third Parties were already in possession of his information regardless of

Condé Nast's conduct.

As Plaintiff describes it, the Third Parties, all of whom are "registered data brokers in California," [*id.* at ¶ 6], have, independent of anything Condé Nast did, amassed "profiles" on internet users "that contain as much personal and demographic information as possible," [*id*]. The Third Parties do this by, among other things, "shar[ing]" their user profiles "between each other and with various other entities," [*id.*]; "crunching 150 billion data points—from cookies, cellphone IDs (which link individual phones to app downloads and Web browsing), Wi-Fi, connections, website registrations, browsing history and other inputs," [*id.* at ¶ 84]; "intergrat[ing] with… 'offline consumer data set (purchase behaviors, interests, lifestyle info)'…including 'first-party data such as names, physical addresses, email addresses, mobile ad identifiers (MAIDs), IP addresses, and other information,'" [*id.* at ¶ 85]; and "procur[ing] consumers' identities from 'public records (including voter registration files, phone books, deeds, and permits), surveys ('self-reported data from 20 million households'), partners (data from corporate sources), and 'multi-sourced' information," including "'real transactional data' on categories of purchases'," [*id.* at ¶ 90].

Thus, per Plaintiff's own admissions, the Third Parties independently knew who he was, where he lived, what he liked, where he shopped, etc., not because of the pseudonymous information they obtained from the Sites but because of the sheer volume of information about him that was already in their possession.   In short, to the extent Plaintiff was injured (he was not), his injury was not caused by Condé Nast. Any alleged injury was caused by information these Third Parties had amassed on him separate and apart from anything Condé Nast did—an injury that Plaintiff could have prevented by opting out of sales or shares under the CCPA and an injury that Plaintiff could prevent now by exercising his deletion rights under the CCPA. *See* Cal. Civ. Code §§ 1798.120(a)(1) (opt-out right), 1798.105(a) ("A consumer shall have the right to request that a business delete any personal information about the consumer which the business has collected from the consumer."). Plaintiff cannot, in good faith, argue that Condé Nast allowing the Third Parties to collect pseudonymous information from the Sites ***caused*** his alleged injury. His Complaint must be dismissed. *See Sanchez*, 2025 WL 487194, at *3 (sustaining demurrer in pen-

21

register claim because "[w]hen the facts as alleged do not give rise to an inference that the claimed injury would naturally result from the alleged wrongful conduct, Plaintiff must allege with specificity how exactly the alleged wrongful conduct could have caused the alleged injury" and "[a] mere allegation of injury without a reasonable relationship to Defendant's acts" is insufficient).

Even beyond that, the provision under which Plaintiff brings suit here—Cal. Penal Code § 638.51(a)—does not prevent Condé Nast from disclosing Plaintiff's IP address, Device Metadata, and pseudonymous ID to the Third Parties. The CCPA regulates such activity, and Plaintiff does not claim Condé Nast violated the CCPA. Instead, Cal. Penal Code § 638.51(a) regulates the ***manner*** in which that information is collected (via a pen register). *Gabrielli*, 2025 WL 522515, at *8 ("§ 638.51 merely limits the manner in which Insider can collect Gabrielli's information."). Plaintiff's injury-related allegations all relate to the actual disclosure of the information ***and how it was used after it was disclosed***. That alleged injury, however, would occur regardless of whether Cal. Penal Code § 638.51(a) was violated.

Plaintiff has not alleged an injury arising out of Condé Nast's alleged installation of a pen register. His Complaint should be dismissed.

### (ii)    Plaintiff's Unjust Enrichment Allegations Do Not Save His Claim.

Plaintiff repeatedly alleges in the Complaint that Condé Nast "unjustly enrich[ed] [itself]…through th[e] improperly collected information." [Dkt. No. 1-1, ¶ 70; *see also id.* ¶¶ 149 ("Defendant is unjustly enriched through advertising revenue by installing the Trackers on Plaintiff's and Class Members' browsers[.]"), 170 ("Defendant is unjustly enriched through its installation and use of the Trackers[.]"), 200 ("Defendant has likewise been unjustly enriched through the Third Parties' surreptitious and unconsented-to collection of Plaintiff's data.").]

Earlier this month, the United States District Court for the Northern District of California rejected this very argument, stating that because IP addresses are "so commonly shared across the internet that [they] cannot reasonably be considered private," the plaintiff had "not shown why Defendant's use of their IP addresses was unjust." *Khamooshi*, 2025 WL 1408896, at *6. As the court explained, "[j]ust as a retailer might profit from the use of home addresses without being *unjustly* enriched," a website operator, like Condé Nast, could profit from the use of an IP address

without that profit being unjust. *Id*. (emphasis in original). This is especially true when the information at issue is "automatically sen[t]…to the website's server as part of the communication process." *Id.* at *3.

Plaintiff has failed to allege that he was injured by Condé Nast's alleged violation of the Pen-Register Statute. His Complaint should be dismissed.

### D. **The Rule of Lenity Compels This Court to Dismiss Plaintiff's Complaint.**

The rule of lenity "generally requires that 'ambiguity in a criminal statute should be resolved in favor of lenity, giving the defendant the benefit of every reasonable doubt on questions of interpretation." *People v. Reynoza*, 15 Cal. 5th 982, 1012 (Cal. 2024) (quoting *People v. Nuckles,* 56 Cal. 4th 601, 611 (Cal. 2013).) The rule of lenity is intended to ensure that before defendants are held liable under a criminal statute, they are given reasonable notice of the consequences of their actions. *United States v. Nosal*, 676 F.3d 854, 863 (9th Cir. 2012); *United States v. Simpson*, 319 F.3d 81, 86–87 (2d Cir. 2002) ("'The purposes underlying the rule of lenity [are] to promote fair notice to those subject to the criminal laws, to minimize the risk of selective or arbitrary enforcement, and to maintain the proper balance between Congress, prosecutors, and courts....'" (quoting *United States v. Kozminski*, 487 U.S. 931, 952 (1988)).)

