**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Emily A. Horne (State Bar No. 347723)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
          ehorne@bursor.com
          jwilner@bursor.com

**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-mail: pfraietta@bursor.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AARON DEIVAPRAKASH, individually and on behalf of all other persons similarly situated,<br><br>                              Plaintiff,<br><br>         v.<br><br>CONDE NAST DIGITAL,<br><br>                              Defendant. | Case No. 3:25-cv-04021-RFL<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT**<br><br>Date:   August 26, 2025<br>Time:  10:00 a.m.<br>Courtroom:  15<br>Judge:  Hon. Rita F. Lin |

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ...........................................................................................................................1

ARGUMENT ................................................................................................................................2

I.    THE TRACKERS ARE "PEN REGISTERS" BECAUSE THEY RECORD OR DECODE "ROUTING, ADDRESSING, OR SIGNALING INFORMATION"..................2

II.   PLAINTIFF PLAUSIBLY ALLEGES THE TRACKERS DO NOT RECORD THE CONTENTS OF THE COMMUNICATION ...........................................................5

III.  PLAINTIFF DID NOT DIRECTLY OR VOLUNTARILY DISCLOSE HIS PERSONAL INFORMATION TO THE THIRD PARTY DATA BROKERS ..................9

IV.   DEFENDANT INSTALLED AND USED THE THIRD PARTY TRACKERS ...............11

    A.    Defendant Installed The Trackers By Configuring Its Website Code To Place And Cause The Trackers To Operate On Plaintiff's Browser..................11

    B.    Defendant Used The Trackers In Conjunction With The Third Parties To De-Anonymize Plaintiff And Sell His Data Profile To Advertisers..................13

V.    PLAINTIFF HAS STATUTORY STANDING UNDER CIPA § 637.2 ..........................15

    A.    Defendant's Installation And Use Of The Trackers Injured Plaintiff .....................15

        1.    Plaintiff Has An Interest In Preventing The Uncontrolled Dissemination Of His Personal Information ..................................................15

        2.    Defendant Was Unjustly Enriched Through Its Installation And Use Of The Third Party Trackers ........................................................18

        3.    Defendant's CIPA Violation Caused Plaintiff's Injuries ...........................19

    B.    The CCPA Does Not Salvage Defendant's Argument.............................................20

    C.    Defendant's Contradictory Arguments Support Plaintiff's Standing......................21

VI.   DEFENDANT'S RULE OF LENITY ARGUMENT FAILS UNDER CALIFORNIA SUPREME COURT PRECEDENT .........................................................22

    A.    The California Supreme Court Has Rejected The Rule Of Lenity's Application To The Clear Text Of The CIPA .........................................................22

    B.    Defendant's Cited Cases Are Inapposite ...............................................................24

CONCLUSION ...........................................................................................................................25

1

## <u>TABLE OF AUTHORITIES</u>

2

**PAGE(S)**

3

**CASES**

4
*Ambriz v. Google, LLC,*
  2025 WL 8304504 (N.D. Cal. Feb. 10, 2025) ............................................................... 12

5

6
*Aviles v. LiveRamp, Inc.,*
  2025 WL 4871963 (Super. Ct. Los Angeles Cnty. Jan. 28, 2025) ................................ 14

7
*Berman v. Freedom Financial Network, LLC,*
  30 F.4th 849 (9th Cir. 2022) ......................................................................................... 12

8

9
*Britton v. County of Santa Cruz,*
  2020 WL 41976094 (N.D. Cal. July 22, 2020) ....................................................... 21, 22

10

11
*Capitol Recs. Inc. v. Thomas-Rasset,*
  2009 WL 1664468 (D. Minn. June 11, 2009) ............................................................... 10

12
*Carolus v. Nextstar Media Inc.,*
  2025 WL 13381931 (N.D. Cal. Apr. 9, 2025) ............................................................... 17

13

14
*Cody v. Ring LLC,*
  718 F. Supp. 3d 993 (N.D. Cal. 2024) .......................................................................... 13

15

16
*Collier v. SP Plus Corp.,*
  889 F.3d 8946 (7th Cir. 2018) ....................................................................................... 21

17
*Conohan v. Rad Power Bikes Inc.,*
  2025 WL 1111246 (C.D. Cal. Apr. 3, 2025) ............................................................... 1, 3

18

19
*Corbett v. Pharmacare U.S., Inc.,*
  544 F. Supp. 3d 996 (S.D. Cal. 2021) .......................................................................... 21

20

21
*Gabrielli v. Insider, Inc.,*
  2025 WL 5225155 (S.D.N.Y. Feb. 18, 2025) ............................................................... 17

22
*Gabrielli v. Motorola Mobility LLC,*
  2025 WL 1939957 (N.D. Cal. July 14, 2025) ............................................. 1, 3, 17, 20

23

24
*Greenley v. Kochava, Inc.,*
  684 F. Supp. 3d 1024 (S.D. Cal. 2023) .................................................................. passim

25

26
*Heeger v. Facebook, Inc.,*
  509 F. Supp. 3d 1182 (N.D. Cal. 2020) ........................................................................ 16

27
*Heiting v. FKA Distributing Co.,*
  2025 WL 7365943 (C.D. Cal. Feb. 3, 2025) .................................................................. 6

28

*Heiting v. FKA Distributing Co.,*
2025 WL 14306632 (C.D. Cal. May 15, 2025)...................................................... 15

*Hill v. Nat'l Collegiate Athletic Assn.,*
7 Cal. 4th 15 (1994).................................................................................................. 18

*Howard v. Lab. Corp. of Am.,*
2024 WL 42506778 (M.D.N.C. Aug, 8, 2024) ...................................................... 23

*In re Capacitors Antitrust Litig.,*
154 F. Supp. 3d 918 (N.D. Cal. 2015)...................................................................... 21

*In re Facebook Inc. Internet Tracking Litig.,*
956 F.3d 589 (9th Cir. 2020) ................................................................ 10, 15, 17

*James v. Walt Disney Co.,*
701 F. Supp. 3d 942 (N.D. Cal. 2023)...................................................................... 18

*Jones v. Ford Motor Co.,*
85 F.4th 570 (9th Cir. 2023)...................................................................................... 21

*Katz-Lacabe v. Oracle Am., Inc.,*
668 F. Supp. 3d 928 (N.D. Cal. 2023)...................................................................... 17

*Khamooshi v. Politico LLC,*
2025 WL 14088966 (N.D. Cal. May 13, 2025)......................................................... 19

*Lesh v. Cable News Network, Inc.,*
767 F. Supp. 3d 33 (S.D.N.Y. 2025) ................................................ 1, 3, 4, 16

*Licea v. Hickory Farms LLC,*
2024 WL 1698147 (Super. Ct. Los Angeles Cnty. Mar. 13, 2024)............................ 24

*Lopez v. Apple, Inc.,*
519 F. Supp. 3d 672 (N.D. Cal. 2021).......................................................................... 9

*Malibu Media, LLC v. Pontello,*
2013 WL 121807094 (E.D. Mich. Nov. 19, 2013)..................................................... 10

*Mirmalek v. Los Angeles Times Communications LLC,*
2024 WL 5102709 (N.D. Cal. Dec. 12, 2024) ................................................. passim

*Moody v. C2 Educ. Sys. Inc.,*
742 F. Supp. 3d 10726 (C.D. Cal. 2024)............................................................ 3, 6, 15

*Ocasio v. United States,*
578 U.S. 282 (2016) ................................................................................................. 23

*Palacios v. Fandom, Inc.,*
2024 WL 5184412 (Super. Ct. Los Angeles Cnty. Sep. 24, 2024) ............................ 24

*People v. Blair,*
  25 Cal. 3d 640 (1979) ................................................................................................ 24

*Price v. Carnival Corp.,*
  712 F. Supp. 3d 1347 (S.D. Cal. 2024) ................................................................. 9, 13

*Price v. Headspace, Inc.,*
  2025 WL 12379773 (Super. Ct. Los Angeles Cnty. Apr. 1, 2025) ............................ 7

*R.C. v. Sussex Publishers, LLC,*
  2025 WL 9480603 (N.D. Cal. Mar. 28, 2025) ........................................ 1, 15, 16, 17

*Ribas v. Clark,*
  38 Cal. 3d 355 (1985) .................................................................................. 10, 19, 21

*Riganian v. LiveRamp Holdings, Inc.,*
  2025 WL 2021802 (N.D. Cal. July 18, 2025) ................................................... passim

*Rodriguez v. Autotrader.com, Inc.,*
  762 F. Supp. 3d 921 (C.D. Cal. 2025) .............................................................. passim

*Roney v. Miller,*
  705 F. App'x 670 (9th Cir. 2017) .............................................................................. 25

*Sanchez v. Cars.com Inc.,*
  2025 WL 487194 (Super. Ct. Los Angeles Cnty. Jan. 27, 2025) .............................. 24

*Shah v. Fandom, Inc.,*
  754 F. Supp. 3d 924 (N.D. Cal. 2024) .............................................................. passim

*Smith v. LoanMe, Inc.,*
  11 Cal. 5th 183 (2021) .............................................................................................. 23

