Matthew D. Pearson (SBN 294302)
Matthew.Pearson@wbd-us.com
Jack F. Altura (SBN 297314)
Jack.Altura@wbd-us.com
WOMBLE BOND DICKINSON (US) LLP
400 Spectrum Center Drive, Suite 1700
Irvine, California 92618
Telephone: (714) 557-3800
Facsimile: (714) 557-3347

*Attorneys for Defendant*
ADVANCE MAGAZINE PUBLISHERS, INC. D/B/A CONDÉ NAST DIGITAL (ERRONEOUSLY SUED AS CONDÉ NAST DIGITAL)

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| AARON DEIVAPRAKASH, individually and on behalf of all other persons similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CONDÉ NAST DIGITAL,<br><br>Defendant. | Case No.: 3:25-cv-04021-RFL<br><br>*The Honorable Rita F. Lin presiding*<br><br>**REPLY IN SUPPORT OF MOTION TO DISMISS**<br><br>**DATE:** August 26, 2025<br>**TIME:** 10:00 a.m.<br>**COURTROOM:** 15<br><br>Action Filed: March 7, 2025 |

## I. INTRODUCTION

Condé Nast's Motion asks the Court to answer three questions. **First**, does the JavaScript running on Condé Nast's Websites[1] meet the definition of a pen register under CIPA? **Second**, if the JavaScript does meet the definition of a pen register, is CIPA sufficiently clear to inform website operators that using JavaScript for third-party advertising violates a criminal law? And **third**, if the JavaScript is a pen register and CIPA provides clear notice, was Plaintiff injured by the alleged CIPA violation?

Neither the Ninth Circuit nor the California Court of Appeals has addressed these questions. And while district courts have issued opinions in similar cases, those courts did so under different circumstances and in response to different arguments.

Each of the questions requires a different analysis. The first question—whether the JavaScript running on Condé Nast's websites is a pen register—depends on the type of information collected and how it was collected; how the information was used thereafter is irrelevant[2]. The second question asks whether CIPA adequately notified website operators, like Condé Nast, what conduct was unlawful. The third question—whether Plaintiff was injured by the alleged CIPA violation—depends on how the information was used post-collection. The Court need only answer one of these questions in Condé Nast's favor to grant the Motion. It should, however, answer all of them in Condé Nast's favor.

Pen registers are devices or processes that record or decode dialing, routing, addressing, or signaling information ("DRAS Information") transmitted by an instrument or facility from which a wire or electronic communication is transmitted without collecting the contents of a communication. That is not what the JavaScript did here.

JavaScript is a set of instructions provided to and complied with (or not complied with) by a user's browser. Here, the JavaScript instructed Plaintiff's browser to send stand-alone messages directly to Pubmatic, Audiencerate, and Neustar ("Third Parties") that included a unique cookie

---

[1] www.newyorker.com and www.wired.com [Dkt. No. 1-1, ¶ 1.]
[2] For this reason, Plaintiff's statement about similar trackers on the Court's website is irrelevant. Regardless of whether information collected on the Court's website is "linked to [user] profiles," [Dkt. No. 21, 14:23-25], under Plaintiff's argument, the use of the JavaScript would be, in and of itself, a violation of CIPA.

ID for Plaintiff's device, and the type of browser and device being used. The JavaScript did not record or decode anything. It merely asked Plaintiff's browser to send certain information to certain third parties.

Moreover, the messages Plaintiff's browser sent to the Third Parties were separate transmissions, distinct from and not dependent on the Plaintiff-initiated, original Plaintiff-to-Condé Nast transmission. Indeed, both the DRAS Information and the content of the Plaintiff-to-Third Parties transmissions differed from what Plaintiff provided to Condé Nast. For example, Plaintiff alleges that the Third Parties collected cookie values from him via the JavaScript, but Plaintiff admits that the cookie was not stored on his browser until *after* he contacted Condé Nast.