CIPA and its Pen-Register Statute are criminal laws subject to criminal punishment. *See* Cal. Penal Code § 638.51(c) ("A violation of this section is punishable by a fine not exceeding two thousand five hundred dollars ($2,500), or by imprisonment in the county jail not exceeding one year, or by imprisonment pursuant to subdivision (h) of Section 1170, or by both that fine and imprisonment."). The rule of lenity, therefore, applies fully to the Pen-Register Statute, regardless of whether it is being enforced in a criminal or civil setting. *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 518 (1992) (applying rule of lenity in civil action because "although it is a tax statute that we construe now in a civil setting, the [statute] has criminal applications"); *Crandon v. United States*, 494 U.S. 152, 158 (1990) ("[B]ecause the governing standard is set forth in a criminal statute, it is appropriate to apply the rule of lenity in resolving any ambiguity in the ambit of the statute's coverage.").

Under the rule of lenity, where a criminal statute "is ambiguous," courts must "resolv[e]

23

the ambiguity strictly to apply only to conduct clearly covered." *United States v. Balint*, 201 F.3d 928, 934 (7th Cir. 2000).

Cases decided within just the last twelve months make clear that the Pen-Register Statute is ambiguous in a number of ways, including:

**1.      Does the Pen-Register Statute apply to all outgoing information or just to destination information of communications?** *Compare Shah*, 2024 WL 4539577, at *3 ("All that is required is that the Trackers record addressing information transmitted by the user's computer or smartphone in connection with the outgoing HTTP request to Fandom's website, regardless of whether that addressing information pertains to the sender or the recipient of the communication at issue.") *with Aviles*, 2025 WL 487196, at * (holding that, to be a pen register, the device of process must collect the outgoing addressing information from visitors' devices or browser," he "has not alleged the use of a pen register") *and Palacios v. Fandom, Inc*., No. 24STCV11264, 2024 WL 5184412, at *1 (Cal.Super. Sep. 24, 2024) (adopting tentative ruling) and Pearson Decl., Ex. A, Tentative ruling in *Palacios v. Fandom, Inc*., Case 24STCV11264 (Cal. Super. Ct. September 24, 2024) ("The Court concludes that, as alleged, the Accused Code is not a pen register because it does not collect the destination information of communications from Plaintiff's computer.").

**2.      Does the Pen-Register Statute apply to IP addresses affirmatively provided to websites?** *Compare Shah*, 2024 WL 4539577, at *6 ("To the extent that Fandom believes the statute may impose too many burdens when applied to the realities of modern technologies, and that it is too unwieldy to obtain users' consent through disclosures of the practices at issue, the question of whether the statute's scope should be narrowed ultimately rests with the Legislature, not the courts.") *with Sanchez*, 2025 WL 487194, at *3 ("[T]he legislative history of the CIPA suggests that 'pen register' and 'track and trace devices' [sic] refer to devices or processes that are used to record or decode dialing, routing, addressing, or signaling information from telephone numbers, and not internet communications such as websites") *and Licea v. Hickory Farms LLC*, No. 23STCV26148, 2024 WL 1698147, at *4 (Cal. Super. Ct. Mar. 13, 2024) ("The court also finds public policy strongly disputes Plaintiff's potential interpretation of privacy laws as one

rendering every single entity voluntarily visited by a potential plaintiff, thereby providing an IP address for purposes of connecting the website, as a violator.").

If California courts cannot even agree on whether the Pen-Register Statute prohibits use of this ubiquitous technology, how is Condé Nast expected to be on "fair notice of what is and is not criminal"? *United States v. Saathoff*, 708 F. Supp. 2d 1020, 1036 (S.D. Cal. 2010). As the United States Supreme Court stated "[i]n these circumstances, the rule of lenity, not to mention a dose of common sense, favors a strict construction." *Bittner v. United States*, 598 U.S. 85, 103 (2023); *see also United States v. Santos,* 553 U.S. 507, 514 (2008*)* ("[N]o citizen should be held accountable for a violation of a statute whose commands are uncertain[.]").

In a case involving internet browsing, another court recently applied the rule of lenity to a civilly enforced, criminal privacy statute. In late 2024, the Supreme Judicial Court of Massachusetts held in *Vita v. New England Baptist Hosp*., No. SJC-13542, 2024 WL 4558621 (Mass. Oct. 24, 2024), that because it could not conclude that "browsing and other similar website interactions of the kind [plaintiff] alleges she engaged in on the hospitals' websites are 'wire communication[s]' under the wiretap act," the rule of lenity required the court to find that they were not and to dismiss the claim. *Id.* at *15.

This Court should do the same and find that the Pen-Register Statute cannot be enforced against Condé Nast's conduct here. Plaintiff's Complaint should be dismissed.

## V.    **CONCLUSION**

For the foregoing reasons, Condé Nast respectfully requests that the Court grant its motion and dismiss, with prejudice, Plaintiff's Complaint.

Respectfully submitted,

Dated: June 9, 2025              **WOMBLE BOND DICKINSON (US) LLP**

By:    */s/ Matthew D. Pearson*
MATTHEW D. PEARSON
JACK F. ALTURA

*Attorneys for Defendant*
ADVANCE MAGAZINE PUBLISHERS, INC.
D/B/A CONDÉ NAST DIGITAL (ERRONEOUSLY
SUED AS CONDÉ NAST DIGITAL)

25