*Smith v. Rack Room Shoes, Inc.,*
  2025 WL 10851694 (N.D. Cal. Apr. 4, 2025) ......................................................... 6, 7

*U.S. Dep't of Just. v. Reporters Comm. For Freedom of Press,*
  489 U.S. 749 (1989) .................................................................................................. 18

*United States v. Kail,*
  612 F.2d 443 (9th Cir. 1979) ...................................................................................... 4

*United States v. Kidd,*
  394 F. Supp. 3d 357 (S.D.N.Y. 2019) ...................................................................... 16

*Vera v. O'Keefe,*
  791 F. Supp. 2d 959 (S.D. Cal. 2011) ...................................................................... 23

*Vita v. New England Baptist Hosp.,*
  494 Mass. 824 (2024) ............................................................................................... 25

*Yockey v. Salesforce, Inc.,*
  745 F. Supp. 3d 945 (N.D. Cal. 2024) ........................................................................... 9

*Zanotti v. Invention Submission Corp.,*
  2020 WL 28573047 (S.D.N.Y. June 2, 2020) ............................................................... 21

**STATUTES**

Cal. Civ. Code. § 1798 ............................................................................................... 13, 16

Cal. Pen. Code § 638 ................................................................................................. passim

Cal. Pen. Code § 630 ...................................................................................................... 24

Mass. Gen. L. c. 272, § 99(C)(1) .................................................................................... 25

**RULES**

Fed. R. Civ. P. 12(h) ...................................................................................................... 22

## INTRODUCTION

This Court has already rejected Defendant's strained interpretation of CIPA §§ 638.50-638.51. *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924 (N.D. Cal. 2024) (Lin, J.). So too has every federal court to address the scope of these provisions—including in New York.[1] *See, e.g.*, *Lesh v. Cable News Network, Inc.*, 767 F. Supp. 3d 33 (S.D.N.Y. 2025); *Gabrielli v. Motorola Mobility LLC*, 2025 WL 1939957 (N.D. Cal. July 14, 2025); *Mirmalek v. Los Angeles Times Communications LLC*, 2024 WL 5102709 (N.D. Cal. Dec. 12, 2024); *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024 (S.D. Cal. 2023); *Rodriguez v. Autotrader.com, Inc.*, 762 F. Supp. 3d 921 (C.D. Cal. 2025); *Conohan v. Rad Power Bikes Inc.*, 2025 WL 1111246 (C.D. Cal. Apr. 3, 2025); *Riganian v. LiveRamp Holdings, Inc.*, --- F. Supp. 3d ---, 2025 WL 2021802 (N.D. Cal. July 18, 2025). And while Plaintiff's allegations elaborate on the capabilities of the Third Parties[2] and the harms caused by Defendant's conduct, his allegations still map onto the elements of a CIPA § 638.51 claim per the chart distributed by the Court at the hearing on the motion to dismiss in *Shah*:

| STATUTORY LANGUAGE | APPLICATION TO FACTS |
|---|---|
| "A device or process that records or decodes" | The PubMatic, Audiencerate, and AGKN Trackers. Compl. ¶¶ 2, 32. |
| "Dialing, routing, addressing, or signaling information" | IP addresses, Device Metadata, and unique user identifiers. Compl. ¶¶ 32-34, 65, 76-77, 80, 107-109, 124-125, 127. |
| "Transmitted by an instrument or facility" | "[T]he user's computer or smartphone…" *Shah*, 754 F. Supp. 3d at 929; Compl. ¶¶ 30, 75, 107, 123, 197. |
| "From which a wire or electronic communication is transmitted" | "[T]he transmission of the HTTP request from the user's computer or smartphone to [the] [W]ebsite[s]." *Shah*, 754 F. Supp. 3d at 929; Compl. ¶¶ 30, 75, 107, 123. |

As to whether Defendant's conduct harmed Plaintiff, this Court and numerous others "have held IP address collection for targeted advertisement, creates a concrete injury-in-fact." *R.C. v. Sussex Publishers, LLC*, 2025 WL 948060, at *3 (N.D. Cal. Mar. 28, 2025) (collecting cases); *Shah*,

---

[1] Defendant claims "Plaintiff is before this Court because he believes this Court gives him a better chance of surviving a motion to dismiss than the Southern District of New York did." MTD at 3:4-5. But Plaintiff resides in this District (Compl. ¶ 8) and Defendant has not moved to dismiss for lack of personal jurisdiction. And whereas Plaintiff refiled his Complaint (with stronger allegations) in California state court, it is Defendant who removed this action to this Court and therefore, chose to be here. So clearly, Defendant is more than happy to be in this Court as well. None of this has to do with "playing the odds."

[2] All terms not defined herein shall have the same meaning as in the Complaint.

754 F. Supp. 3d at 932 (finding statutory standing where plaintiffs "allege[d] that the collection of their IP addresses through the Trackers allows the third parties to obtain personally identifying, non-anonymized information … sufficient for third parties to conduct targeted advertising") (cleaned up).

But Plaintiff's allegations also elaborate on those harms in spades. The Third Parties are not just ordinary service providers, but registered data brokers. Compl. ¶¶ 72, 103, 120. When Defendant installed the Trackers on Website users' browsers, these data brokers matched the information they collected directly from Website users (IP addresses, Device Metadata, unique identifiers) to comprehensive user profiles to de-anonymize users, including by connecting their information with profiles held by even more data brokers. *See*, *e.g.*, *id.* ¶¶ 6, 55-57, 81-99, 111-114, 128-129, 136, 146, 148-149, 174-176, 180-186, 192-193. Defendant and these Third Parties then use the Trackers to sell the profiles to advertisements through real-time bidding, where these comprehensive profiles are sold to advertisers in the blink of an eye without notice or consent, so Defendant can monetize its Websites. *See*, *e.g.*, *id.* ¶¶ 7, 12, 81, 136, 148, 150-156, 172-173, 177-178, 181-182. This conduct—which is done at Defendant's behest and for Defendant's profit—results in significant harms to Website users, including Plaintiff. *Id.* ¶¶ 143-145, 157-159. Indeed, what Defendant's installation and use of the Trackers is perpetuating is potentially "the biggest data breach ever recorded." *Id.* ¶ 159 (cleaned up). To say Defendant's conduct caused no harm, or that Defendant can insulate itself from the egregious breach of privacy its actions have caused, is unsupportable.

For the following reasons, Defendant's Motion should be denied.

## <u>ARGUMENT</u>

## I.     THE TRACKERS ARE "PEN REGISTERS" BECAUSE THEY RECORD OR DECODE "ROUTING, ADDRESSING, OR SIGNALING INFORMATION"

CIPA § 638.50(b) defines a "pen register" as a "device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." As this Court found in *Shah*, the "California Legislature[] chose[]" "expansive language" for the definition of a pen register that "[t]he Court cannot ignore," language that is "specific as to the type

of data collected," but "vague and inclusive as to the form of the collection tool (*i.e.* 'device or process')." *Shah*, 754 F. Supp. 3d at 928-29 (citing *Greenley*, 684 F. Supp. 3d at 1050).

Thus, federal courts, including this Court, have held that online trackers or tracking software such as the Trackers at issue here are "pen registers." *See*, *e.g.*, *Shah*, 754 F. Supp. 3d at 929 (agreeing with "[p]laintiffs' theory [] that the third-party Trackers operate as pen registers under the meaning of the statute because they are processes that record users' IP addressing information"); *Mirmalek*, 2024 WL 5102709, at *3 ("[U]nder the inclusive language of CIPA's definition of a pen register, Plaintiff sufficiently alleges that the Trackers are a 'device or process…'"); *Moody v. C2 Educ. Sys. Inc.*, 742 F. Supp. 3d 1072, 1076 (C.D. Cal. 2024) ("Plaintiff's allegations that the TikTok Software is embedded in the Website and collects information from visitors plausibly fall within the scope of §§ 638.50 and 638.51.") *Greenley*, 684 F. Supp. 3d at 1050 (finding software constituted a "pen register"); *Motorola Mobility*, 2025 WL 1939957, at *12 (same); *Riganian*, 2025 WL 2021802, at *11-12 (same); *Autotrader.com*, 762 F. Supp. 3d at 929 (same); *Conohan*, 2025 WL 1111246, at *6 (same); *Lesh*, 767 F. Supp. 3d at 40 (same).

Resisting this weight of authority, Defendant argues the Trackers are not pen registers because they are "a line of JavaScript embedded in the Sites' HTML code" that "can neither record nor decode anything." MTD at 7:14-15. This directly contradicts this Court's reasoning in *Shah*, where this Court found the plaintiffs "sufficiently allege[d] that the Trackers *record* addressing information, but not the content of the outgoing communication transmitted from the user's computer or smartphone to Fandom's website." *Shah*, 754 F. Supp. 3d at 928 (emphasis added). This was because "the HTTP request—the electronic communication sent to Fandom's website—transmit[ted] the IP addressing information" to the third parties operating the trackers. *Id.* Federal courts are in line with this Court's view. *See*, *e.g.*, *Mirmalek*, 2024 WL 5102709, at *4 ("Plaintiff adequately alleges that the Trackers record addressing information in the form of IP addresses."); *Greenley*, 684 F. Supp. 3d at 1050 ("[S]oftware that identifies consumers, gathers data, and correlates that data through unique 'fingerprinting'" is a pen register); *Lesh*, 767 F. Supp. 3d at 40 (same); *Moody*, 742 F. Supp. 3d at 1076 ("Plaintiff's allegations that the TikTok Software is embedded in the Website and collects information from visitors plausibly fall within the scope of §§ 638.50 and 638.51.").