In essence, the process Plaintiff complains of looked as follows:

1.  Plaintiff sent a GET request[3] to Condé Nast asking for the Websites' HTML code;[4]
2.  Condé Nast responded to Plaintiff, provided a copy of the Websites' HTML code,[5] and requested that Plaintiff send another message directly to the Third Parties;[6] and
3.  Plaintiff complied with the request and sent a message directly to the Third Parties,[7] which included information not available at the time of his GET request.[8]

Condé Nast's request to Plaintiff did not "record or decode" anything. Plaintiff's response was separate and apart from Plaintiff's initial message to Condé Nast. And some of the information Plaintiff provided to the Third Parties could not have been included in Plaintiff's initial request to Condé Nast. Accordingly, the JavaScript at issue is not a pen register.

But even if the JavaScript could qualify as a pen register under CIPA, the fact that other courts have reached such divergent conclusions about the same technology at issue requires lenity. Indeed, interpreting CIPA's pen register definition to encompass the JavaScript would be fundamentally unfair. Website operators, like Condé Nast, would be subject to criminal liability without having received "fair warning" that their conduct may run afoul of the law, and this Court,

---

[3] GET requests are requests for data from a specific source, like Conde Nast's web servers. [Dkt. No. 1-1, ¶ 30.]
[4] *Id.*
[5] *Id.* at ¶ 31.
[6] *Id.* at ¶ 32.
[7] *Id.*
[8] *Id.* at ¶ 33.

not "the legislature," would be the entity "defin[ing] crimes and fix[ing] punishments," *Whitman v. United States*, 135 S. Ct. 352, 354 (2014). That is not how the law works.

Finally, even if the Court were to answer the first two questions in Plaintiff's favor, dismissal of the Complaint is appropriate because Condé Nast's conduct did not injure Plaintiff. Plaintiff claims he suffered two categories of "injury": (1) "the loss of control of information concerning his…person" and (2) Condé Nast's unjust enrichment. Plaintiff does not identify any instances in which the information he sent to the Third Parties was used to his detriment. Nor does Plaintiff claim that any information he sent to the Third Parties was inherently sensitive. He merely claims that the Third Parties obtaining his information and the resultant "loss of control" over his information injured him. That "loss of control" is not an injury the law recognizes.

Plaintiff has also failed to establish, and cannot establish, that any money made by Condé Nast was unjust. Plaintiff voluntarily visited the Websites to, presumably, consume content available without a paid subscription. Condé Nast sold ad space on the web pages Plaintiff viewed. That the information Plaintiff provided to the Third Parties may have also been used for advertising on the website does not indicate that payment received by Condé Nast was unjust. As several courts have found, using information voluntarily provided for advertising purposes is "routine commercial behavior," nothing more.

Ultimately, to survive this Motion, Plaintiff must prevail on each of the above-three questions. He should prevail on none. As a set of instructions, JavaScript is not a pen register. Enforcing CIPA to punish websites for running JavaScript would violate the rule of lenity. And beyond all that, Plaintiff has not been injured by anything Condé Nast did. The Motion should be granted, and Plaintiff's claims should be dismissed in full and with prejudice.

## II. THERE IS NO PEN REGISTER.

Despite its other ambiguities, CIPA is clear that, to be a pen register, a device or process must "record or decode." Cal. Penal Code § 638.50(b). Plaintiff argues that his information was "recorded," which he defines as "'to register permanently by mechanical means,' to 'indicate,' to 'read,' or to 'log'," [Dkt. No. 21, 4:1-2], on three separate occasions: (1) when the JavaScript "logged" his "IP address, Device Metadata, and unique user identifier[]", (2) when the JavaScript

"store[d] a 'cookie'" on his device and (2) when the "Third Parties operating the Trackers" "stored and compiled this information…into comprehensive user profiles," [*Id.* at 4:4-11]. Plaintiff further asserts that the JavaScript "decoded" his information—that is, "recogniz[ed] and interpret[ed] (an electronic signal)" or "convert[ed] … into intelligible form," [Dkt. No. 21, 4:2-4]—because "[a]ll modern communications—whether telephonic or over the Internet—involve taking electronic or other impulses or signals and translating them into readable information," [Dkt. No. 21, 4:16-18]. Plaintiff's claims are without merit.