The plain meaning of the statute supports the holding of this Court and others. To "record" means "to register permanently by mechanical means," to "indicate," to "read,"[3] or to "log."[4] And to "decode" means "to recognize and interpret (an electronic signal)" or "to convert … into intelligible form."[5] Plaintiff's allegations fit within these definitions. Plaintiff alleges each of the Trackers logs (and thus, "records") several pieces of "routing, signaling, or addressing" information: IP address, Device Metadata, and unique user identifiers. *See* Compl. ¶¶ 76-77, 80, 107-108, 123, 125. Indeed, Plaintiff alleges that when the Trackers are installed on users' browsers, they store a "cookie … along with a unique user ID, the user's IP address," and/or Device Metadata. *Id.* ¶¶ 77 108-109, 125. And Plaintiff alleges this information is stored and compiled by the Third Parties operating the Trackers into comprehensive user profiles. *See*, *e.g.*, *id.* ¶¶ 146-149, 167-168, 174-175, 181, 192. This too constitutes "recording."[6]

Defendant claims that to "decode" means to "translat[e] electrical impulses into" information. MTD at 8:4-5 (citing *United States v. Kail*, 612 F.2d 443, 448 (9th Cir. 1979)). Thus, Defendant argues the Trackers are not decoding any information because "Plaintiff includes in the Complaint screenshots of the information he alleges was sent from his browser directly to PubMatic, Audiencerate, and Neustar." MTD at 8:8-9. Defendant's argument is smoke and mirrors. All modern communications—whether telephonic or over the Internet—involve taking electronic or other impulses or signals and translating them into readable information. For instance, a telephone call works by converting sound waves "into electrical energy:" "[t]he electrical energy travels over wires to another phone," and the electrical energy is "converted … to sound waves again which can

---

[3] RECORD, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/record.

[4] LOG, MERRIAM-WEBSTER, https://www.merriam-webster.com/thesaurus/log.

[5] DECODE, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/decode.

[6] Defendant's argument that the Trackers must collect the information of the websites Plaintiff accessed versus the information of Plaintiff himself has already been rejected by this Court and others. *Shah*, 754 F. Supp. 3d at 929 (finding third party trackers were "pen registers" where they "record[ed] addressing information *transmitted by* the user's computer or smartphone in connection with the outgoing HTTP request to Fandom's website, regardless of whether that addressing information pertains to the sender or the recipient of the communication at issue.") (emphasis added); *see also id.* ("By the plain meaning of § 638.50(b), collection of the recipient phone number or IP address is not a required element."); *Mirmalek*, 2024 WL 5102709, at *4 (following *Shah*); *Lesh*, 767 F. Supp. 3d at 40 (same).

be heard by someone on the other end of the phone." VIRGINIA 4-H, THE SCIENCE OF TELEPHONES, https://tinyurl.com/ccsfstae.  The Internet is no different:

> Computers connect to each other and to the Internet via wires, cables … and other types of networking infrastructure. All data sent over the Internet is translated into pulses of light or electricity, also called 'bits,' and then interpreted by the receiving computer.

CLOUDFLARE, HOW DOES THE INTERNET WORK?, https://tinyurl.com/bdfhfcby.  So, the transmissions captured in the Complaint are the readable data that the Trackers have translated from electronic impulses into "routing, addressing, or signaling information," but not the "contents" of those communications.  According to Defendant therefore, the Trackers have "decoded" these impulses and are thus pen registers.

Defendant also seeks to create an artificial distinction between "the Trackers, *themselves*" and the Third Parties operating them.  *See* MTD at 7:19-20 (emphasis in original); *see also id.* at 7:25-8:1 (Plaintiff "merely alleges that the Trackers tell his browser to send his IP address, device information, and device ID to PubMatic, Audiencerate, and Neustar.").  This distinction makes no sense.  The Trackers must log and decode the information in some manner to send it to the Third Parties operating them (which Plaintiff alleges), and the Trackers are analyzing and identifying the users behind the website communications through cookie syncing with the various data brokers (which Plaintiff also alleges).  *See*, *e.g.*, Compl. ¶¶ 81-99, 111-114, 129, 146-149, 167-168, 174-175, 181-182, 192-194.  This is no different than a more traditional telephonic pen register that would log and decode various phone numbers and transmit them to the law enforcement officers operating them.  *See Shah*, 754 F. Supp. 3d at 929 ("A traditional phone pen register collects information about a phone call from Party A to Party B … The traditional pen register will then transmit the phone number and length of call to the law enforcement officer.").

## II.    PLAINTIFF PLAUSIBLY ALLEGES THE TRACKERS DO NOT RECORD THE CONTENTS OF THE COMMUNICATION

Defendant next argues that the Trackers do not constitute pen registers because "they include more than just 'dialing, routing, addressing, or signaling information.'"  MTD at 11:14-15.  As an initial matter, the definition of a "pen register" does not prohibit such devices from recording no information other than "dialing, routing, addressing, or signaling information."  Cal. Pen. Code

§ 638.50. Instead, the statute only states that a "pen register" must record any of these categories of information, "but not the contents of a communication." *Id*. In other words, a device or process can be a pen register regardless of what information it records or decodes, so long as (i) some of that information is "dialing, routing, addressing, or signaling information," and (ii) none of that information is "the contents of a communication." *Autotrader.com*, 762 F. Supp. 3d at 930 (sustaining CIPA § 638.51 claim where "Plaintiff alleges that the tracking software captured more than just her IP address. She alleges that the software also captured her operating system information, browser information, geolocation data, and email addresses…").

Here, Plaintiff alleges the Trackers recorded or decoded his "routing, addressing, or signaling information"—his IP address, Device Metadata, and unique user identifiers. *See* Compl. ¶¶ 76-77, 80, 107-108, 123, 125. None of this information divulges the substance of what Plaintiff was communicating with the Websites; it is simply used to identify the person communicating (*i.e.*, Plaintiff) and is "the characteristics of the message that is generated in the course of the communication." *Smith v. Rack Room Shoes, Inc.*, 2025 WL 1085169, at *4 (N.D. Cal. Apr. 4, 2025) (Lin, J.); *see also id.* ("[A]n email address is … generally not "content" where it is used in the "to" line to direct the email to its intended recipient. Likewise, a basic URL that directs to the homepage of a website is often found not to be content…"). By contrast, Plaintiff alleges the Trackers *did not* record the "contents" of his communications with the Websites. *See id.* ¶¶ 211, 215.

Defendant notes that the Trackers collect "Device Metadata, and/or the unique cookie IDs" and "additional information." MTD at 10:6-10. But Defendant does *not* argue this information is the "contents" of the communication. Nor can it. This information divulges, for instance, that Plaintiff is PubMatic user "0AF6314C…" and he visited the New Yorker Website on a Macintosh device, but says nothing about what articles Plaintiff reviewed or searched for. Compl. ¶ 80 (Figure 6). This is simply the "characteristics" of Plaintiff's message. *Rack Room Shoes*, 2025 WL 1085169, at *4; *see also Moody*, 742 F. Supp. 3d at 1077 ("Plaintiff's allegations that the TikTok Software gathers device and browser data plausibly fall within the scope of §§ 638.50 and 638.51."); *Heiting v. FKA Distributing Co.*, 2025 WL 736594, at *3 (C.D. Cal. Feb. 3, 2025) ("The TikTok software, which identifies users on Defendant's website by gathering their device and browser information and

geographic information, among other data, is plausibly a trap and trace device under the meaning of section 638.50(c).") (cleaned up).  Even the URLs of the homepages of the Websites without any search terms or mentions of the articles read or viewed by consumers are not "content[s]" because they are "basic URL[s] that direct[] to the homepage of a website."  *Rack Room Shoes*, 2025 WL 1085169, at *4; *see also* Compl. ¶ 80 (Figure 6).

By contrast, in *Price v. Headspace, Inc.*, 2025 WL 1237977, at *3 (Super. Ct. Los Angeles Cnty. Apr. 1, 2025), which Defendant cites to, the plaintiff alleged the tracker collected "substantive information in the communications themselves."  *See also id.* ("[T]here is no liberal construction of TikTok sending 'images' that does not amount to capturing the contents of the communication.").  The *Headspace* court contrasted those allegations with allegations that Plaintiff makes here, which show the Trackers are only getting "the 'who,' 'when,' and 'where' of communications," and which the *Headspace* court found fell within purview of CIPA § 638.51.  *Id.* ("[T]rap and trace devices by definition are tools which provide information about the who, when, and where of communications— but not the what.") (cleaned up).