Plaintiff's arguments highlight the importance of distinguishing between the JavaScript, or, per Plaintiff, the "Trackers," and the Third Parties who operate it.[9] This is because legal entities, like the Third Parties, cannot be pen registers. Only "devices or processes" can be. Thus, despite Plaintiff claiming that the "Third Parties who operate the Trackers" record his information when they "store and compile [it]…into comprehensive user profiles," that "recording" (or any alleged "decoding" by the Third Parties) is irrelevant to this motion. The only "recording" or "decoding" that matters would be "recording or decoding" done by the JavaScript, and the JavaScript cannot record or decode anything.

JavaScript is simply a snippet of computer code embedded in a website's HTML code. It doesn't "register," "indicate," "read," or "log." It provides instructions that can be, but need not be, followed by an internet browser. Here, the JavaScript instructed Plaintiff's browser to open a separate line of communication with the Third Parties, and from that separate line of communication, the Third Parties obtained the information about which Plaintiff now complains (i.e., the IP address he was using at the time, a unique cookie ID, and his browser and device type). The JavaScript did not register, read, or log this information; as a set of instructions, it can't.

Similarly, the JavaScript does not "decode" anything because it never receives anything to decode. The JavaScript's job begins and ends with providing instructions. If the user ignores the instructions—effectuated either through his browser settings, a Global Privacy Control signal, or the Websites' opt-out mechanism—the JavaScript does nothing. It provides instructions; what Plaintiff does with those instructions is his own decision.

---

[9] Nevertheless, Plaintiff argues that the distinction "makes no sense." [Dkt. No. 21, 5:10-14]

Beyond that, Plaintiff's argument that the JavaScript must have decoded *something* because "[a]ll modern communications…involve taking electronic…signals and translating them into readable information" is a red herring. First, it's Plaintiff's browser that "decodes" the JavaScript code, not the other way around. Second, the JavaScript is not a party to the Plaintiff-to-Third Parties transmissions. And third, notwithstanding both those points, Plaintiff's argument would make every internet-connected device a pen register. That is not and cannot be the law.

### A.     No DRAS Information Was Unlawfully Collected.

IP addresses can be DRAS Information. For example, in Figure 6 of the Complaint, Plaintiff's IP address is DRAS Information because it is not included in the content of the transmission (i.e., what is shown in the figure). It is used solely for transmission purposes (i.e., the "from" address). But simply because an IP address *can* be DRAS Information does not mean that it always is. [Dkt. No. 11, p. 9.] Figure 12 of the Complaint is a good example. Like Figure 6, in Figure 12, Plaintiff's IP address was transmitted to Audiencerate as the "from" address; that is, as DRAS Information. But unlike Figure 6, the *content* of the message in Figure 12 also includes Plaintiff's IP address (as indicated by the redaction). It is included in the "unique cookie value" that did not exist at the time Plaintiff sent his GET request to Condé Nast. [Dkt. No. 1-1, ¶¶ 31-33.]

Plaintiff tries to avoid this fact by claiming that the "content" of the communication was his transmissions to Condé Nast, and the information obtained by the Third Parties "says nothing about what articles Plaintiff reviewed or searched for" on the Websites. [Dkt. No. 21, 6:19-23.] In making this argument, though, Plaintiff conflates the two transmissions—to Condé Nast and to the Third Parties. Had the Third Parties only obtained the "to" (the websites' IP addresses) and "from" (Plaintiff's IP address) from the Plaintiff-to-Condé Nast transmission, his claim that no content was collected might withstand scrutiny. But that is not what happened here.

The distinction lies in the difference between DRAS Information and "identifying information." DRAS Information includes the parameters of a communication, like the originating source (Plaintiff's IP address), the receiving source (the Websites' IP addresses), and the duration. It does not identify *who* is communicating. "Identifying information" goes far beyond DRAS

Information. According to Plaintiff, "identifying information," which Plaintiff claims the Third Parties collected, can be used "to deanonymize Plaintiff and Class Members." [Dkt. No. 16, ¶ 70.] No amount of DRAS Information could ever do that. With just DRAS Information, the Third Parties would, at most, know the to and from IP addresses, and the time of the transmission.