Defendant also argues that "each of the [] Figures included in Plaintiff's Complaint, do not include IP addresses."  MTD at 11:11-12.  This is false.  Figures 12-13 and 15, which reflect transmissions from Plaintiff's computer to the Audiencerate and AGKN Trackers, plainly show each of those Trackers recording Plaintiff's IP address (albeit, the IP address is partially redacted to protect his privacy).  Compl. ¶¶ 108-109, 127.  And while Figure 6—which reflects a transmission from Plaintiff's computer to the PubMatic Tracker—does not picture the IP address, Plaintiff alleges that, per PubMatic's own admissions, its Tracker "automatically collects" "Browser and Device Information, such as the IP address you use to connect to an online service."  Compl. ¶ 76.  In any event, the other information recorded by the PubMatic Tracker—Plaintiff's Device Metadata and unique KADUSERCOOKIE that is used to identify him—also constitutes "routing, addressing, and signaling information."  *Id.* ¶ 102.

Finally, Defendant argues that because the IP addresses, Device Metadata, and unique user identifiers were sent within an electronic communication packet, they cannot be "routing, addressing,

or signaling information." *See* MTD at 11:12-15 ("[T]he Figures are not just the envelopes … They are the letters…"). The Court rejected an analogous argument in *Shah*:

> Fandom argues that the IP addresses are the contents of the communication, since the IP addresses are transmitted through or within the cookie … But … the electronic communication at issue is the transmission of the HTTP request from the user's computer or smartphone to Fandom's website. The Trackers are not alleged to collect the contents of that HTTP request, only the user's IP address. *Whether the Trackers later send the user's IP address to the third party inside a cookie, or through some other transmission method, is immaterial.*
>
> The analogy to a traditional pen register is instructive. A traditional phone pen register collects information about a phone call from Party A to Party B … but does not collect the contents of what was said (which would be a wiretap). The traditional pen register will then transmit the phone number and length of call to the law enforcement officer. *The phone number and length of call may be the contents of what is sent to the law enforcement officer, but that does not take the pen register outside Section 638.50(b), because the relevant contents of the electronic communication at issue is what was said on the phone call.* Likewise, here, the contents referenced by Section 638.50(b) are the users' HTTP requests to load Fandom's website, *not the Tracker's transmission of the users' IP addresses to the third party.*

*Shah*, 754 F. Supp. 3d at 929 (emphasis added). The import of the Court's holding was clear. Ultimately, to be a pen register, the "routing, addressing, or signaling information" must be sent in some electronic communication "transmitted by an instrument." Cal. Pen. Code § 638.50(b). But the fact that information is sent in a transmission does not magically render it the "contents" of a communication. Instead, the relevant communication is "the users' HTTP requests to load [Defendant's] [W]ebsite[s], not the Tracker's transmission of the users' IP addresses [and other identifying information] to the [T]hird [P]art[ies]." *Shah*, 754 F. Supp. 3d at 929.

To put all this simply, Plaintiff alleges the Trackers capture information about who he is, where he was, and the devices he was using to communicate (*i.e.*, his "routing, addressing, or signaling information"), but *not* the substance of what he was communicating to the Websites (*i.e.*, the "contents"). It is "immaterial" that this information was sent as an electronic transmission to the Third Parties. *Shah*, 754 F. Supp. 3d at 929. On the contrary, the statute requires it. Cal. Pen. Code § 638.50(b). Thus, the Trackers capture the information necessary to make them "pen registers," without capturing information that excludes them from the statutory definition.

### III.    PLAINTIFF DID NOT DIRECTLY OR VOLUNTARILY DISCLOSE HIS PERSONAL INFORMATION TO THE THIRD PARTY DATA BROKERS

Defendant argues that because the Third Parties operating the Trackers "instruct a user's browser to send an entirely separate transmission to a third party" rather than "intercept[ing] a user's transmission to the website operator," "[t]he transmission from Plaintiff to the Third Parties was addressed to … those Third Parties' web servers."  MTD at 11:21-23, 12:15-16 (cleaned up).  To wit, Defendant claims "[t]hat is not a violation of the Pen-Register Act" because Plaintiff's electronic communications were sent "directly to the Third Parties operating the Trackers."  *Id.* at 12:18-19.

Not so.  For instance, in *Yockey v. Salesforce, Inc.*, 745 F. Supp. 3d 945, 952 (N.D. Cal. 2024), the defendant argued that it did not intercept communications because it was "the intended destination server of the communications."  Judge Tigar rejected this argument, find that "while the information was routed through Salesforce's server, the 'intended recipients' were [the website operators]."  *Id.* at 953; *see also id.* at 952 n.5 ("Salesforce was not the *intended recipient*, even if its server was the only server involved in receiving the messages.") (emphasis in original).  So too here. Even if Plaintiff's communications were routed to the Third Parties, that does not mean Plaintiff was directly or intentionally communicating with the Third Parties.  Instead, the intended recipient of Plaintiff's communications were the Websites alone, *not* the Third Party data brokers whose Trackers were installed on his browser without his knowledge or consent.  *See also Lopez v. Apple, Inc.*, 519 F. Supp. 3d 672, 683 (N.D. Cal. 2021) (rejecting argument that Apple was "the intended recipient of the communications" because "Plaintiffs allege that they did not intend Apple to receive their private communications, but that Apple 'captured' such communications using [] software"); *Autotrader.com, Inc.*, 762 F. Supp. 3d at 930 (rejecting argument that "any reasonably informed visitor would understand that by visiting the Website … she was giving her IP address, and therefore implicitly consented to its collection" because the plaintiff alleged her "information was sent to third parties, not just Defendant"); *Price v. Carnival Corp.*, 712 F. Supp. 3d 1347, 1355-56 (S.D. Cal. 2024) (rejecting argument that "Plaintiffs' very act of sending a communication over the Internet to Carnival constituted express consent to Carnival's surveillance scheme" because the plaintiff alleged "simultaneous interception by a third party") (cleaned up).

In fact, the premise of Defendant's argument—that a user consents to the disclosure of their information to third parties because their browser sends a separate transmission to the third parties—has been rejected by the Ninth Circuit. *See In re Facebook Inc. Internet Tracking Litig.*, 956 F.3d 589, 596, 608 (9th Cir. 2020) ("[S]imultaneous, unknown duplication and communication of GET requests do not exempt a defendant from liability under the party exception."). On the contrary, the Ninth Circuit has held that "[p]ermitting an entity to engage in the unauthorized duplication and forwarding of unknowing users' information would render permissible the most common methods of intrusion." *Id.*; *Ribas v. Clark*, 38 Cal. 3d 355, 360-61 (1985) ("[A] substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.").

Defendant's cited authorities were already distinguished in *Shah*. Those cases dealt with the collection of IP addresses by *website operators*, and thus, the "users were directly communicating with the party alleged to be operating the pen register and voluntarily sent that party their IP address." *Shah*, 754 F. Supp. 3d at 932 n.3 (distinguishing *Capitol Recs. Inc. v. Thomas-Rasset*, 2009 WL 1664468 (D. Minn. June 11, 2009), and *Malibu Media, LLC v. Pontello*, 2013 WL 12180709, at *4 (E.D. Mich. Nov. 19, 2013)). In contrast here (as in *Shah*), Plaintiff's personal information was recorded and decoded by *Third Parties* with whom Plaintiff did not know he was communicating with, nor did he intend to communicate with.

In sum, it would be one thing if Plaintiff was aware of the Third Parties' presence on the Websites and the extensive data surveillance network that they help facilitate (he was not). But any communication with the Third Parties cannot possibly be voluntary where Defendant installed the Third Parties' Trackers *without* Plaintiff's knowledge or consent, and those Trackers *compelled* Plaintiff's browser to communicate Plaintiff's personal information to the Third Parties. *See*, *e.g.*, Compl. ¶¶ 71, 170, 199, 216. Compelled communications with undisclosed third parties cannot possibly be voluntary. *See also Shah*, 754 F. Supp. 3d at 932 ("Perhaps Plaintiffs should expect to reveal their IP addresses to the gamespot.com website, and possibly even to third parties who provide the advertisements that load when Plaintiffs visit that website. But that does not necessarily mean

that Plaintiffs should reasonably expect to have Trackers installed that send their IP addresses to third parties every time Plaintiffs visit gamespot.com.").[7]

## IV. DEFENDANT INSTALLED AND USED THE THIRD PARTY TRACKERS

### A. Defendant Installed The Trackers By Configuring Its Website Code To Place And Cause The Trackers To Operate On Plaintiff's Browser

Defendant argues that it did not "install" the Trackers because "[t]he Trackers are pieces of code embedded in the website's HTML code that, when read by the user's browser, instruct the user's browser to take certain actions." MTD at 14:25-27. The distinction Defendant seeks to create is one without import. As an initial matter, Cal. Pen. Code § 638.51(a) does not specify where a "pen register" must be installed, only that it is, in fact, "installed." Defendant admits the definition of "install" means "to set up for use or service," such as "install[ing] software."[8] Defendant does not dispute that it "embedded" the Trackers in its Websites' code—that is, that Defendant set up and configured the Trackers for use. MTD at 14:26; *see also* Compl. ¶¶ 64-65, 75, 107, 123. And as Defendant admits, once Defendant set up the Trackers on its Websites, the Trackers "instruct[ed]" Plaintiff's browser to send Plaintiff's personal information to the Third Parties. MTD at 14:27; Compl. ¶¶ 76-77, 80, 107-108, 123, 125. So, Defendant configured and set up the Tracker's code on its Websites, that code was loaded onto and placed on Plaintiff's browser, and that code surreptitiously compelled Plaintiff's browser to send Plaintiff's information to the Third Parties and others. It is unclear how this does not suffice for installation