In *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924 (N.D. Cal. 2024), a CIPA pen-register class action, this Court denied a motion to dismiss because the "Trackers are not alleged to collect the contents of th[e] HTTP request" from the plaintiff to the website, but, instead, "**only the user's IP address**" and "[w]hether the Trackers later send the ***user's IP address*** to the third party inside a cookie, or through some other transmission method, is immaterial." *Id.* at 929 (emphasis added). But that is not what Plaintiff here is alleging. [Dkt. No. 21, 13:25-26 ("Plaintiff's claim is about the collection of his personal information—***not just his IP address***—by the Third Parties." (emphasis added).] Nor were the *Shah* defendant's argument the same as Condé Nast's.

Unlike in *Shah*, Plaintiff here is not alleging that the Third Parties collected just the "to" and "from" addresses of his initial GET request to Condé Nast. He openly admits that the Third Parties obtain far more information (i.e., "public IP addresses, Device Metadata, and other information of Website visitors" [Dkt. No. 1-1, ¶ 70]). And Condé Nast does not argue that **how** the information is conveyed (i.e., through a cookie or otherwise) is determinative. Instead, Condé Nast argues that the alleged "Trackers" are not pen registers because the information provided to the Third Parties is not the DRAS Information for Plaintiff's communication to Condé Nast; indeed, it is information that could definitively ***not*** have been included in Plaintiff's GET request. [Dkt. No. 1-1, ¶¶ 31-33.] This Court's example in *Shah* provides the perfect distinction:

> A traditional phone pen register collects information about a phone call from Party A to Party B—such as the phone number called and length of the call—but does not collect the contents of what was said…. The traditional pen register will then transmit the phone number and length of call to the law enforcement officer. The phone number and length of call may be the "contents" of what is sent to the law enforcement officer, but that does not take the pen register outside Section 638.50(b), because the relevant "contents" of the "electronic communication" at issue is what was said on the phone call.

*Shah*, 754 F. Supp. 3d at 929. Unlike the "traditional pen register," the "Trackers" here do not send

information to the Third Parties; Plaintiff's browser does. Unlike the "traditional pen register," the information collected here is not derived from the "phone call from Party A to Party B" (i.e., Plaintiff's GET request to the Websites); it is its own set of information. And unlike the "traditional pen register," Plaintiff, himself, controls whether to send this information to the Third Parties.

Through his own allegations, Plaintiff pleads himself out of court. If he alleges that the Third Parties collected more than DRAS Information, he has failed to allege the use of a pen register. If he alleges that the Third Parties only collected DRAS Information, he has suffered no injury. Either way, his claim fails. Plaintiff's Complaint should be dismissed.

### III. ENFORCING CIPA ON WEBSITES VIOLATES THE RULE OF LENITY.

The Supreme Court has identified the rule of lenity's purposes: (1) ensuring that "fair warning…[is] given to the world…of what the law intends to do if a certain line is passed" and (2) making certain that "legislatures and not courts…define criminal activity." *United States v. Bass*, 404 U.S. 336, 348 (1971). Application of the rule of lenity depends on the statute's clarity. When the statute requires that "a choice…be made between two readings of what conduct [the legislature] has made a crime, it is appropriate…to require that Congress…[speak] in language that is clear and definite" because courts "should not derive criminal outlawry from some ambiguous implication." *United States v. Universal C. I. T. Credit Corp*., 344 U.S. 218, 221–22 (1952).