Defendant also argues "[t]here is a big difference between Condé Nast installing the Trackers on Plaintiff's browser and the Sites' HTML code instructing Plaintiff's browser to do so." MTD at 15:11-12. There is not. As this Court has held, "it is alleged [Defendant] was responsible for integrating the third-party script into its own website." *Shah*, 754 F. Supp. 3d at 932; *see also*, *e.g.*, *Mirmalek*, 2024 WL 5102709, at *5 ("Plaintiff asserts that Defendant's alleged CIPA violation

---

[7] To be clear, the allegations here are not different in this sense than those at issue in *Shah*. *Shah*, 754 F. Supp. 3d at 926. Like here, the plaintiffs in *Shah* alleged "when a user visits that website, their browser sends an HTTP request to Fandom's server. In response, Fandom's server sends an HTTP response back to the user's browser with instructions … [for] the Trackers to be installed on the user's browser. … Once the Trackers are installed on the user's browser, they instruct the user's browser to send the user's IP address to the third party." *Id.*

[8] INSTALL, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/install.

---

injured her by causing Plaintiff's IP address to be disclosed to unconsented-to third parties…")
(cleaned up).  That means that all the conduct alleged in the Complaint—the de-anonymization of
Plaintiff and the matching of his information to profiles maintained by data brokers, the real-time
sale of his information to advertisers, and each of the harms that caused—stemmed from *Defendant's
conduct*.  And, to be clear, these actions were done to financially benefit Defendant, who was able
to monetize its Websites by having its users de-anonymized so their data could be sold for greater
profit to advertisers.  *See*, *e.g.*, Compl. ¶¶ 171-195.  Defendant's attempt "to draw an artificial
distinction between itself and" its Websites is not persuasive.  *Ambriz v. Google, LLC*, 2025 WL
830450, at *4 (N.D. Cal. Feb. 10, 2025).  When Defendant's Website installed the Trackers on
Plaintiff's browser—as a result of Defendant's contracting with these Third Parties and programming
of its Websites' code—that is the same as Defendant installing the Trackers.  *See id.* ("When
GCCCAI 'learns' the content of the call, that is the same as Google 'learning' it.").

   Defendant also argues that "Plaintiff and his browser were not required to comply with the
instructions" to install the Trackers because Plaintiff could have either "activat[ed] a Global Privacy
Control signal … or by opting out of sales/shares on" the Websites.  MTD at 15:13-16 (cleaned up).
This is like arguing that a person consents to battery because they did not take self-defense classes
and learn how to dodge the attack.

   The CIPA "reflects the Legislature's judgment that an individual's consent is required before
others may track certain addressing information in their electronic communications for non-law
enforcement purposes." *Shah*, 754 F. Supp. 3d at 933.  Thus, the onus is on Defendant to secure the
consent of users like Plaintiff to install the Trackers; it is not Plaintiff's burden to opt-out at a later
date.  *See Berman v. Freedom Financial Network, LLC*, 30 F.4th 849, 857 (9th Cir. 2022) ("[T]he
onus must be on website owners to put users on notice of the terms to which they wish to bind
consumers.") (cleaned up).  This is especially so where, as here, Defendant installed the Trackers
*without Plaintiff's knowledge or consent*.  Compl. ¶¶ 71, 170, 199, 216.  Expecting users to opt out
of or avoid tracking they do not know is occurring—especially at the scale it occurs at on Defendant's
Websites—improperly flips the burden.

Relatedly, although Defendant cites to its privacy policies, it provides no argument that Plaintiff was on notice of or assented to these privacy policies. Like any other contract, a website operator must show that "a "reasonably prudent user would be on inquiry notice of the terms of" the privacy policy. *Carnival Corp.*, 712 F. Supp. 3d at 1359 (cleaned up). "[M]erely having a privacy policy online" is insufficient. *Cody v. Ring LLC*, 718 F. Supp. 3d 993, 1000 (N.D. Cal. 2024). Thus, claiming Plaintiff had some right somewhere in a privacy policy he was not on notice of fails.

Defendant's "Global Privacy Control signal" argument also fails. Again, it is *Defendant's burden* to secure consent under the CIPA, not Plaintiff's burden to opt-out. *Shah*, 754 F. Supp. 3d at 933. And saying that website users consent to tracking that they are unaware of unless they fidget with browser settings or download a browser extension that they may also be unaware of is a bridge too far. But as Plaintiff alleges, even were he to clear his cookies, the Third Parties would still be capable of tracking and identifying him through the "XID" that Defendant sets on users' browsers. Compl. ¶¶ 95-98. So, notwithstanding Defendant's argument raises factual questions and are not of legal relevance, it is dubious if opting out of tracking evens work here.

Last, Defendant claims it gave users the right to opt out of tracking under the CCPA. MTD at 16:14-15. Whether or not this is true or was done in a CCPA-compliant matter is irrelevant to the CIPA. Cal. Civ. Code. § 1798.175 provides that "in the event of a conflict between other laws and the provisions of this title, the provisions of the law that afford the greatest protection for the right of privacy for consumers shall control." To the extent the CIPA requires opt-in consent while the CCPA requires opt-out consent, then "by Defendant's own argument, CIPA should control." *Mirmalek*, 2024 WL 5102709, at *5.

**B.    Defendant Used The Trackers In Conjunction With The Third Parties To De-Anonymize Plaintiff And Sell His Data Profile To Advertisers**

As for "use," Defendant argues that "a website that records the IP address of a device that has visited it is not unlawfully using a pen register; it is merely operating a website." MTD at 13:17-19. Defendant's argument misses the mark. Again, Plaintiff's claim is about the collection of his personal information—not just his IP address—by the *Third Parties*. *See* Argument § III, *supra*.

1    To be sure, Plaintiff alleges Defendant used the Trackers to monetize its Websites, as the

2   Trackers matched Plaintiff's personal information to comprehensive profiles held by data brokers

3   that were then sold to advertisers on the Websites. *See, e.g.*, Compl. ¶¶ 3, 70, 149, 168-170, 179,

4   187, 194, 197-198. But the claim is not based on Defendant's direct collection of Plaintiff's personal

5   information. Rather, Defendant is enabling the Third Parties to simultaneously and surreptitiously

6   collect the "keys" to Plaintiff's identity, and then allowing the Third Parties to sell Plaintiff's identity

7   for Defendant's financial gain.

8    Defendant cites *Aviles v. LiveRamp, Inc.*, 2025 WL 487196, at *3 (Super. Ct. Los Angeles

9   Cnty. Jan. 28, 2025). But *Aviles* only held the software at issue did not constitute a "pen register"

10  because it did not collect "incoming contact information to Plaintiff's device." *Id.*, at *3. This Court

11  and others have already rejected *Aviles'* interpretation of the statute. *Shah*, 754 F. Supp. 3d at 929

12  ("All that is required is that the Trackers record addressing information transmitted by the user's

13  computer or smartphone … to Fandom's website, regardless of whether that addressing information

14  pertains to the sender or the recipient of the communication at issue."). Thus, *Aviles* is of no import.

15   Defendant also argues that Plaintiff's interpretation of the CIPA (which this Court and

16  numerous others have agreed with) "would even include the Court's own website." MTD at 13:25.

17  Defendant's capture of transmissions on an unrelated website raises factual issues that are not subject

18  to judicial notice, and Defendant has not submitted one in any event. Moreover, Defendant has not

19  submitted a declaration stating who pulled this information, how it was acquired, and when.

20   Even if the Court were to take judicial notice of this argument (and it should not), it is unclear

21  what conclusion would be authorized. The Court's website is not a statute or a decision by a court

22  of law.

23   More important, there are no facts to suggest that the technology on the Court's website is

24  like the Trackers here. For instance, there are no advertisements on the Court's website, or facts

25  suggesting consumers are linked to profiles held by data sold. But to the extent that Google is using

26  the information it collects from website visitors in the same way as the Trackers here, that is

27  something that should concern the Court as it did for then-Judge Koh. *See Brown v. Google LLC*,

28  Case No. 4:20-cv-3664, ECF No. 104 at 48:24-49:1 (N.D. Cal. Feb. 26, 2021) ("I have the website

up, and I'm deeply disturbed that you would say that the Court's website is selling stuff for third parties."); *id.* at 50:5-11 ("You're not just providing the service that the Court has contracted. You're saying, in addition, give me a copy beyond what you're doing, providing this service to the Court, we want to know and keep track of every user who is accessing the Court's website. I don't see how that is important for Google to provide the service to the Court."); *id.* at 51:19-22 ("I'm disturbed then if you're saying that you're getting that duplicate and collecting that duplicate information of users' browsing history from everyone accessing the Court's website.").