As it relates to the use of JavaScript, CIPA's pen-register statute is neither clear nor definite. The statute's ambiguity arises from its requirements for a court order to install a pen register. Cal. Penal Code §§ 638.52-638.54. Those provisions specifically reference, and only reference, telephonic communications. For example, "[a]n order issued pursuant to subdivision (b) ***shall*** specify all of the following: (1) The identity, if known, of the person to whom is leased or in whose name is listed ***the telephone line to which the pen register or trap and trace device is to be attached***[;]…(3) The ***number and, if known, physical location of the telephone line to which the pen register or trap and trace device is to be attached*** [.]" Cal. Penal Code § 638.52(d) (emphasis added). And, upon the issuance of an order, a "provider of a wire or electronic communication service…shall immediately install the device ***on the appropriate line***." *Id.* (emphasis added).

7
REPLY IN SUPPORT OF MOTION TO DISMISS

If, as this Court previously stated, its "task is to interpret the law as the Legislature wrote it," *Shah*, 754 F. Supp. 3d at 932–33, then, under a plain reading of the statute, there are only two viable interpretations. Either it outlaws using an internet-based pen register because the information required for an authorizing order could never be provided, or the definition of a pen register is limited to a "device or process" attached to a "telephone line." The former interpretation exposes website operators, like Condé Nast, to liability. The latter does not. The ambiguity of CIPA's pen-register statute, therefore, leaves it to this Court to "define criminal activity," which is exactly what the rule of lenity seeks to avoid. *Bass*, 404 U.S. at 348.

Only one court has refused to apply the rule of lenity to CIPA's pen-register statute. *See Riganian v. LiveRamp Holdings, Inc.*, No. 25-CV-00824-JST, 2025 WL 2021802 (N.D. Cal. July 18, 2025). The *Riganian* court reached this conclusion because that defendant had "not established [] any 'grievous ambiguity' in the statute's express language." *Id.* at *12. But the same cannot be said here. CIPA makes it unlawful to "install or use a pen register…without first obtaining a court order pursuant to Section 638.52 or 638.53," Cal. Penal Code § 638.51(a), and Sections 638.52 and 638.53 only allow for an order authorizing the installation or use of a pen register on a telephone line, *see id.* at §§ 638.52, 638.53. Further exacerbating this "grievous ambiguity," the California legislature noted in the statute that because "law enforcement agencies have a legitimate need to employ modern listening devices and techniques in the investigation of criminal conduct and the apprehension of lawbreakers," it did not intend "to place greater restraints on…law enforcement agencies than existed prior to the effective date of this chapter." *Id*. at § 630.

Ultimately, "[w]here the traditional tools of statutory interpretation yield no clear answer, the judge's next step isn't to legislative history or the law's unexpressed purposes. ***The next step is to lenity***." *Wooden v. United States*, 595 U.S. 360, 395 (2022) (Gorusch, C.J., concurring) (emphasis added). Lenity is the only option here. Plaintiff's Complaint should be dismissed.

### IV.     PLAINTIFF WAS NOT INJURED BY A VIOLATION OF CIPA.

Plaintiff does not allege that Condé Nast was legally prohibited from sharing his "IP address, Device Metadata, and unique user identifier" with the Third Parties. The California Consumer Privacy Act ("CCPA") regulates that kind of disclosure, and Plaintiff does not claim

| | |
|---|---|
| 1 | that Condé Nast violated the CCPA. Nor does Plaintiff allege that the Third Parties' use of his "IP address, Device Metadata, and unique user identifier" to create "comprehensive user profiles" was unlawful. Again, the CCPA regulates that type of conduct, and Plaintiff does not allege that the Third Parties violated the CCPA. |

Plaintiff's complaint rests on **how** the Third Parties obtained the information. In fact, the pen-register statute has been held to be procedural, codifying no substantive rights. *Gabrielli v. Insider, Inc.*, No. 24-CV-01566 (ER), 2025 WL 522515, at *8 (S.D.N.Y. Feb. 18, 2025) ("§ 638.51 merely limits the manner in which [defendant] can collect [plaintiff's] information" and "does not codify the right for [plaintiff] to control his information").