## V.     PLAINTIFF HAS STATUTORY STANDING UNDER CIPA § 637.2

### A.     Defendant's Installation And Use Of The Trackers Injured Plaintiff

#### 1.     *Plaintiff Has An Interest In Preventing The Uncontrolled Dissemination Of His Personal Information*

"In determining statutory standing under CIPA, courts have held IP address collection for targeted advertisement, creates a concrete injury-in-fact." *R.C.*, 2025 WL 948060, at *3 (collecting cases); *see also*, *e.g.*, *Shah*, 754 F. Supp. 3d at 932 ("Plaintiffs plausibly allege that the collection of their IP addresses through the Trackers allows the third parties to obtain personally identifying, non-anonymized information, and that the IP addresses reveal geographical location and other personal information sufficient for third parties to conduct targeted advertising.") (cleaned up); *Mirmalek*, 2024 WL 5102709, at *4 (same). The same is true of device information and other user identifiers. *See*, *e.g.*, *Moody*, 742 F. Supp. 3d at 1077-1078 (finding statutory standing based on collection of "browser and device data" by third party tracker); *Heiting v. FKA Distributing Co.*, 2025 WL 1430663, at *2 (C.D. Cal. May 15, 2025) (same based on collection of "device and browser information, geographic information, referral tracking, and URL tracking" by third party tracker) (cleaned up).

Against this weight of authority, Defendant argues "[i]nternet users, like Plaintiff, have no reasonable expectation of privacy in the public IP address they are using while browsing the internet." MTD at 18:14-15. This is a red herring. As an initial matter, the CIPA protects individuals against the loss of an "individual's control of information concerning his or her person." *In re Facebook*, 956 F.3d at 598 (cleaned up). And "[i]dentifiers such as a … unique personal identifier, online identifier, [and] Internet Protocol address" are "personal information" because they "identif[y]

… or could reasonably be linked, directly or indirectly, with a particular consumer or household." Cal. Civ. Code § 1798.140(v)(1)(A); *see also* Compl. ¶¶ 55-57, 146-148 (alleging the Third Parties, as data brokers, link consumers' IP addresses and Device Metadata to their identities and profiles).

Defendant's cited authorities analyzed privacy under the Fourth Amendment and are unpersuasive for this reason. MTD at 18:14-23. "[C]ases regarding the limits of the Fourth Amendment have no bearing on whether an individual has standing to sue under CIPA, as CIPA provides protection beyond the floor set by the Fourth Amendment." *Lesh*, 767 F. Supp. 3d at 39[9]; *Greenley*, 684 F. Supp. 3d at 1051 ("The fact that law enforcement can install a warrantless pen register without offending the Fourth Amendment is immaterial."); *R.C.*, 2025 WL 948060, at *3 (noting that *Kidd*, which Defendant cites, "disclaimed the categorical approach" to IP addresses in the Fourth Amendment context). Moreover, in *Heeger v. Facebook, Inc.*, 509 F. Supp. 3d 1182, 1188 (N.D. Cal. 2020), the plaintiff "allege[d] only that Facebook collected plaintiffs' IP addresses and even then, *only when they were using the Facebook app or were visiting Facebook's website*." (Emphasis added). In other words, *Heeger* involved a situation where the disclosures were made by one party to the communication to another. *Id*. By contrast, Plaintiff here alleges "that the collection of their IP addresses through the Trackers allows the *third parties* to obtain 'personally identifying, non-anonymized information.'" *Shah*, 754 F. Supp. 3d at 932.

But Defendant's argument also misses the forest through the trees. The harm is not just that the Third Parties collected Plaintiff's personal information without consent. The harm is that through the information the Third Parties collect, website users are identified by being linked to comprehensive, non-anonymous profiles maintained by data brokers; that such linkage occurs by bypassing the normal "restriction that sites can't read each other[s'] cookies"; and that those profiles are offered up for sale to a near endless supply of advertisers. Compl. ¶¶ 55-57, 81-99, 108-114, 127-129, 136, 142-149, 155, 157-160, 162, 167, 168-170, 174-175, 178-179, 181-182, 185, 192-194. Defendant caused this conduct by installing and using the Trackers on its Websites. That widespread

---

[9] Judge Victor Marrero, who decided *Lesh* and found statutory standing under the CIPA, was also the same judge who decided *United States v. Kidd*, 394 F. Supp. 3d 357, 366 (S.D.N.Y. 2019), which Defendant cites for the proposition that people have no "reasonable expectation of privacy in the IP address" in the context of the Fourth Amendment.

1    dissemination and sale of Plaintiff's profile and information causes harm.  *See, e.g.*, *Riganian*, 2025

2    WL 2021802, at *6 ("[T]he tracking of individuals' activity across thousands of websites, combined

3    with extensive offline records gathered over decades, to generate uniquely identifying profiles on

4    those individuals is sufficient to allege intrusion into privacy."); *Motorola Mobility*, 2025 WL

5    1939957, at *6 ("Gabrielli's allegations that Motorola deprived him control of personal information

6    regarding his digital activity and profile are sufficient to establish a concrete injury to his right to

7    privacy and confer standing."); *Katz-Lacabe v. Oracle Am., Inc.*, 668 F. Supp. 3d 928, 940 (N.D.

8    Cal. 2023) (finding Article III standing based on "Oracle's ability to amass vast amounts of personal

9    data for the purpose of identifying individuals and aggregating their many identifiers") (cleaned up);

10   *In re Facebook*, 956 F.3d at 604 n.7 ("[I]ndividuals maintain the expectation that entities will not be

11   able to collect such broad swaths of personal information absent consent.").

12       To the extent some of Defendant's authorities concluded otherwise (in the context of Article

13   III, which Defendant has conceded), a number of those authorities based their decisions on a lack of

14   allegations regarding the ability of the third parties to link browsing information to comprehensive

15   profiles sold to advertisers, unlike here.  *See, e.g.*, *Carolus v. Nextstar Media Inc.*, 2025 WL 1338193,

16   at *1 (N.D. Cal. Apr. 9, 2025) (distinguishing cases where, like here, "a privacy injury involved

17   disclosure of several types of personal information all linked together, not just IP addresses");

18   *Gabrielli v. Insider, Inc.*, 2025 WL 522515, at *5 (S.D.N.Y. Feb. 18, 2025) (basing conclusion on

19   the premise that "an IP address [alone] cannot identify an individual user and at most conveys general

20   geographic information," without allegations regarding linkage to profiles similar to those here).

21   And to the extent Defendant argues that these identifiers cannot identify website users, that is a

22   factual question not ripe for resolution at this stage.  *See R.C.*, 2025 WL 948060, at *3.[10]

23       Last, Defendant argues that "even if Plaintiff could be identified from the information

24   collected," he still must allege the disclosure "resulted in embarrassment or indignity."  MTD at

25   20:10-16 (cleaned up).  CIPA requires no such thing.  The CIPA protects an individual's right to

26

27   ───────────────────────
     [10] Defendant does argue that the Trackers collect "pseudonymous" information.  MTD at 18:16.  But
28   given the Trackers' ability to match the information with profiles "associated with an individual,"
     "any anonymity functionally" is "meaningless."  *Riganian*, 2025 WL 2021802, at *7.

control the dissemination of their personal information; the intrusion need not be "highly offensive" or lead specifically to embarrassment. *See James v. Walt Disney Co.*, 701 F. Supp. 3d 942, 949 (N.D. Cal. 2023). The case Defendant cites for its argument, *Hill v. Nat'l Collegiate Athletic Assn.*, 7 Cal. 4th 1, 15 (1994), dealt with a claim for an invasion of privacy under the California Constitution, *not* the CIPA.  And "[t]he question of the statutory meaning of privacy under the [CIPA] is … not the same as the question whether a tort action might lie for invasion of privacy or the question whether an individual's interest in privacy is protected by the [California] Constitution." *U.S. Dep't of Just. v. Reporters Comm. For Freedom of Press*, 489 U.S. 749, 763 (1989).

### 2.    *Defendant Was Unjustly Enriched Through Its Installation And Use Of The Third Party Trackers*

As another ground for statutory standing, Plaintiff alleges that Defendant derived an unlawful economic benefit through its installation and use of the Trackers.  Specifically, Plaintiff alleges that by installing and using the Trackers, Plaintiff's information was collected by the Third Parties without consent; the Trackers de-anonymized Plaintiff, which enabled his information to be sold to advertisers for a higher value than it otherwise would have been; and that Defendant derived a profit from these unlawful sales. *See*, *e.g.*, Compl. ¶ 168 ("[T]he Third Parties enrich the value Defendant's users would otherwise command by tying the data they obtain directly from users on the Websites (e.g., IP addresses, Device Metadata, unique IDs) with comprehensive user profiles."); *id.* ¶¶ 12, 136, 148-149, 155-156, 198.  This also suffices for injury.  *See*, *e.g.*, *Greenley*, 684 F. Supp. 3d at 1038 (Article III standing alleged where "Plaintiff … conferred a benefit on Defendant through the use and dissemination of Plaintiff's … personal information … which Defendant used and disseminated for its own monetary benefit.") (cleaned up); *Riganian*, 2025 WL 2021802, at *13 (sustaining unjust enrichment claim where "the FAC contains detailed factual allegations as to how LiveRamp has violated Plaintiffs' privacy rights to create a 'surveillance ecosystem' at the heart of its revenue generation without their consent").