The question, therefore, is: was Plaintiff injured because the Third Parties learned that he visited the Websites through the "Trackers" (alleged to be unlawful) instead of merely obtaining the information directly from Condé Nast (permitted under the CCPA)? The answer to this question is clearly no. To hold otherwise would be to impermissibly ignore CIPA's requirement that, before bringing suit, a person must be "injured by a violation." Cal. Penal Code § 637.2(a). *Tulelake Irrigation Dist. v. United States Fish & Wildlife Serv.*, 40 F.4th 930, 936 (9th Cir. 2022) ("'[C]ourts should 'avoid any statutory interpretation that renders any section superfluous.'").

Any disagreements among courts on this point arise from differences in the scope of the collection. Last month, the Northern District of California refused to dismiss a CIPA pen-register claim brought against a technology provider like the Third Parties. *Riganian*, 2025 WL 2021802. In analyzing whether the Plaintiff's privacy had been invaded, the court emphasized the breadth of the collection at issue, finding "that the tracking of individuals' activity ***across thousands of websites***, combined with extensive offline records gathered over decades, to generate uniquely identifying profiles on those individuals is sufficient to allege intrusion into privacy." *Id.* at *6 (emphasis added). In fact, the court noted how the defendant's "comprehensive aggregation of data…reveals a person's internet activity with specificity such that the…[user] profiles allow others to determine an individual's personal interests, searches, and habits…." *Id.*

That is a far cry from what Plaintiff alleges here. Plaintiff claims that by embedding the JavaScript in the Websites' HTML code, Condé Nast allowed the Third Parties to determine that

he visited *the Websites*, nothing more. This is not a situation in which Condé Nast could "accumulate[e]…a 'vast repository of personal data'…from compiling Plaintiffs' browsing activity, online communications, and offline activity[.]" *Katz-Lacabe v. Oracle Am., Inc.*, 668 F. Supp. 3d 928, 942 (N.D. Cal. 2023). Rather, Condé Nast was merely engaging in the "'routine commercial behavior' of collecting contact information for sending advertisements." *Id.*

As a last-ditch effort, Plaintiff argues that he has statutory standing because Condé Nast was unjustly enriched through its conduct. But Condé Nast's "enrichment" only results in injury to Plaintiff if it was unjust, and nothing he has alleged suggests that it was. Admittedly, courts have found that technology providers, like LiveRamp and the Third Parties, may be unjustly enriched by their collection and sale practices. But, again, Condé Nast is not a technology provider; it only collects information from people with whom it directly interacts such as when they voluntarily visit the Websites. Therefore, unlike the technology providers that "violate[]…privacy rights to create a 'surveillance ecosystem'… without…consent," *Riganian*, 2025 WL 2021802, at *13, Condé Nast merely utilized voluntarily provided information to sell ad space on its ***own*** Websites in lieu of charging Plaintiff for the content he received.

## V.     CONCLUSION

Condé Nast generates and makes available to anyone with an internet connection interesting news and content. Condé Nast opts to make some of this content available without payment, leveraging instead advertisers' desire to reach these users. To accomplish this, Condé Nast instructs Website visitors to send to the Third Parties information that is freely provided to Condé Nast and does so in compliance with the CCPA. Nevertheless, Condé Nast now faces a class action alleging it violated a criminal statute enacted before the advent of the internet that carries crippling liability. To make matters worse, nothing in CIPA's language suggests, let alone says, that Condé Nast's way of doing business is unlawful. At bottom, Plaintiff tries to stretch CIPA beyond the bounds of reason to punish Condé Nast for what is widely considered "routine commercial behavior." The Court should not allow him to do so. Plaintiff's Complaint should be dismissed in full and with prejudice.

/ / /

Respectfully submitted,

Dated: August 5, 2025  **WOMBLE BOND DICKINSON (US) LLP**

By: */s/ Matthew D. Pearson*
MATTHEW D. PEARSON
JACK F. ALTURA

*Attorneys for Defendant*
ADVANCE MAGAZINE PUBLISHERS, INC.
D/B/A CONDÉ NAST DIGITAL (ERRONEOUSLY SUED AS CONDÉ NAST DIGITAL)

11
REPLY IN SUPPORT OF MOTION TO DISMISS