Defendant claims that "just as a retailer might profit from the use of home addresses without being unjustly enriched, a website operator, like Condé Nast, could profit from the use of an IP address without that profit being unjust."  MTD at 22:27-28:1 (internal quotations and brackets

omitted) (citing *Khamooshi v. Politico LLC*, 2025 WL 1408896, at *6 (N.D. Cal. May 13, 2025)). The problem with this argument is that Defendant enabled the *Third Parties* to collect Plaintiff's IP address without consent (not just Defendant itself), and that his IP address was linked to a profile, which is something Defendant could not have done without the use of the Trackers.  That is a far different set of circumstances, and one at the heart of the CIPA (the "substantial distinction … between the secondhand repetition of the contents of a conversation and its simultaneous dissemination to an unannounced second auditor"). *Ribas*, 38 Cal. 3d at 360.  In *Khamooshi*, the court found there was no "unjust" disclosure of IP address, but did not consider (i) the disclosure of other information and its linkage to a profile of more comprehensive information, and (ii) that the violation the CIPA made the disclosure "unjust."  Further, courts have respectfully disagreed with *Khamooshi*'s conclusion that "*Facebook Internet Tracking*'s holding relied on the 'sensitive' and 'personal' nature of the information at issue." *Khamooshi*, 2025 WL 1408896, at *5.  Instead, the harm can be based on either the disclosure of "specific, sensitive information" or that the third party "acquired an enormous amount of individualized data" as a result of Defendant's conduct. *Riganian*, 2025 WL 2021802, at *6.  Plaintiff's allegations fall in the latter category, as Defendant's installation of the Trackers caused "the comprehensive aggregation of data that reveals a person's internet activity with specificity." *Id.*

### 3. Defendant's CIPA Violation Caused Plaintiff's Injuries

Defendant argues that "to the extent Plaintiff was injured (he was not), his injury was not caused by Condé Nast.  Any alleged injury was caused by information these Third Parties had amassed on him separate and apart from anything Condé Nast did." MTD at 21:19-21.  Not so.  Part of the reason the Third Parties can amass such comprehensive profiles is that their Trackers are installed by website operators like Defendant.  Compl. ¶¶ 146, 148.  Further, rather than having these profiles sit in storage, the Third Parties disclose and sell those profiles to advertisers because Defendant installs of their Trackers on its Websites. *See*, *e.g.*, *id.* ¶¶ 148-150, 155, 168.  The Third Parties share this information with one another and other data brokers because Defendant install each Trackers and others on its Websites, enabling the Third Parties to cookie sync with each other. *See*, *e.g.*, *id.* ¶¶ 107, 111-114, 128-129.  The Third Parties are contracted by Defendant to do this because

it enables Defendant to monetize its Websites. *See, e.g.*, *id.* ¶¶ 72, 74, 103, 106, 122, 173, 193. And because of Defendant's installation and use of the Trackers, Plaintiff and Class Members were unable to browse the Websites anonymously, and without having their information sold without consent. Defendant enabled and profited off of the system that injured Plaintiff. Defendant cannot now detach itself or bury its head in the sand. Thus, Plaintiff's injures were caused by to Defendant's conduct.

### B.    The CCPA Does Not Salvage Defendant's Argument

Last, Defendant argues that "Plaintiff's injury-related allegations all relate to the actual disclosure of the information and how it was used after it was disclosed." MTD at 22:11-12 (cleaned up). To wit, Defendant contends "[t]he CCPA regulates such activity, and Plaintiff does not claim Condé Nast violated the CCPA." MTD at 22:7-8. Whether Defendant violated the CCPA is irrelevant. If Defendant's acts are permissible under the CCPA but illegal under the CIPA (which they are), then "by Defendant's own argument, CIPA should control." *Mirmalek*, 2024 WL 5102709, at *5 (citing Cal. Civ. Code § 1798.175).

Defendant's argument that CIPA § 638.51 is only about the "manner" of collection and not about the disclosure or use is betrayed by the text of the statute. Cal. Pen. Code § 638.51(a) ("a person may not install or use a pen register…"); *see Motorola Mobility*, 2025 WL 1939957, at *6 (finding "[s]tatutes such as CIPA thus codify a substantive right to privacy" without distinguishing between subsections) (cleaned up). Regardless, Defendant is wrong that Plaintiff's injury "would occur regardless of whether Cal. Penal Code § 638.51(a) was violated." MTD at 22:12-13. Plaintiff's harm is not just that his information was disclosed to the Third Party data brokers or sold to advertisers, but that it was done *without notice and prior consent*. *Shah*, 754 F. Supp. 3d at 933 ("Th[e] statute reflects the Legislature's judgment that an individual's consent is required before others may track certain addressing information in their electronic communications for non-law enforcement purposes."). "[S]uch secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements." *Ribas*, 38 Cal. 3d at 361. Thus, the amassment of information by data brokers and its sale through real-time bidding is harmful. But part and parcel of Plaintiff's harm is that Defendant's acts foist Plaintiff into this surveillance economy without Plaintiff's knowledge or

1    consent.  Defendant's violation of the CIPA thus deprived Plaintiff of the right to control the

2    dissemination of his personal information, and that is not something the CCPA regulates.

3        **C.    Defendant's Contradictory Arguments Support Plaintiff's Standing**

4        As an aside, Defendant takes contradictory positions in its Motion.  On the one hand,

5    Defendant argues that "Article III standing and statutory standing are distinct legal analyses." MTD

6    at 16 n.14 (cleaned up).  This is the position courts have taken as well.  *In re Capacitors Antitrust*

7    *Litig.*, 154 F. Supp. 3d 918, 925 (N.D. Cal. 2015) ("Article III standing is different from, and not to

8    be measured by, statutory standing."); *Corbett v. Pharmacare U.S., Inc.*, 544 F. Supp. 3d 996, 1005

9    (S.D. Cal. 2021) ("Article III standing and statutory standing are distinct legal analyses.").  But under

10   Defendant's own reasoning, Defendant's removal is fatal.  But elsewhere in its Motion, Defendant

11   argues that "statutory standing under CIPA is similar, if not identical, to standing under Article III."

12   MTD at 17:17-18.  Notwithstanding Defendant is wrong, Defendant's concessions as to Article III

13   standing also support Plaintiff's statutory standing.

14       As both then-Judge Koh and the Ninth Circuit have noted, when a defendant removes a case

15   from state court to federal court, the defendant "must establish subject matter jurisdiction, including

16   Article III standing."  *See Britton v. County of Santa Cruz*, 2020 WL 4197609, at *4 (N.D. Cal. July

17   22, 2020) (Koh, J.); *see also Jones v. Ford Motor Co.*, 85 F.4th 570, 573 (9th Cir. 2023) ("Upon

18   removal, the burden to demonstrate Article III jurisdiction shifts to the Defendant as the party

19   invoking federal jurisdiction.") (cleaned up); *Collier v. SP Plus Corp.*, 889 F.3d 894, 896 (7th Cir.

20   2018) ("As the party invoking federal jurisdiction, SP Plus had to establish that all elements of

21   jurisdiction—including Article III standing—existed at the time of removal.").  A defendant cannot

22   just "rely on CAFA to justify the [C]ourt's continued exercise of jurisdiction over the claims against

23   them."  *Zanotti v. Invention Submission Corp.*, 2020 WL 2857304, at *7 (S.D.N.Y. June 2, 2020).

24       To be clear, Plaintiff maintains he has Article III standing per many of the above authorities.

25   *See* Argument §§ V.A.1-3, *supra*.  And by removing this case to this Court (ECF No. 1), Defendant

26   implicitly conceded that Plaintiff's Article III standing as well.  *Britton*, 2020 WL 4197609, at *3.

27   This concession is even more apparent given Defendant previously challenged Plaintiff's Article III

28   standing but has not done so here given Plaintiff's new allegations.  *See* MTD at 3.  If Defendant did

not have a good-faith basis to believe there was Article III standing, then it had no basis to remove this action. Thus, by Defendant's own logic, suffering an injury-in-fact sufficient for Article III standing means Plaintiff has statutory standing as well under the CIPA.

To be clear, this does not put Defendant in a catch-22. Defendant could have challenged statutory standing in state court and avoided the Article III question altogether. Defendant could also have removed based on Plaintiff's allegations and waited to challenge Plaintiff's standing later if the facts do not bear out Plaintiff's allegations. *See* Fed. R. Civ. P. 12(h)(2)-(h)(3) (noting a defense for failure to state a claim can be raised at time through trial, and defense for lack of subject matter jurisdiction cannot be waived). Or, Defendant simply admit the holdings of numerous courts—that Article III standing and statutory standing are separate—are correct.

Instead, Defendant has twisted itself into a pretzel of its own making. It challenged Plaintiff's Article III standing the first time around. When Plaintiff refiled his action in state court with far stronger allegations of harm, Defendant removed the case to this Court, thereby conceding Article III standing. And, of course, Plaintiff believes Article III standing exists as well. And Defendant has argued that "statutory standing under CIPA is similar, if not identical, to standing under Article III." MTD at 17:17-18. In fact, Defendant's counsel has firmly made this point elsewhere, arguing that "[p]roof of injury under the CIPA should require the same factual showing as proof of 'injury-in-fact' under Article III" and that "application of the two standards [is] similar, if not identical." Matthew Pearson, *2 Recent Federal Decisions Affecting State CIPA Cases*, Law360 (Mar. 27, 2025), https://tinyurl.com/yjxkfw6n. Thus, by Defendant's own reasoning, because both Parties agree Plaintiff has alleged Article III standing to sue, Plaintiff has statutory standing to sue under the CIPA.

## VI.    DEFENDANT'S RULE OF LENITY ARGUMENT FAILS UNDER CALIFORNIA SUPREME COURT PRECEDENT

### A.    The California Supreme Court Has Rejected The Rule Of Lenity's Application To The Clear Text Of The CIPA

Defendant argues that because "cases decided within just the last twelve months make clear that the Pen-Register Statute is ambiguous," the Court should dismiss based on the rule of lenity. MTD at 24. But the rule of lenity only applies "when two reasonable interpretations of the same provision stand in relative equipoise," not "every time there are two or more reasonable

interpretations of a penal statute." *Smith v. LoanMe, Inc.*, 11 Cal. 5th 183, 202 (2021) (cleaned up); *see also Ocasio v. United States*, 578 U.S. 282, 295 n.8 (2016) (noting the rule of lenity only applies "when a criminal statute contains a grievous ambiguity or uncertainty") (cleaned up).  For this reason, the California Supreme Court has rejected the rule of lenity's application to disputed provisions of the CIPA.  *See LoanMe*, 11 Cal. 5th at 202 (declining to apply rule of lenity to CIPA § 632.7).  Indeed, courts and this District and others have overwhelming rejected the rule of lenity's application to disputed provisions of the CIPA—including CIPA §§ 638.50-638.51.  *See*, *e.g.*, *Riganian*, 2025 WL 2021802, at *12 ("LiveRamp has argued for a certain interpretation of Section 638.50(b), but it has not established that any 'grievous ambiguity' in the statute's express language."); *Vera v. O'Keefe*, 791 F. Supp. 2d 959, 965 (S.D. Cal. 2011) (rejecting application of rule of lenity to CIPA § 632); *Howard v. Lab. Corp. of Am.*, 2024 WL 4250677, at *8 (M.D.N.C. Aug, 8, 2024), *report and recommendation adopted*, 2024 WL 4326898 (M.D.N.C. Sept. 27, 2024) (rejecting application of rule of lenity to CIPA § 631).

There is no "grievous ambiguity" in Cal. Pen. Code §§ 638.50-638.51.  *See Riganian*, 2025 WL 2021802, at *12.  On the contrary, the "text is clear." *Shah*, 754 F. Supp. 3d at 929.  The statute may be broad, but that does not give the Court leeway to set aside "the California Legislature's chosen definition."  *Id.* (quoting *Greenley*, 684 F. Supp. 3d at 1050).  That definition should be accorded the most "significance" and end the debate.  *LoanMe*, 11 Cal. 5th at 202.  Further, the statute was drafted broadly because the CIPA was intended to protect Californians from "the invasion of privacy resulting from" "advances in science and technology [that] have led to the development of new devices and techniques for the purpose of eavesdropping … [that] has created a serious threat … and cannot be tolerated in a free and civilized society."  Cal. Pen. Code § 630.  Based on "the California Supreme Court's pronouncements regarding the broad legislative intent underlying CIPA to protect privacy, and the California courts' approach to updating obsolete statutes in light of emerging technologies," "courts have repeatedly held that [] provisions of CIPA are not limited to the traditional versions of the tools at issue." *Shah*, 754 F. Supp. 3d at 930-31 (cleaned up); *see also id.* (noting "the California Supreme Court has instructed courts to interpret CIPA in the manner that fulfills the legislative purpose of CIPA by giving greater protection to privacy interests").

1

**B.      Defendant's Cited Cases Are Inapposite**

2          Defendant cites to several California state court decisions, but none of those actually analyzed

3    the text of the CIPA, and thus, cannot weigh on whether the plain text is ambiguous.  For instance,

4    Defendant cites to *Palacios v. Fandom, Inc.*, 2024 WL 5184412 (Super. Ct. Los Angeles Cnty. Sep.

5    24, 2024), to argue the text is ambiguous as to whether a "pen register" applies "to all outgoing

6    information."  MTD at 24:5-17.  This Court already distinguished *Palacios* as ignoring the plain text

7    of the statute and improperly skipping to (limited) legislative history.  *See Shah*, 754 F. Supp. 3d at

8    930 (noting *Palacios* "relied upon legislative materials from the June 2015 Senate Amendments to

9    CIPA," which did not "state an intent to add a statutory requirement limiting pen registers to those

10   traditional forms").  Defendant's citation to *Aviles* suffered from a similar flaw: it cited to a decision

11   predating CIPA § 638.50's enactment, let alone the invention of the Internet, rather than first

12   analyzing the plain text of the statute.  *Id.*, at *2 ("Historically, courts recognized that a pen register

13   is a mechanical device which records the numbers dialed from a telephone.") (citing *People v. Blair*,

14   25 Cal. 3d 640, 654 (1979) (internal quotations and brackets omitted).  And *Aviles* ignored the edicts

15   of the California Supreme Court to "update[e] obsolete statutes in light of emerging technologies."

16   *Shah*, 754 F. Supp. 3d 930-31 (cleaned up).

17          Similarly, Defendant cites two state court decisions to claim the CIPA is ambiguous as to

18   whether a pen register applies to technology that collects "IP addresses affirmatively provided to

19   *websites*."  MTD at 24:18-19 (emphasis added) (citing *Licea v. Hickory Farms LLC*, 2024 WL

20   1698147 (Super. Ct. Los Angeles Cnty. Mar. 13, 2024); *Sanchez v. Cars.com Inc.*, 2025 WL 487194

21   (Super. Ct. Los Angeles Cnty. Jan. 27, 2025)).[11]  But as this Court has pointed out, "[a] user who

22   consents to disclose their IP address to [a website operator] as part of accessing its website does not

23   necessarily consent to disclose their IP address to the *third parties* operating the Trackers."  *Shah*,

24   754 F. Supp. 3d at 932 (emphasis added); *see also id.* at 930 n.2 (distinguishing cases "involv[ing]

25   situations where users were directly communicating with the [website operator] alleged to be

26

27   _____

     [11] Judge Tigar also distinguished *Sanchez* for the same reasons as this Court distinguished *Palacios*:
28   it "focused its analysis on the legislative history of the CIPA rather than on the expansive, plain
     language of Section 638.50."  *Riganian*, 2025 WL 2021802, at *12.

operating the pen register and voluntarily sent that party their IP address"). So, if anything, a clear line has been drawn. When a plaintiff alleges his or her addressing information was collected directly by a *website operator* who was operating a pen register, courts have dismissed those claims because the information was voluntarily provided to the website. By contrast, in cases like here where Plaintiff alleges his addressing information was collected by *Third Parties* operating the Trackers, federal courts have sustained those claims. *Shah*, 754 F. Supp. 3d at 932; *see also Autotrader.com*, 762 F. Supp. 3d at 930 (sustaining CIPA § 638.51 claim where the plaintiff alleged her "information was sent to third parties, not just Defendant").

Finally, Defendant's reliance on *Vita v. New England Baptist Hosp.*, 494 Mass. 824, 243 N.E.3d 1185 (2024) is also misplaced, as it analyzed Massachusetts' wiretapping act. And Massachusetts' wiretapping act prohibits only the interception of "wire or oral communication[s]," rather than also regulating electronic communications. Mass. Gen. L. c. 272, § 99(C)(1). Thus, the plain text of the Massachusetts statute made clear it did not apply to "browsing a website." *Vita*, 494 Mass. at 839. By contrast, CIPA § 638.50—and numerous other provisions of the CIPA—regulate the collection of "wire *or* electronic communication[s]." CIPA § 638.50(b) (emphasis added). That gives CIPA a broader reach than the Massachusetts law.

**CONCLUSION**

For the foregoing reasons, the Court should deny Defendant's Motion. If the Court grants the Motion in any respect, Plaintiff respectfully requests leave to amend. *See Roney v. Miller*, 705 F. App'x 670, 671 (9th Cir. 2017).

Dated: July 22, 2025                    Respectfully submitted,

                                        **BURSOR & FISHER, P.A**.

                                        By: */s/ Emily A. Horne*
                                              Emily A. Horne

                                        L. Timothy Fisher (State Bar No. 191626)
                                        Emily A. Horne (State Bar No. 347723)
                                        Joshua R. Wilner (State Bar No. 353949)
                                        1990 North California Blvd., 9th Floor
                                        Walnut Creek, CA 94596
                                        Telephone: (925) 300-4455
                                        Facsimile:  (925) 407-2700

E-mail: ltfisher@bursor.com
  ehorne@bursor.com
  jwilner@bursor.com

**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-mail: pfraietta@bursor.com

*Attorneys for Plaintiff*